IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BENJAMIN WHITESIDES, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>E*TRADE SECURITIES, LLC, et al.,<br><br>    Defendants. | Case No. 20-cv-05803-JSC<br><br>**ORDER RE: MOTION TO DISMISS AND TO STRIKE** |

Three users of E*TRADE's electronic trading service bring suit alleging that E*TRADE failed to process their orders as the crude oil futures market collapsed on April 20, 2020. E*TRADE's motion to dismiss and to strike is now pending before the Court.[1] (Dkt. No. 17.) Having carefully considered the parties' briefs and having had the benefit of oral argument on February 25, 2021, the Court GRANTS the motion to dismiss with leave to amend. The economic loss rule bars Plaintiffs' claims and Plaintiffs have not sufficiently pleaded the existence of a "special relationship". The motion to strike is DENIED as moot.

I.     **BACKGROUND**

    A.     **Complaint Allegations**

E*TRADE is one of the largest online focused broker-dealers in the world. (First Amended Complaint ("FAC") Dkt. No. 16 ¶ 18.) Customers of E*TRADE's platform trade securities through a web-based application or by calling E*TRADE's help center. (*Id.* ¶ 1.) E*TRADE's platform allows retail investors to trade oil futures contracts. (*Id.* ¶ 2.) A futures contract is effectively a promise to deliver a commodity at a certain time. (*Id.* ¶ 3.) The buyer of

---

[1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. Section 636(c). (Dkt. Nos. 6 and 9.)

a futures contract takes on the obligation to buy and receive the underlying asset when the contract expires. (*Id.* ¶ 21.) The seller of a futures contract takes on the obligation to deliver the underlying asset at expiration. (*Id.*) However, nearly all retail investors trade commodity futures contracts without any expectation of receiving or delivering the underlying asset. (*Id.* ¶ 22.) These investors close out their positions prior to the expiration of the contract. (*Id.*)  E*TRADE also allows customers to trade oil futures that are settled with cash instead of oil. (*Id.*)  These futures are known as "e-mini futures." (*Id.*)  Upon expiration, the value of "e-mini futures" converge with the value of regular oil futures. (*Id.*)  The benchmark for oil futures is the contract on West Texas Intermediate ("WTI") crude oil delivered to Cushing, Oklahoma. (*Id.* ¶ 20).

In early 2020, the global coronavirus pandemic caused a precipitous decline in demand for oil. (*Id.* ¶ 23.)  In addition, on March 8, 2020, Russia and Saudi Arabia announced increases in oil production and Saudi Arabia announced price discounts. (*Id.* ¶ 24.)  These announcements depressed crude oil prices. (*Id.*)  On April 20, 2020, the day before the May 2020 WTI futures contracts expired, the price of these futures dropped precipitously. (*Id.* ¶ 30.)  By the end of the day, the futures closed at a negative price of -$37.63 as investors became concerned that the cost to store these barrels of oil would be more than the oil was worth. (*Id.* ¶ 27.)  When the price of these futures dropped below zero, E*TRADE's platform suffered a system failure. (*Id.* ¶ 31.)  As a result of the system failure, the platform failed to display accurate prices for crude oil futures and did not allow users to close out their positions. (*Id.*)  Prior to the system failure, it was known industrywide that oil futures could trade negative. (*Id.* ¶ 28.)  The owner of the New York Mercantile Exchange sent a notice to its clearing-member firms on April 15, 2020, advising them how they could test their systems using negative prices. (FAC ¶ 29.)  Furthermore, CME Group, Inc. warned on the day of the crash that the company's WTI futures had the potential to trade negative. (FAC ¶ 30.)

Plaintiffs, Benjamin Whitesides, Aziz Si Hadj Mohand, and Matthew Cheung, are customers of E*TRADE's trading platform who held "e-mini" oil futures contracts when the price fell below zero. (*Id.* ¶¶ 35, 41, 46.)  Each Plaintiff claims that he immediately attempted to sell off the contracts when the price fell below zero. (*Id.*)  However, each Plaintiff alleges that he was

2

unable to do so because of the system failure afflicting E*TRADE's platform. (*Id.*) Each Plaintiff alleges that he suffered substantial losses. (*Id.* ¶¶ 37, 43, 48.) E*TRADE's relationship with Plaintiffs is governed by a customer agreement. (*Id.* ¶¶ 12, 34, 39, 45.)

### B. Procedural History

On August 18, 2020, Plaintiffs filed a class action complaint against E*TRADE Securities, LLC and E*TRADE Futures, LLC, alleging causes of action for breach of contract, breach of the duty of good faith and fair dealing, negligence, gross negligence, and a claim under the California Unlawful Competition Law ("UCL"). (Dkt. No. 1.) Defendants then moved to dismiss. (Dkt. No. 12.) However, on October 28, 2020, the parties stipulated to withdraw the motion to dismiss and allow Plaintiffs to file an amended complaint. (Dkt. Nos. 13, 14.) Plaintiffs filed the now operative FAC on November 12, 2020. (Dkt. No. 16.) The FAC amends out the claims for breach of contract and breach of the duty of good faith and fair dealing, leaving only the claims for negligence, gross negligence, and violation of the UCL. On December 11, 2020, Defendants again moved to dismiss, or in the alternative, to strike certain portions of the pleading. (Dkt. No. 17.) These motions are now fully briefed, and the Court held oral argument on February 25, 2021.

## II. LEGAL STANDARD

A Rule 12(b)(6) motion should be granted when the complaint does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facial plausibility standard is not a "probability requirement" but mandates "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). In ruling on a Rule 12(b)(6) motion, the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the non-moving party." *Manzarek v. St. Paul Fire & Mar. Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). "[D]ismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008) (internal quotation marks and citations omitted); *see also Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law").

If a court grants a Rule 12(b)(6) motion, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and citations omitted).

## III. DISCUSSION

### A. Choice of Law

Defendants argue that a choice-of-law clause in E*TRADE's customer agreement requires Plaintiffs' negligence claims be governed by New York law. Plaintiffs counter that the choice-of-law clause does not reach tort claims, so California law should govern.

A federal court sitting in diversity applies the choice-of-law rules of the forum state.[2] *Narayan v. EGL, Inc.*, 616 F.3d 895, 898 (9th Cir. 2010). California, here the forum state, "ordinarily examines the scope of a choice of law provision in a contract under the law designated in that contract." *Id.* Here, that is New York law. New York courts are reluctant to construe contractual choice-of-law clauses broadly to encompass extra-contractual causes of action. *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 334 (2d Cir. 2005). For a choice-of-law clause to cover tort claims arising incident to the contract, the language of that clause "must be sufficiently broad as to encompass the entire relationship between the contracting parties." *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996). However, such a broad choice-of-law clause is so rare that, in 2005, the Second Circuit concluded that "no reported New York cases present such a broad clause." *Fin. One*, 414 F.3d at 335.

The choice-of-law clause contained in the customer agreement reads: "The Account Holder understands that this Customer Agreement will be deemed to have been made in the State of New York and will be construed, and the rights and liabilities of the parties determined, in accordance with the internal laws of the State of New York."[3] (Dkt. No. 17-3 at 38.)[4] Defendants

---

[2] Plaintiffs allege federal jurisdiction under the Class Action Fairness Act. (FAC ¶ 16.)
[3] The Court considers the customer agreement as incorporated by reference into the complaint. "Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis for the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).
[4] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the

4

claim that this clause requires (1) that the contract be construed under New York law and (2) that the "rights and liabilities" of the parties *beyond the contract* also be determined under New York law. According to Defendants, if the "rights and liabilities" language referred only to contractual rights and liabilities, then this would be redundant with the earlier language requiring that the contract be construed under New York law. Not so. Contract construction is an important step to determine the rights and liabilities of the parties to a contract, but it is not the only step. Even if no party disputes the proper construction of a contract, a party may mount a challenge on grounds such as duress, unconscionability, public policy, or the like. *See 159 MP Corp. v. Redbridge Bedford, LLC*, 33 N.Y.3d 353, 360 (2019). The better reading of E*TRADE's choice of law clause is that New York law governs all aspects of the parties' *contractual* rights and liabilities. Therefore, the Court will analyze Plaintiffs' negligence claims under California law.

Defendants also argue that the customer agreement contains an exculpatory clause that contractually waives the duty of care. The exculpatory clause falls within the scope of the choice of law clause because it defines the parties' contractual rights and liabilities. Therefore, the Court will analyze the application of the exculpatory clause under New York law.

### B.  Negligence Claims

#### 1.  Exculpatory Clause

Defendants argue that an exculpatory clause contained in the E*TRADE customer agreement absolves Defendants from liability for ordinary negligence.

Under New York law, contractual provisions absolving a party from its own ordinary negligence are generally enforceable. *Colnaghi, U.S.A. v. Jewelers Protection Servs.*, 81 N.Y.2d 821, 823 (1993). In some cases, an exculpatory clause may be deemed void as against public policy or by statute. *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 553 (1992). For example, New York courts have concluded that public policy does not permit a party to insulate itself from damages caused by its own grossly negligent conduct. *Id.* at 554.

The exculpatory clause contained in the customer agreement reads: "To the maximum

---

ECF-generated page numbers at the top of the documents.

extent permitted by Applicable Law, no E*TRADE Indemnified Parties shall be liable for any action taken or omitted to be taken by any of them hereunder or in connection herewith except for their breach of this Customer Agreement, gross negligence, or willful misconduct." (Dkt. No. 17-3 at 34.) This clause unambiguously protects Defendants from any claim of ordinary negligence.

Plaintiffs' briefing argues this clause is void as against public policy; however, at oral argument, Plaintiffs conceded this clause barred the ordinary negligence claim. The Court agrees. Plaintiffs' brief argues that New York courts have adopted California's *Tunkl* test for the public policy exception. *Tunkl v. Regents of the Univ. of Cal.*, 60 Cal.2d 92 (1963). In *Tunkl*, the California Supreme Court declared that the "social forces" that define the public interest are "volatile and dynamic". *Id.* at 98. The court went on to adopt a lengthy multifactor test which considers bargaining power, existing public regulation, and many other factors to determine whether public policy bars the enforcement of an exculpatory clause. *Id.* at 98–101. Plaintiffs, however, cite only a single mid-level appellate case, *Ash v. N.Y. Univ. Dental Ctr.*, applying *Tunkl* in New York. 564 N.Y.S.2d 308, 312–13 (1st Dep't 1990). In fact, New York courts typically approach the public policy exception very differently than *Tunkl*. For example, in *Corwin v. NYC Bike Share, LLC*, the Southern District of New York explained that "Public Policy" in New York is "ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." 238 F.Supp.3d 475, 491 (S.D.N.Y. 2017). The *Corwin* court then considered the exculpatory clause at issue against three specific "sources of public policy" identified by the plaintiffs in New York statutes and common law. *Id.* Plaintiffs here have not offered any source of public policy or other basis under New York law for invalidating the exculpatory clause in E*TRADE's customer agreement. Accordingly, the exculpatory clause is enforceable and Plaintiffs' ordinary negligence claim is dismissed.

### 2. Economic Loss Rule

Defendants next argue that the economic loss rule requires the dismissal of Plaintiffs' negligence and gross negligence claims. Plaintiffs maintain that the economic loss rule is inapplicable and that, in any event, there is a "special relationship" between the parties permitting the recovery of economic losses.

In California, the economic loss rule ordinarily prevents a party to a contract from recovering in tort for purely economic loss. *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal.4th 979, 988 (2004). The rule applies equally to claims for negligence and gross negligence. *See Rejects Skate Magazine v. Acutrack, Inc.*, No. C 06-2590 CW, 2006 WL 2458759, at *6 (N.D. Cal. August 22, 2006) (applying the economic loss rule to dismiss both negligence and gross negligence claims). The purpose of the rule is to "prevent[] the law of contract and the law of tort from dissolving one into the other." *Robinson Helicopter Co.*, 24 Cal.4th at 988 (internal quotation marks and citation omitted). However, conduct amounting to a breach of contract becomes tortious and justifies the recovery of economic loss when "it also violates a duty independent of the contract arising from principles of tort law." *Id.* at 989.

        a.  **Economic Loss Rule and Service Contracts**

Plaintiffs first argue that the economic loss rule does not apply where the parties have contracted for the performance of services. As support, they cite *North American Chemical Co. v. Superior Court*, 59 Cal. App. 4th 764 (1997). However, the *North American Chemical* court did not categorically hold that the economic loss rule does not apply when the parties have contracted for the performance of services. *Id.* at 785. Instead, the court held that, where the contract is for the performance of services, a "special relationship" between the contracting parties may create an independent duty of care permitting the plaintiff to recover economic losses in tort. *Id.* The court then applied the six-factor "special relationship" test as announced by the California Supreme Court in *J'Aire Corp. v. Gregory*, 24 Cal.3d 799, 804 (1979). Thus, under *North American Chemical*, a party to a contract for services may argue that there exists a special relationship between the parties giving rise to a duty of care independent of the contract.

        b.  **Economic Loss Rule and Parties in Contractual Privity**

Notwithstanding *North American Chemical*, Defendants argue that under California law, parties in contractual privity can never be in a special relationship giving rise to an independent duty of care that permits the recovery of economic losses. As support they cite a recent unpublished Ninth Circuit decision holding that privity between a digital platform and its users through a customer agreement defeated any special relationship. *Berk v. Coinbase, Inc.*, ---

7

Fed.Appx. ---, 2020 WL 7658357, at *2 (9th Cir. 2020). *Berk* relies on another California appellate decision, *Stop Loss Ins. Brokers, Inc. v. Brown & Toland Med. Grp.*, 143 Cal. App. 4th 1036 (2006) (limiting the "special relationship" test to cases where the defendant's negligent performance of a contract injures a third party). *Berk*'s holding is in accord with several other district court decisions. *See Body Jewelz, Inc. v. Valley Forge Ins. Co.*, 241 F. Supp. 3d 1084, 1092 (C.D. Cal. 2017); *Kelomar, Inc. v. Kulow*, No. 90CV0353 BTM(PCL), 2009 WL 3818817 (S.D. Cal. November 12, 2009).

However, in *R Power Biofuels, LLC v. Chemex LLC*, the district court predicted that the California Supreme Court would follow *North American Chemical* and conclude that parties in privity can have a special relationship giving rise to an independent duty of care. No. 16-CV-00716-LHK, 2016 WL 6663002, at *5 (N.D. Cal. November 11, 2016). Courts in this district have consistently followed *R Power Biofuels*' holding. *See In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113, 1131–32 (N.D. Cal. 2018); *Kemp v. Wells Fargo Bank, N.A.*, No. 17-CV-01259-MEJ, 2017 WL 4805567, at *3 (N.D. Cal. October 25, 2017).

In resolving questions of state law, the Court is bound by "pronouncements from the state's highest court." *See Jerry Beeman & Pharmacy Servs., Inc. v. Anthem Prescription Mgmt., LLC*, 652 F.3d 1085, 1092 (9th Cir. 2011). The Court is also "obligated to follow the decisions of the state's intermediate appellate courts unless the court finds convincing evidence that the state's supreme court likely would not follow them." *Id.* (internal quotations and brackets omitted). As usual, the Court is also bound by published decisions from the Ninth Circuit. Where there is no clear binding authority, the Court's task is to "predict how the highest state court would decide the issue." *Id.* at 1106.

Here, neither the California Supreme Court nor the Ninth Circuit have decided, in a published decision, whether parties in contractual privity can also be in a "special relationship", and the lower California appellate courts are split. Therefore, it is the Court's task to predict how the California Supreme Court would decide this issue. The starting point is the most recent California Supreme Court decision on the economic loss rule: *S. Cal. Gas Leak Cases*, 7 Cal.5th 391 (2019). In *S. Cal. Gas Leak*, local businesses sued a natural gas company for a massive gas

leak which drove residents away and devastated the local economy. *Id.* at 396. The local businesses did not allege that the gas leak resulted in personal injury or property damage—instead, they sought to recover lost business income. *Id.* Affirming dismissal, the court held that liability in negligence for purely economic losses is "the exception, not the rule" and the "primary exception" arises when parties are in a "special relationship." *Id.* at 400. The court further held that "[d]eciding whether to impose a duty of care turns on a careful consideration of the sum total of the policy considerations at play, not a mere tallying of some finite, one-size-fits-all set of factors." *Id.* at 401. Under the facts of *S. Cal. Gas Leak*, the court was especially concerned by the prospect of "limitless liability and unending litigation" should the court permit the recovery of economic losses for all persons affected by such a disaster. *Id.* at 403. Weighing these policy considerations, the court affirmed dismissal.

The California Supreme Court's flexible, fact-specific approach to the question of duty in *S. Cal. Gas Leak* suggests that it would carefully examine the policy considerations at play before categorically barring negligence actions for economic loss where the parties are in privity of contract. The conflicting decisions raise many such policy arguments. Those courts which have refused to recognize a "special relationship" between contracting parties have reasoned that allowing contracting parties to recover in tort "undermines the predictability that parties seek when they enter into a contract." *Body Jewelz*, 241 F. Supp. 3d at 1093. Recognizing a duty between contracting parties may also "blur the law's distinction between contract and tort remedies." *Stop Loss*, 143 Cal. App. 4th at 1043. Those courts which have recognized a "special relationship" between contracting parties have also pointed to policy considerations. The *North American Chemical* court argues that, where the contract is for services, "defendant's reasonable and competent performance is the whole purpose of the contract" and a contractual allocation of losses away from the negligently performing party would "defeat the contract's purpose." 59 Cal. App. 4th at 784–85. Similarly, courts have emphasized the need to "incentivize the service provider's due care." *R Power Biofuels*, 2016 WL 6663002 at 5; *see also Yahoo!*, 313 F. Supp. 3d at 1132.

9

None of these policy arguments are especially compelling. While predictability in the enforcement of contracts is an important public policy, the California Supreme Court has expressed skepticism regarding contracts of adhesion drafted by parties with superior bargaining power. *See Tunkl*, 60 Cal.2d at 100. Furthermore, the California Supreme Court has explicitly limited the power of contracting parties to allocate liabilities where one party acts with gross negligence, as alleged here. *See City of Santa Barbara v. Superior Court*, 41 Cal.4th 747, 781 (2007). The policy arguments in *North American Chemical* are also unconvincing because they are overbroad and fail to grapple with the distinction between tort and contract remedies. *North American Chemical* imagines tort remedies as a stand in for contract remedies because contract remedies are too easily disclaimed. 59 Cal. App. 4th at 784–85. But this is a drastic argument and its reasoning has been rejected by the California Supreme Court. *See Aas v. Superior Court*, 24 Cal.4th 627, 643 (2000) (superseded by statute on other grounds) (rejecting a broad reading of *North American Chemical* and holding that courts generally enforce breaches of contract through contract law, except when the actions that constitute breach violate a social policy that merits the imposition of tort remedies). Lastly, regarding the argument that tort law must incentivize a service provider's due care, this may be an important public policy, but courts do not typically impose liability for economic losses to this end. *See S. Cal. Gas Leak*, 7 Cal.5th at 400.

In all, the sum total of policy considerations does not justify a blanket rule barring or allowing the recovery of economic losses when parties are in privity of contract. Instead, the Court predicts that the California Supreme Court would hold that courts must examine the particular policy considerations at play under the facts of each case to determine if a special relationship exists giving rise to an independent duty of care.

                      **c.**       **Whether Plaintiffs Have Pled a Special Relationship**

To judge the existence of a special relationship giving rise to an independent duty, courts consider six factors: (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing

future harm. *J'Aire*, 24 Cal.3d at 804; *see also Aas*, 24 Cal.4th at 644 (superseded by statute on other grounds).

      Here, the first of the *J'Aire* factors is the most important. Drawing all reasonable inferences from the facts alleged in Plaintiffs' favor, E*TRADE's trading platform was not intended to affect Plaintiffs in any way particular to Plaintiffs. *Ott v. Alfa-Laval Agri, Inc.*, is instructive. 31 Cal. App. 4th 1439 (1995). In *Ott*, the court rejected a milk farm's contention that there existed a "special relationship" between the farm and a manufacturer of milking equipment. *Id.* at 1456. The farm had argued that the milking equipment was "intended to affect" dairymen like the plaintiffs. *Id.* at 1455. The court rejected this argument, concluding that the plaintiffs needed to show intent "particular to the plaintiffs, as opposed to all potential purchasers of the equipment." *Id.* Plaintiffs in this case do not plead intent particular to them, as opposed to all users of E*TRADE's trading platform. *See also In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 972 (S.D. Cal. 2014) (holding that the first factor weighed against imposing a special relationship where the defendant did not develop goods and services for the plaintiffs' "specific benefit, above and beyond what was offered to all consumers").

      Plaintiffs' failure to plead intent specific to them also implicates important policy considerations which disfavor recognizing a duty of care. As the court held in *S. Cal. Gas Leak*, a duty of care should not be recognized where it would create limitless liability and unending litigation. 7 Cal.5th at 403. The court echoed concerns expressed in the Restatement of Torts that purely economic losses "proliferate more easily than losses of other kinds and are not self-limiting." *Id.* at 407 (internal quotations omitted). The result is that liability for economic loss may be "indeterminate and out of proportion to a defendant's culpability." *Id.* (internal quotations and brackets omitted). In cases where courts have recognized a right to recover economic losses, the foregoing considerations have often been "weak or absent". *Id.* Should the Court recognize a duty of care to prevent economic loss under the alleged facts of this case, then there would be no meaningful limits on the tort exposure of service providers who market services to the public. Any person who used the service and suffered economic loss could sue. This broad duty would

run contrary to the California Supreme Court's holding that tort liability for economic losses is the exception, not the rule. *Id.* at 400.

The Court is not persuaded by the contrary holding in *Yahoo!*, 313 F. Supp. 3d at 1132. In *Yahoo!*, users of the defendant's email service sued the defendant over multiple data breaches that exposed many users' personal information to hackers. *Id.* at 1122. The court concluded that the first factor favored a special relationship because "the contract entered into between the parties related to email services for Plaintiffs." *Id.* at 1132. The court did not require a showing of intent particular to the plaintiffs. The *Yahoo!* court's analysis is unpersuasive because it would render the first factor meaningless when the parties are in contractual privity. Any time parties are in contractual privity, the contract entered into will relate to the services offered under the contract. But this abbreviated analysis does not allow courts to take account of the policy consequences of extending liability for economic losses to all parties in contractual privity. Used properly, the first *J'Aire* factor is a tool for courts to limit recovery for economic losses to those relationships that are truly "special". *See S. Cal. Gas Leak*, 7 Cal.5th at 401. Mere privity of contract should not shortcut this analysis.

The second *J'Aire* factor considers the foreseeability of the injury. Here, Plaintiffs have alleged sufficient facts to raise a plausible inference that the injury was foreseeable; specifically, Plaintiffs allege that the owner of the New York Mercantile Exchange sent a notice five days before the crash to its clearing-member firms advising them how they could test their systems using negative prices. (FAC ¶ 29.) Plaintiffs further allege that CME Group, Inc. announced on the day of the crash that CME's futures can trade negative. *(Id.* ¶ 30.) The third and fourth *J'Aire* factors consider the degree of certainty that the plaintiff suffered injury and the closeness of the connection between the defendant's conduct and the injury suffered. While Plaintiffs adequately allege that they suffered an injury, the connection alleged between the defendant's conduct and the injury suffered is attenuated. Plaintiffs allege that E*TRADE suffered a system failure only after the price of futures contracts went negative. (*Id.* ¶ 4.) Consequently, only those losses suffered after prices had already gone negative could be connected to Defendant's conduct. Furthermore, the Court takes judicial notice that WTI futures experienced minimal trading volume after the

12

price fell below zero, meaning that Plaintiffs would have faced difficulties filling their orders even if E*TRADE's platform had accepted them.[5] This further difficulty which Plaintiffs would have faced in mitigating their losses attenuates the connection between the defendant's conduct and the injury suffered. *See Andrews v. Plains All American Pipeline, L.P.*, No. CV 15-4113 PSG (JEMx), 2017 WL 10543401, at *12 (C.D. Cal. Aug. 25, 2017) (where the causal chain leading to the plaintiff's loss involves independent actors exercising independent judgement, causation may be attenuated).

The fifth *J'Aire* factor considers the moral blame attributable to the defendant's conduct. To establish moral blame, courts look for allegations that the defendants knew of a deficiency and failed to act. *See J'Aire*, 24 Cal.3d at 805; *Yahoo!*, 313 F. Supp. 3d at 1132. While Plaintiffs allege that E*TRADE knew that oil futures contracts could go negative, they do not plausibly allege that E*TRADE knew of the deficiencies in their own system which caused the outage. Paragraph seven of the complaint does allege that E*TRADE failed to "correct known deficiencies" and "ignored multiple red flags," but these allegations are vague and conclusory. *See Iqbal*, 556 U.S. at 681 (2009) (conclusory allegations are "not entitled to be assumed true"). The FAC does not offer specific factual allegations from which the Court could infer that E*TRADE knew of these deficiencies. Lastly, the sixth *J'Aire* factor considers the policy of preventing future harm. Here, Plaintiffs do not identify any compelling policy argument that requires tort liability for malfunctions in the operation of an online trading platform. *Cf. Ales-Peratis Foods Internat., Inc. v. American Can Co.*, 164 Cal. App. 3d 277, 289–90 (1985) (extending liability under the *J'Aire* factors where the defendant sold defective and potentially dangerous food packaging); *Huang v. Garner*, 157 Cal. App. 3d 404, 424 (1984) (extending liability under the *J'Aire* factors where the defendants built and sold houses with dangerous defects); *Yahoo!*, 313 F. Supp. 3d at 1132–33 (extending liability under the *J'Aire* factors for a serious consumer data breach).

Weighing the *J'Aire* factors, the Court declines to recognize a duty of care to prevent

---

[5] Plaintiffs have not opposed Defendants' request for judicial notice of these facts.

13

economic losses under the alleged facts. The only factor to weigh in favor of a duty is foreseeability of the harm; however, as the California Supreme Court has warned, foreseeability "provides virtually no limit on liability for nonphysical harm." *S. Cal Gas Leak*, 7 Cal.5th at 401. Accordingly, Plaintiffs' claim for gross negligence is dismissed.  Plaintiffs' claim for ordinary negligence also merits dismissal on this alternative ground.  Plaintiffs have conceded that, should the negligence claims fail, the UCL claim must also fail.  (Dkt. No. 18 at 29:27–30:1.) Accordingly, Plaintiffs' claim under the UCL is also dismissed.

### C. Leave to Amend

If a court grants a Rule 12(b)(6) motion, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and citations omitted).  Here, the ordinary negligence claim is barred by the exculpatory clause and cannot be cured by amendment.  However, Plaintiffs may attempt to cure the deficiencies in their gross negligence and UCL claims by alleging other facts which tip the balance of the *J'Aire* factors.  Plaintiffs may also choose to reassert their contract claims.  Defendants argue that Plaintiffs have abandoned their contract claims by amending them out.  As support, they cite *Sierra Med. Servs. All. v. Kent*, 883 F.3d 1216 (9th Cir. 2018), and *Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012).  But these cases only hold that claims not in the operative complaint are waived on appeal. *Sierra Med. Servs.*, 883 F.3d at 1223; *Lacey*, 693 F.3d at 928.  The standard for granting leave to amend is much more forgiving.  *See Ross v. Trex Company, Inc.*, No. C 09-670 JF (PVT) & C 09-1878 JF (PVT), 2010 WL 11570868, at *3 (N.D. Cal. March 16, 2010) (allowing plaintiffs to reassert claims they had previously amended out).  Accordingly, the Court will grant leave to amend, except with respect to the ordinary negligence claim.

### D. Motion to Strike

Because the complaint is dismissed, E*TRADE's separate motion to strike is denied as moot.

14

## IV. CONCLUSION

For the reasons set forth above, the Court GRANTS the motion to dismiss. The ordinary negligence claim is dismissed without leave to amend. The remaining claims are dismissed with leave to amend. Plaintiffs may also reassert their contract claims. Any amended complaint must be filed within 30 days of this Order. The Court sets a video case management conference for May 27, 2021 at 1:30 p.m.

The motion to strike is DENIED as moot.

This Order disposes of Docket No. 17.

**IT IS SO ORDERED.**

Dated: March 11, 2021

JACQUELINE SCOTT CORLEY
United States Magistrate Judge