BRIAN S. KABATECK (SBN 152054)
bsk@kbklawyers.com
CHRISTOPHER B. NOYES (SBN 270094)
cn@kbklawyers.com
KABATECK LLP
633 W. Fifth Street, Suite 3200
Los Angeles, CA 90071
Telephone: (213) 217-5000
Facsimile:  (213)217-5010

ROBERT J. GIRARD II (SBN 216949)    MICHAEL GATTO (BAR NO. 232674)
rgirard@girardbengali.com            mike@actiumllp.com
OMAR H. BENGALI (SBN 276055)        ACTIUM LLP
obengali@girardbengali.com           5419 Hollywood Blvd, Ste C-356
STEVEN M. BUHA (SBN 271798)         Los Angeles, CA 90027
sbuha@girardbengali.com              Telephone:  (323) 819-0300
GIRARD BENGALI, APC
355 South Grand Ave., Suite 2450
Los Angeles, California 90071
Telephone: (323) 302-8300
Facsimile:   (323) 302-8310

Attorneys for Plaintiff(s) Benjamin
Whitesides, Aziz Si Hadj Mohand, and
Matthew Cheung, individually and on
behalf of others similarly situated

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BENJAMIN WHITESIDES, AZIZ SI HADJ MOHAND, and MATTHEW CHEUNG, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> E*TRADE SECURITIES, LLC, a Delaware limited liability company; and E*TRADE FUTURES, LLC, an Illinois limited liability company, and DOES 1 through 50, inclusive, <br><br> Defendant. | Case No. 3:20-cv-05803-JSC <br><br> *Assigned to: Hon. Jacqueline Scott Corley, Courtroom E – 15th Floor* <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT FOR:** <br> **1. BREACH OF CONTRACT;** <br> **2. BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING; AND** <br> **3. UNLAWFUL COMPETITION LAW CLAIM (CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*)** <br><br> Action Filed: 8/18/20_____ <br> Trial Date: None set |

Plaintiff(s) Benjamin Whitesides ("Whitesides"), Aziz Si Hadj Mohand

("Mohand"), and Matthew Cheung ("Cheung") (collectively and individually,

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

1  "Plaintiff(s)"), individually and on behalf of all others similarly situated, bring this
2  putative class action against Defendant(s) E*TRADE Securities, LLC, E*TRADE
3  Futures, LLC, and DOES 1 through 50 (collectively and individually, "Defendant(s)"
4  or "E*TRADE"), demanding a trial by jury. Plaintiffs make the following allegations
5  based upon information and belief, except as to the allegations specifically pertaining
6  to themselves, which are based on personal knowledge. Accordingly, Plaintiffs allege
7  as follows:

8  **NATURE OF THE ACTION**

9  1.      E*TRADE is an online brokerage firm. Its customers place securities
10 trades through the firm's website, by using a web-based application (or "app"), or by
11 calling the firm's help center. E*TRADE permits customers, when its trading
12 platform is operational, to purchase and sell certain securities, including futures
13 contracts.

14 2.      While, for decades, ordinary retail investors did not trade commodities,
15 electronic trading at discount brokerage firms and new investment products marketed
16 by these firms prompted amateur investors to start buying and selling oil. Brokerage
17 firms like E*TRADE spent years making oil products easy to trade and giving
18 individual investors access to futures contracts like those purchased by Plaintiffs.

19 3.      Futures contracts are effectively a promise to deliver a commodity at a
20 certain time, allowing an investor to speculate on price moves and producers to
21 protect against large swings. Ordinarily, when a U.S. crude futures contract expires,
22 the holder must either sell it or take delivery of barrels of oil the following month.
23 E*TRADE also offered futures that are settled with cash instead of oil. Plaintiffs,
24 along with other affected class members, purchased these "e-mini futures" that trade
25 on CME Group Inc.'s New York Mercantile Exchange. Upon expiration of the
26 contracts, the "e-mini futures" converge with regular U.S. crude futures.

27

28

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

4.     That is exactly what happened on Monday, April 20, 2020, when an unprecedented crash occurred in the crude oil futures markets. Prior to the COVID-19 pandemic, the idea that oil futures could move into negative pricing territory was a known possibility. On April 20, however, that possibility turned into a reality. The benchmark West Texas Intermediate ("WTI") crude oil futures settled at negative ($37.63) by the close of the market on April 20 for the May contracts that were set to expire the following day. E-mini futures followed the slide of the regular futures and trapped traders who, due to the limitations of E*TRADE's electronic trading system, were unable to a) see accurate information pricing information and b) trade at negative prices.

5.     Simultaneous with the oil market's precipitous decline into negative territory, E*TRADE's system was unprepared for the negative pricing, failed to display accurate prices, and locked out users attempting to enter orders with negative values, resulting in an outage of its trading platform through the end of the session on April 20, 2020 (the "Outage"). As a result of the Outage, E*TRADE's customers were unable to exercise futures contracts on WTI through E*TRADE's website, app, or call center. Customers were also unable during this time to obtain accurate information or meaningful support from E*TRADE's customer service specific to their individual investment needs.

6.     In offering trading services, E*TRADE assumed a duty to ensure that its systems were sufficiently equipped to reliably deliver such services under foreseeable customer demands and market conditions, such as those that occurred on April 20, 2020. Plaintiffs and members of the proposed class understood and reasonably believed that E*TRADE had or would take such steps, but it did not. E*TRADE failed to adequately or properly equip itself technologically and systemically to maintain Plaintiffs and class members' access to trading services. Due solely to its failure to maintain an adequate infrastructure, E*TRADE breached obligations owed to

3

Plaintiffs and class members and caused them substantial losses. Its failures are all the more serious due to the magnitude of the Outage, the absence of alternative means for customers to protect their investments, and the lack of communication and customer support.

7.     Despite possessing knowledge of the possibility of oil futures trading negatively for weeks, E*TRADE failed to test its online trading platform for this possibility, failed to ready its systems and correct known deficiencies, failed to disclose this possibility to its customers, and openly ignored multiple red flags from the relevant exchanges.

8.     Plaintiffs thus bring this class action on behalf of themselves and all other E*TRADE customers within the United States who held futures contracts expiring during the Outage, and who thereby suffered losses in their E*TRADE accounts. Plaintiffs assert claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of California consumer protection laws and seeks damages, restitution, and injunctive relief.

## **PARTIES**

9.     Plaintiff Benjamin Whitesides is a citizen and resident of the State of Utah.

10.     Plaintiff Aziz Si Hadj Mohand is a citizen and resident of the State of California.

11.     Plaintiff Matthew Cheung is a citizen and resident of the State of New Hampshire.

12.     Defendant E*TRADE Securities, LLC is a Delaware limited liability company qualified to do business in California, with its principal place of business at 11 Times Square, 32nd Floor, New York, New York 10036. Defendant E*TRADE Securities, LLC acts as a clearing broker and clears trades introduced by its affiliate

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

1   E*TRADE Financial, LLC.[1] Defendant E*TRADE Securities, LLC is a party to the

2   Customer Agreements, dated April 15, 2019, entered into by and between Plaintiffs

3   and Defendants, a true and correct June 30, 2020 amended copy of which is attached

4   hereto as **Exhibit A** ("Customer Agreement")[2].

5       13.    Defendant E*TRADE Futures, LLC is an Illinois limited liability

6   company with its principal place of business at 10 S. Riverside Plaza, Suite 500,

7   Chicago, Illinois, 60606.  Defendant E*TRADE Futures, LLC acts as an introducing

8   broker and has a clearing arrangement with its affiliate Defendant E*TRADE

9   Securities, LLC. Based upon information and belief, Defendant E*TRADE Futures,

10   LLC is a party to the Customer Agreement. **Exhibit A**.

11       14.    Defendants are referred to herein collectively as "E*TRADE."

12   <u>**JURISDICTION AND VENUE**</u>

13       15.    This Court has subject-matter jurisdiction over this action pursuant to 28

14   U.S.C. § 1332(d)(2). The aggregate claims of all members of the proposed class and

15   subclass(es) are in excess of $5 million, exclusive of interest and costs, and there are

16   more than 100 putative class members. Many members of the proposed class are

17   citizens of a state different from Defendant.

18       16.    Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action

19   because a substantial part of the events, omissions, and acts giving rise to the claims

20   herein occurred in this District where E*TRADE, distributed, marketed, advertised,

21   and sold the trading services which are the subject of the present complaint. Finally,

22   venue is appropriate in this District pursuant to 28 USC § 1391(b)(2) because a

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

---

[1] E*TRADE Financial, LLC has not been named as a party at this time, however, Plaintiffs reserve the right to add the entity at a future date.

[2] Plaintiffs base all allegations regarding the terms of the Customer Agreement on information and belief, as well as the assumption that the terms of the operative agreement (effective on or about April 20, 2020), material to the issues presented in this action, are identical to the same terms in the currently available customer agreement, effective June 30, 2020, and attached hereto as **Exhibit A**.

SECOND AMENDED CLASS ACTION COMPLAINT

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

substantial part of the acts and omissions that gave rise to this Complaint occurred or emanated from this District.

17.     This Court has personal jurisdiction over E*TRADE because it is authorized to do business and does conduct business in California, and because it has specifically marketed, advertised, and made substantial sales in California, and has sufficient minimum contacts with this state and/or sufficiently avails itself of the markets of this state through its promotion, sales, and marketing within this state to render the exercise of jurisdiction by this Court permissible.

## FACTUAL ALLEGATIONS

18.     E*TRADE is one of the largest online focused broker-dealers in the world and has over 30 brick and mortar locations across the United States. It also offers other financial products and services including online banking. E*TRADE aims to compete with traditional financial institutions by offering cheaper and more user-friendly digital services. E*TRADE markets itself as the "original place to invest online, and still one of the best." E*TRADE, https://us.etrade.com/platforms (last visited July 20, 2020). It further markets itself as "[t]he complete package for traders who won't compromise…with intuitive, easy-to-use trading platforms and apps, specialized trading support, and stock, options and futures for traders of every level."

19.     With regard to E*TRADE's platform, it states: "Easy-to-use Power E*TRADE platform…built to bring simplicity to a complex trading world." E*TRADE markets its "Dedicated trader service team" and states: "[w]hen money is at stake, you want answers fast." E*TRADE, https://us.etrade.com/trade (last visited July 20, 2020). Referencing options, E*TRADE's website markets as follows:

/ / /

/ / /

/ / /

/ / /

6

SECOND AMENDED CLASS ACTION COMPLAINT

E*TRADE, https://us.etrade.com/trade (last visited July 20, 2020). E*TRADE's promises of simplicity, precision, and the ability to "seize opportunities wherever they arise" were nothing more than illusory.

## Background on Oil Futures

20.     The "Benchmark Oil Futures Contract" is the futures contract on West Texas Intermediate ("WTI") light, sweet crude oil delivered to Cushing, Oklahoma, as traded on the New York Mercantile Exchange (the "NYMEX") that is the near-month contract to expire, except when the near-month contract is within two weeks of expiration, in which case it refers to the futures contract that is the next-month contract to expire.

21.     A futures contract is a legal agreement to buy or sell a particular commodity at a predetermined price at a specified time in the future. The buyer of a futures contract takes on the obligation to buy and receive the underlying asset when the futures contract expires, while the seller of a futures contract takes on the obligation to deliver the underlying asset at expiration. Futures contracts can be used to hedge other investments, to protect against fluctuations in the price of a commodity, or as a speculative investment.

22.     Nearly all retail investors trade commodity futures contracts without any expectation of ever taking or delivering the underlying asset. Instead, these investors close out their positions prior to contract expiration.  E*TRADE offered futures

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

contracts that are settled with cash instead of oil known as "e-mini futures" that trade on the NYMEX. Upon expiration of the contracts, the "e-mini futures" converge with regular U.S. crude futures.

### Oil Market Crash

23.     In early 2020, the global coronavirus pandemic caused a precipitous decline in demand for oil. Between state, national and international lockdowns, businesses closed, travel halted to a crawl, and consumer spending declined.

24.     In addition, on March 8, 2020, the Kingdom of Saudi Arabia announced price discounts for its oil exports and Russia and Saudi Arabia announced increases in their oil production, both of which had the impact of depressing crude oil prices. The day following Saudi Arabia's announcement, the price of WTI fell 25%, the largest single-day decline it had suffered in decades. Within 10 days, WTI fell below $21 per barrel, which was an 18-year low and less than half the price of just two weeks prior.

25.     As a result, retail investors were purchasing options and/or futures in order to "buy the dip" in oil prices, expecting that the price of oil would rise as the market effects of the coronavirus pandemic and the geopolitical oil games between Russia and Saudi Arabia dissipated.

26.     Unfortunately, the futures market entered a period of "super cantango," a rare event that occurs when the spot price trades substantially below the futures price. This dynamic was exacerbated because the inventory space available to store WTI barrels in Cushing, Oklahoma was filling up due to the glut of supply and was increasing the costs to store delivered oil barrels.

27.     On April 20, 2020, the day before the May 2020 WTI futures contracts expired, the May 2020 WTI contracts closed at a negative price (-$37.63) as investors became concerned that the cost to store the barrels of oil being delivered to Cushing, Oklahoma would be more than the oil was worth.

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

28.     While oil futures had never before reached negative prices, it was known industrywide that the CME Group Inc.'s ("CME") benchmark oil contracts could go negative. In fact, on April 8, 2020, CME announced that it had been testing plans to support the possibility of negative options such that if, in any month, WTI oil futures settle at a price between $8.11 and $11.00 a barrel, it could switch to a different pricing model that would allow for negative pricing.

29.     Thereafter, on April 15, 2020, the owner of the NYMEX sent a notice to all its clearing-member firms advising them that they could test their systems using negative prices. Specifically. NYMEX stated: "Effective immediately, firms wishing to test such negative futures and/or strike prices in their systems may utilize CME's 'New Release' testing environments" for crude oil. Undoubtedly, E*TRADE received this notice.

30.     Thereafter, at approximately 11:50 a.m. EST on April 20, 2020, the CME reiterated that WTI futures can trade negative which sent the May contract plummeting to approximately $4.00 per barrel. Trading volume was low prior to the CME announcement but became more active after the announcement. In fact, the WTI futures price for the May contract remained positive until approximately 3:08pm EST when it began dropping precipitously almost $40.00 in the last 22 minutes of trading. Within a 3-minute span between 3:24pm and 1:27pm EST, the price dropped approximately $25.00 per barrel. Most, if not all of the price decline occurred in the last 22 minutes of trading.  The following chart produced by Bloomberg demonstrates the "super cantango" and precipitous decline in the last minutes of market trading on April 20:

/ / /

/ / /

/ / /

/ / /

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

9



Leisig, Matther "Oil Crash Busted Broker's Computers and Inflicted Big Losses" May 8, 2020 (www.bloomberg.com/news/articles/2020-05-08/oil-crash-busted-a-broker-s-computers-and-inflicted-huge-losses).

31.    While E*TRADE customers were permitted to, and did, trade when the e-mini futures prices for crude were positive, critically, E*TRADE's platform suffered an outage that failed to show the accurate price of the crude oil futures contracts when the spot price dropped below zero. In fact, once the price went negative, the platform continued to show a positive value, but did not display a bid or ask price in order for its customers to close out their trades. E*TRADE's customers were flying blind, locked into their investments and blocked from trading. On April 20, 2020, E*TRADE's trading platform stopped functioning as it was supposed to, stopped processing orders entered by customers, and rendered its customers unable to enter new orders and mitigate their losses.

32.    E*TRADE was not the only brokerage firm for whom negative trading exposed serious bugs in its software. In fact, Interactive Brokers, another retail brokerage firm, admitted that it would "rebate from our own funds to our customers who were locked in with a long position during the time the price was negative any

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

1  losses they suffered below zero." While Interactive Brokers has committed to making

2  its customers whole, E*TRADE has failed and refused to do the same.

3      33.    To the contrary, E*TRADE has misleadingly stated to multiple class

4  members in a prepared automated response that:

> "[t]he turn to negative prices accelerated the market decline and severely diminished the amount of liquidity in the market. The severity of these events was marked by the extremely wide intraday trading range of more than $55, and extremely low trading volumes after prices turned negative…This wide trading range demonstrates a lack of active buyers in the market to support pricing levels or provide liquidity…E*TRADE [] has determined that there was not enough liquidity in the market to support existing the position you maintained in your account. Accordingly, E*TRADE will not be making any adjustments to your account."

**Plaintiff Benjamin Whitesides' Experiences**

12     34.    Plaintiff Benjamin Whitesides is a customer of E*TRADE. He accepted

13  the Customer Agreement by opening an E*TRADE trading account.

14     35.    On April 20, 2020, using his using his E*TRADE trading account, Mr.

15  Whitesides purchased one e-mini crude oil futures contract with a May 2020

16  expiration date[3] for $1.55 totaling $775. He subsequently purchased a second e-mini

17  crude futures contract with a May 2020 expiration date for $0.50 totaling $250. He

18  then purchased a third e-mini crude futures contract with a May 2020 expiration date

19  for $0.125 totaling $62.50 (collectively, the "contracts").  As the contract prices

20  dropped into negative territory without warning, Mr. Whitesides immediately

21  attempted to mitigate his losses by selling the contracts but, as a result of E*TRADE's

22  system failure, he was unable to do so. Despite his best efforts, he was unable to

23  utilize E*TRADE's system to place any trades for e-mini crude oil futures once the

24  prices went negative.

25  / / /

26

27  [3] It should be noted that the last trading day for an oil futures contract with a May 2020 expiration date was 5:00pm EST on April 20, 2020, the day of the Outage.

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

36.     At 5:00pm EST on April 20, 2020, the e-mini crude oil future contract with an expiration of May 2020 expired and was no longer traded. As an example of the system failure E*TRADE suffered; Mr. Whitesides received a statement from E*TRADE that showed that his e-mini contracts were closed at -$376.300 resulting in a margin balance owed to E*TRADE of $565,537.50 for the expired contracts:

```
                                      AVG LONG:        1775.00000
4/20/0        US         1            MAY 20 NYM EMINI CRUD    07      .125  US          188,212.50-
4/20/0        US         1            MAY 20 NYM EMINI CRUD    07      .500  US          188,400.00-
4/20/0        US         1            MAY 20 NYM EMINI CRUD    07     1.550  US          188,925.00-
                         3*                       LTD- 4/20/20 CLOSE -376.300            565,537.50-
                                      AVG LONG:         .72500

MARGIN CALL AND AGING
   DATE      CURR        CALL AMOUNT      TYP  AGE
 -------     ----       ------------      ---  ---
 4/20/20      US          575,048.85      (M)   1
```

37.     The following day, on April 21, 2020, E*TRADE revised its confirmation to reflect a closing price on Mr. Whitesides' position of -$37.63 and a margin balance owed of $57,532.50 for the expired contracts:

```
4/20/0        US         1            MAY 20 NYM EMINI CRUD    07      .125  US
4/20/0        US         1            MAY 20 NYM EMINI CRUD    07      .500  US
4/20/0        US         1            MAY 20 NYM EMINI CRUD    07     1.550  US
4/21/0        US                   3  MAY 20 NYM EMINI CRUD    07   -37.630  US
              US         3*           3* LTD- 4/20/20       GROSS PROFIT OR LOSS US        57,532.50-
```

38.     Mr. Whitesides attempted to contact E*TRADE throughout the Outage to, among other things, notify E*TRADE that he was unable to exercise his futures contract or otherwise execute any trades in his account, and seek assistance in mitigating his losses. He received no such support and was unable to mitigate his losses.

### Plaintiff Aziz Si Hadj Mohand's Experiences

39.     Plaintiff Aziz Si Hadj Mohand is a customer of E*TRADE. He accepted the Customer Agreement by opening an E*TRADE trading account.

40.     On April 20, 2020, using his E*TRADE trading account, Mr. Mohand

12

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

purchased one e-mini crude oil futures contract with a May 2020 expiration date[4] for $0.55 and sold that contract for $2.85 which resulted in a net profit of $1,150 for this trade (excluding commission).

41.     On the same day, Mr. Mohand purchased one contract for e-mini crude oil futures with a contract expiration of May 2020 for $2.40 totaling $1,200. When the contract price was dropping and he tried to mitigate his losses by selling the contract, as a result of E*TRADE's system failure, he was unable to do so. Despite his best efforts, he was unable to utilize E*TRADE's system to place any trades for e-mini crude oil futures once the prices went negative.

42.     At 5:00pm EST on April 20, 2020, the e-mini crude oil future contract with an expiration of May 2020 expired and was no longer traded. As an example of the system failure E*TRADE suffered; Mr. Mohand received a statement from E*TRADE that showed that his contract was closed at -$376.300 resulting in a margin balance owed to E*TRADE of $189,350 for the expired contracts:

```
*   *   *   *   *   *   *   *       O P E N       P O S I T I O N S   *   *   *   *   *   *   *   *   *   *   *

    TRADE    SETTL    AT       LONG          SHORT      CONTRACT DESCRIPTION          EX    PRICE    CC    DEBIT/CREDIT

    4/20/0           US           1                      MAY 20 NYM EMINI CRUD        07    2.400    US     189,350.00-
                                  1*                     LTD- 4/20/20 CLOSE -376.300               US     189,350.00-
                                                         AVG LONG:        2.40000


    MARGIN CALL AND AGING

      DATE      CURR          CALL AMOUNT        TYP  AGE
    4/20/20      US           189,785.78         (M)   1


                                **SEGREGATED USD**   **TOTAL SEGREGATED**   **CONVERTED TOTAL**
    BEGINNING BALANCE               263.04                263.04                263.04
       COMMISSION                   148.50-               148.50-               148.50-
       EXCHANGE FEE                  22.80-                22.80-                22.80-
       NFA FEE                        1.98-                 1.98-                 1.98-
    TOTAL COMMISSION AND FEES       173.28-               173.28-               173.28-
       GROSS PROFIT OR LOSS         262.50-               262.50-               262.50-
       CASH AMOUNTS                 263.04-               263.04-               263.04-
    ENDING BALANCE                  435.78-               435.78-               435.78-
    OPEN TRADE EQUITY           189,350.00-           189,350.00-           189,350.00-
    TOTAL EQUITY                189,785.78-           189,785.78-           189,785.78-
    ACCOUNT VALUE AT MARKET     189,785.78-           189,785.78-           189,785.78-

    MARGIN DEFICIT              189,785.78-           189,785.78-           189,785.78-

    MARGIN CALL                 189,785.78-           189,785.78-           189,785.78-

    ==============================================================================
```

---

[4] It should be noted that the last trading day for an oil futures contract with a May 2020 expiration date was 5:00pm EST on April 20, 2020, the day of the Outage.

13

SECOND AMENDED CLASS ACTION COMPLAINT

43.     The following day, on April 21, 2020, E*TRADE revised its confirmation to reflect a closing price on Mr. Mohand's position of -$37.63 and a margin balance owed of $20,015 for the expired contracts:

```
*   *   *   *   *   *   *   *   *   P U R C H A S E   &   S A L E   *   *   *   *   *   *   *   *   *
TRADE   SETTL   AT   LONG       SHORT   CONTRACT DESCRIPTION        EX   PRICE    CC   DEBIT/CREDIT
------  -----  --   -----      -----   -----------------------     --   -----    --   ------------
4/20/0          US    1                 MAY 20 NYM EMINI CRUD       07    2.400   US
4/21/0          US           1          MAY 20 NYM EMINI CRUD       07  -37.630   US
                US    1*         1* LTD- 4/20/20                  GROSS PROFIT OR LOSS US       20,015.00-

                             **SEGREGATED USD**    **TOTAL SEGREGATED**   **CONVERTED TOTAL**
BEGINNING BALANCE                    435.78-               435.78-              435.78-
      COMMISSION                       1.50-                 1.50-                1.50-
      NFA FEE                           .02-                  .02-                 .02-
   TOTAL COMMISSION AND FEES           1.52-                 1.52-                1.52-
   GROSS PROFIT OR LOSS            20,015.00-            20,015.00-           20,015.00-
ENDING BALANCE                    20,452.30-            20,452.30-           20,452.30-
TOTAL EQUITY                      20,452.30-            20,452.30-           20,452.30-
ACCOUNT VALUE AT MARKET           20,452.30-            20,452.30-           20,452.30-

MARGIN DEFICIT                    20,452.30-            20,452.30-           20,452.30-
```

44.     Mr. Mohand attempted to contact E*TRADE throughout the Outage to, among other things, notify E*TRADE that he was unable to exercise his futures contract or otherwise execute any trades in his account, and seek assistance in mitigating his losses. He received no such support and was unable to mitigate his losses.

## **Plaintiff Matthew Cheung's Experiences**

45.     Plaintiff Matthew Cheung is a customer of E*TRADE. He accepted the Customer Agreement by opening an E*TRADE trading account.

46.     On April 20, 2020, using his using his E*TRADE trading account, Mr. Cheung purchased one e-mini crude oil futures contract with a May 2020 expiration date for $4.85 totaling $2,425. He subsequently purchased a second e-mini crude futures contract with a May 2020 expiration date for $3.75 totaling $1,875. He purchased a third e-mini crude futures contract with a May 2020 expiration date for $3.10 totaling $1,550.  He purchased a fourth e-mini crude futures contract with a May 2020 expiration date for $2.10 totaling $1,050. Finally, he purchased a fifth e-mini crude futures contract with a May 2020 expiration date for $0.50 totaling $250 (collectively, the "contracts").  As the e-mini crude oil futures dropped into negative

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

1  territory without warning, Mr. Cheung immediately attempted to mitigate his losses
2  by selling the contracts but, as a result of E*TRADE's system failure, he was unable
3  to do so. Despite his best efforts, he was unable to utilize E*TRADE's system to place
4  any trades for e-mini crude oil futures once the prices went negative.

5      47.    At 5:00pm EST on April 20, 2020, the e-mini crude oil future contract
6  with an expiration of May 2020 expired and was no longer traded. As an example of
7  the system failure E*TRADE suffered; Mr. Cheung received a statement from
8  E*TRADE that showed that his e-mini contracts were closed at -$376.300 resulting
9  in a margin balance owed to E*TRADE of $947,900 for the expired contracts:

```
*  *  *  *  *  *  *  *  *     O P E N     P O S I T I O N S  *  *  *  *  *  *  *  *  *  *

TRADE    SETTL   AT     LONG        SHORT      CONTRACT DESCRIPTION        EX    PRICE     CC    DEBIT/CREDIT
-------  -----   --     ----        -----      --------------------        --    -----     --    -----------
4/20/0           US      1                     MAY 20 NYM EMINI CRUD       07     .500     US    188,400.00-
4/20/0           US      1                     MAY 20 NYM EMINI CRUD       07    2.100     US    189,200.00-
4/20/0           US      1                     MAY 20 NYM EMINI CRUD       07    3.100     US    189,700.00-
4/20/0           US      1                     MAY 20 NYM EMINI CRUD       07    3.750     US    190,025.00-
4/20/0           US      1                     MAY 20 NYM EMINI CRUD       07    4.850     US    190,575.00-
                         5*                    LTD- 4/20/20 CLOSE        -376.300          US    947,900.00-
                                               AVG LONG:     2.86000
```

14      48.    The following day, on April 21, 2020, E*TRADE revised its
15  confirmation to reflect a closing price on Mr. Cheung's position of -$37.63 and a
16  margin balance now owed of $101,225 for the expired contracts:

```
*  *  *  *  *  *  *  *  *     P U R C H A S E   &   S A L E  *  *  *  *  *  *  *  *  *  *

TRADE    SETTL   AT     LONG        SHORT      CONTRACT DESCRIPTION        EX    PRICE     CC    DEBIT/CREDIT
-------  -----   --     ----        -----      --------------------        --    -----     --    -----------
4/20/0           US      1                     MAY 20 NYM EMINI CRUD       07     .500     US
4/20/0           US      1                     MAY 20 NYM EMINI CRUD       07    2.100     US
4/20/0           US      1                     MAY 20 NYM EMINI CRUD       07    3.100     US
4/20/0           US      1                     MAY 20 NYM EMINI CRUD       07    3.750     US
4/20/0           US      1                     MAY 20 NYM EMINI CRUD       07    4.850     US
4/21/0           US                     5      MAY 20 NYM EMINI CRUD       07  -37.630     US
                         5*             5*      LTD- 4/20/20            GROSS PROFIT OR LOSS US   101,225.00-
```

21      49.    Mr. Cheung attempted to contact E*TRADE throughout the Outage to,
22  among other things, notify E*TRADE that he was unable to exercise his futures
23  contract or otherwise execute any trades in his account, and seek assistance in
24  mitigating his losses. He received no such support and was unable to mitigate his
25  losses.

26      50.    Critically, for Plaintiffs Whitesides, Mohand and Cheung, at no point on
27  March 20, 2020, nor prior thereto, was any communication made to customers

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

1  regarding the possibility of negative trading in oil futures, nor was the E*TRADE
2  trading software updated to display negative prices or to allow the entering of orders
3  with negative values, preventing each individual (and the class) from closing their
4  positions once the futures contracts were trading in the negative.

5  **Class Action Allegations**

6      51.    Plaintiffs bring claims, pursuant to Federal Rules of Civil Procedure,
7  Rule 23(a) and Rule 23(b)(1)-(3), on behalf of the following class:

9  *All persons and entities within the United States who, on April 20, 2020, held a*
10 *futures contract for NYMEX e-mini crude oil expiring May 2020 in an E*TRADE*
*trading account, but were unable to sell, said futures contract (hereinafter referred*
*to as the "Class").*

12     52.    Plaintiff Mohand brings claims, pursuant to Federal Rules of Civil
13 Procedure, Rule 23(a) and Rule 23(b)(1)-(3), on behalf of the following subclass:
14 *All persons and entities within California who, on April 20, 2020, held a futures*
15 *contract for NYMEX e-mini crude oil expiring May 2020 in an E*TRADE trading*
16 *account, but were unable to sell said futures contract (hereinafter referred to as the*
17 *"Subclass").*

18     53.    Excluded from the Class and Subclass are the E*TRADE entities,
19 counsel for any parties to this litigation, and the Court and its personnel presiding
20 over this action, including, at all relevant times, their employees, members of their
21 immediate families, and their legal representatives, heirs, successors, or assigns, and
22 any entity in which E*TRADE have or had a controlling interest; counsel for any of
23 the parties to this litigation, as well as the Court and its personnel presiding over this
24 action.

25     54.    This action has been brought and may properly be maintained as a class
26 action against E*TRADE pursuant to the provisions of Federal Rule of Civil
27 Procedure 23.

SECOND AMENDED CLASS ACTION COMPLAINT

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

55.     Numerosity: The precise number of members of the proposed Class and Subclass is unknown to Plaintiffs at this time, but, based on information and belief, the members are so numerous that their individual joinder herein is impracticable. Based on information and belief and publicly available reports, members number in the thousands. All members may be notified of the pendency of this action by reference to E*TRADE's records, or by other alternative means.

56.     Commonality: Numerous questions of law or fact are common to the claims of Plaintiffs and members of the proposed Class and Subclass. These common questions of law and fact exist as to all such members and predominate over questions affecting only individual members. These common legal and factual questions include, but are not limited to the following:

a.      Whether E*TRADE's technology was inadequate to provide the trading services that were needed to handle reasonable consumer demand.

b.      Whether E*TRADE failed to provide contingencies to customers to execute timely trades in the event of an outage.

c.      Whether E*TRADE was in breach of its contracts or the implied covenant of good faith and fair dealing in connection with its failure to provide trading services in a timely manner.

d.      With respect to the Subclass, whether E*TRADE's conduct was unlawful or unfair in violation of Section 17201 of the California Business & Professions Code (the "Unfair Competition Law").

e.      Whether Plaintiffs and the other Class and Subclass members were injured by E*TRADE's conduct, and if so, the appropriate class-wide measure of damages, restitution, and other appropriate relief, including injunctive relief.

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

57.     Typicality: The claims of the named Plaintiffs are typical of the claims of the proposed Class. Tthe named Plaintiffs were customers during the class period and were unable to view accurate information about their holdings, unable to place time-sensitive trades, and sustained damages as a result of E*TRADE's wrongful conduct.  For the same reasons, Plaintiff Mohand's claims are typical of the proposed Subclass.  Additionally, Plaintiff Mohand was, at all relevant times, a resident of California.

58.     Adequate Representation: Plaintiffs will fairly and adequately represent the interests of the Class and Mr. Mohand of the Subclass.  They have no conflicts of interest with respect to this action, in relation to other members of the Class and Subclass. Plaintiffs have retained competent counsel experienced in prosecuting complex class actions and securities-related litigation and will vigorously litigate this class action.

59.     Predominance and Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. A class action is superior to other available means, if any, for the fair and efficient adjudication of this controversy. Prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for E*TRADE. Additionally, given the relatively modest damages sustained by most individual class members, few, if any, proposed class members could or would sustain the economic burden of pursuing individual remedies for E*TRADE's wrongful conduct. Treatment as a class action will achieve substantial economies of time, effort, and expense, and provide comprehensive and uniform supervision by a single court. This class action presents no material difficulties in management.

60.     Class action certification is warranted under Fed. R. Civ P. 23(b)(1)(A) because the prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent or varying adjudications with respect to

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

1  individual class members, which may produce incompatible standards of conduct for
2  Defendants.

3       61.    Class action certification is warranted under Fed. R. Civ P. 23(b)(1)(B)
4  because the prosecution of separate actions by individual members of the proposed
5  class would create a risk of adjudications with respect to individual class members
6  which may, as a practical matter, be dispositive of the interests of the other members
7  not parties to the adjudications or substantially impair or impede their ability to
8  protect their interests.

9       62.    The prerequisites to maintaining a class action for injunctive or equitable
10  relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as E*TRADE has acted or refused
11  to act on grounds generally applicable to the class, thereby making final injunctive,
12  declaratory, or equitable relief appropriate with respect to the class as a whole.

13       63.    Class action certification is also warranted under Fed. R. Civ P. 23(b)(3)
14  because questions of law or fact common to the class members predominate over any
15  questions affecting only individual members, and a class action is superior to other
16  available remedies for the fair and efficient adjudication of this controversy. The
17  amount of damages available to the Plaintiffs and individual members of the Class and
18  Subclass is insufficient to make litigation addressing E*TRADE's conduct
19  economically feasible for most in the absence of the class action procedure.
20  Individualized litigation also presents a potential for inconsistent or contradictory
21  judgments and increases the delay and expense to all parties and the court system
22  presented by the legal and factual issues of the case. By contrast, the class action device
23  presents far fewer management difficulties and provides the benefits of a single
24  adjudication, economy of scale, and comprehensive supervision by a single court.

25       64.    Class action certification is also warranted under Fed. R. Civ P. 23(c)(4)
26  because questions of law or fact common to the class members may be certified and
27  decided by this Court on a class-wide basis.

28

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

## CAUSE OF ACTION I
### For Breach of Contract

65.     Plaintiffs hereby incorporate by reference the factual allegations set forth above.

66.     Customers must enter into the Customer Agreement with Defendant E*TRADE to open, establish and maintain an E*TRADE trading account for the purchase, sale or carrying of securities or contracts relating thereto. **Exhibit A** at 1. The Customer Agreement provides the terms and conditions "under which E*TRADE will establish and maintain one or more accounts on behalf of the Account Holder and shall govern the Account Holder's relationship with E*TRADE, including all transactions between E*TRADE and the Account Holder and all products and services now and in the future offered through E*TRADE." *Id*.

67.     Use of E*TRADE's website and platform is governed by E*TRADE's Customer Agreement which provides, as follows: "E*TRADE offers a variety of ways to access the Account, including telephone, online, mobile application and interactive voice response services." The Customer Agreement further acknowledges that E*TRADE's website and mobile application may make available "Market Data" which is defined as "all data distributed by E*TRADE regarding bids, offers and market transactions and all information based on any such data."

68.     E*TRADE breached its Customer Agreement by, among other things, (i) failing to provide adequate technological systems necessary to perform under these contracts; (ii) failing to provide trading services when an Outage occurred due to a lack of infrastructure and alternate means for customers to place timely trades; (iii) failing to provide access to its trading services in a timely manner; and (iv) otherwise permitting the Outage to occur and thereby prohibiting the parties from performing in a timely manner (or at all) under the contracts.

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

69.     E*TRADE's failure to perform and its breaches of the Customer Agreement resulted in damages and losses to Plaintiffs and members of the Class and Subclass. These losses reflect damages to Plaintiffs and members of the Class and Subclass in an amount to be determined at trial or separate proceedings as necessary.

**CAUSE OF ACTION II**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**

70.     Plaintiffs hereby incorporate by reference the factual allegations set forth above.

71.     Plaintiffs and members of the Class and Subclass entered into the Customer Agreement with Defendant E*TRADE to open an E*TRADE trading account. **Exhibit A**. They agreed to E*TRADE's Terms and Conditions by using E*TRADE's website and trading platform.

72.     Plaintiffs and members of the Class and Subclass fulfilled their obligations under these contracts by adhering to their terms and using E*TRADE's trading services through its website and trading platform.

73.     E*TRADE was obligated under the Customer Agreement and E*TRADE Terms and Conditions to timely provide the trading services required under those contracts at all times, including but not limited to when Plaintiffs and members of the Class and Subclass attempted to use the service during the Outage.

74.     E*TRADE unfairly interfered with the rights of Plaintiffs and members of the Class and Subclass to receive the benefits of the Customer Agreement by, among other things, (i) failing to provide adequate technological systems necessary to perform under the contract; (ii) failing to provide trading services when an Outage occurred due to a lack of infrastructure and alternate means for customers to place timely trades; (iii) failing to provide access to its trading services in a timely manner; and (iv) otherwise permitting the Outage prohibiting the parties from performing in a timely manner (or at all) under the contracts.

75.     E*TRADE's conduct has caused Plaintiffs and members of the Class and Subclass harm, losses, and damages. These losses reflect damages to Plaintiffs and members of the Class and Subclass in an amount to be determined at trial or separate proceedings as necessary.

## CAUSE OF ACTION III
### Violation of California Unfair Competition Law,
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

76.     Plaintiff Mohand hereby incorporates by reference the factual allegations set forth above and further asserts this cause of action with respect to himself individually and on behalf of the Subclass.

77.     E*TRADE has engaged in unfair competition within the meaning of California Business & Professions Code section 17200, *et seq.*, because E*TRADE's conduct is unlawful and unfair, as herein alleged.

78.     Plaintiff Mohand and members of the Subclass and E*TRADE are each a "person," or "persons," within the meaning of Section 17201 of the California Unfair Competition Law ("UCL").

79.     The UCL prohibits any unlawful or unfair business practices or acts. E*TRADE's conduct, as alleged herein, constitutes an unlawful and unfair business practice that occurred in connection with the marketing, advertisement, and sale of its services.

80.     E*TRADE's conduct, as described within, violated the UCL's unlawful prong because: it constitutes a breach of contract or of the implied covenant of good faith and fair dealing.

81.     E*TRADE's conduct, as described within, violated the UCL's unfair prong because its conduct was and remains immoral, unethical, oppressive, or unscrupulous and has caused injuries to the Plaintiff Mohand and members of the Subclass that outweigh any purported benefit. E*TRADE's (i) failure to provide

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

22

adequate technological systems necessary to perform under the parties' agreement(s); (ii) trading services when an Outage occurred due to a lack of infrastructure and alternate means for customers to place timely trades; (iii) bids and offers that were reasonably related to current market prices and conditions; (iv) failure to display accurate balances and/or live account values; (v) failure to identify trading anomalies or patterns that indicate a system malfunction;(vi) failure to provide access to its trading services in a timely manner; (vii) decision to ignore the CME Group advisory on April 15, 2020 for firms to test negative price trading, especially as it related to the NYMEX energy futures contracts; and (viii) decision to otherwise permit the Outage prohibiting the parties from performing in a timely manner (or at all) under the parties' agreements caused Plaintiffs and class members to suffer losses. The utility of E\*TRADE's conduct is far outweighed by the gravity of harm to consumers who have now incurred losses they would not have otherwise.

82.     As a direct and proximate result of E\*TRADE's conduct, which constitutes unlawful and unfair business practices, Plaintiffs and class members have been damaged and suffered ascertainable losses, thereby entitling them to recover restitution and equitable relief, including disgorgement or ill-gotten gains, refunds of moneys, interest, reasonable attorneys' fees, filing fees, and the costs of prosecuting this class action, as well as any and all other relief that may be available at law or equity.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the class and award the following relief:

A.     Certifying the Class and Subclass and naming Plaintiffs as representative thereof and Plaintiffs' attorneys as Class Counsel to represent the class members;

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

1      B.     Finding in favor of Plaintiffs and the members of the Class and Subclass

2 on all causes of action asserted herein;

3      C.     Granting damages and/or restitution to Plaintiffs and members of the

4 Class and Subclass;

5      D.     Granting compensatory damages, the amount of which is to be

6 determined at trial;

7      E.     Granting pre- and post-judgment interest on all amounts awarded;

8      F.     Granting restitution and all other forms of equitable monetary relief;

9      G.     Granting injunctive relief as pleaded or as the Court may deem proper;

10      H.     Awarding Plaintiffs and members of the Class and Subclass

11 reasonable attorneys' fees and expenses and costs of suit; and

12      I.     Granting further relief as this Court may deem just and proper.

13

14 DATED: April 12, 2021           Respectfully submitted,
                               KABATECK LLP

15

16                                By: /s/Christopher B. Noyes

17                                BRIAN S. KABATECK
                               CHRISTOPHER B. NOYES

18                                JOANA FANG

19                                Attorneys for Plaintiffs

20 DATED: April 12, 2021           Respectfully submitted,
                               GIRARD BENGALI, APC

21

22                                By: /s/Omar Bengali

23                                ROBERT J. GIRARD II

24                                OMAR H. BENGALI
                               STEVEN M. BUHA

25                                Attorneys for Plaintiffs

26

27

28

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

SECOND AMENDED CLASS ACTION COMPLAINT

1

## **JURY DEMAND**

2       Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs, individually and on behalf of the

3   Class and Subclass, demand a trial by jury for all issues so triable.

4   DATED: April 12, 2021              Respectfully submitted,
5                                      KABATECK LLP

6                              By:  /s/Christopher B. Noyes
7                                    BRIAN S. KABATECK
8                                    CHRISTOPHER B. NOYES
                                     Attorneys for Plaintiffs
9

10  DATED: April 12, 2021             Respectfully submitted,
                                      GIRARD BENGALI, APC
11

12                             By:  /s/Omar Bengali
                                     ROBERT J. GIRARD II
13                                   OMAR H. BENGALI
                                     STEVEN M. BUHA
14                                   Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT

GIRARD BENGALI, APC
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

**Exhibit 1**

August 03, 2020 1:49 PM ET

**E*TRADE CUSTOMER AGREEMENT**

*(effective as of June 30, 2020)*

Please refer here for a summary of changes from the E*TRADE Customer Agreement dated April 15, 2019.

## 1. INTRODUCTION

The Customer Agreement, consisting of this base account agreement, the Options Supplement, and supplements listed below (to the extent applicable based on the Account Holder's selections on the Account Application), including all schedules, exhibits, and the Account Application, sets forth the terms and conditions under which E*TRADE will establish and maintain one or more accounts on behalf of the Account Holder and shall govern the Account Holder's relationship with E*TRADE, including all transactions between E*TRADE and the Account Holder and all products and services now and in the future offered through E*TRADE, beginning on the date the Account is opened.

- Margin Account Supplement
- Commodity Futures Supplement

If the Account Holder participates in other services provided by E*TRADE or elects certain account types that require the Account Holder to agree to other specific terms and conditions (including electronically, through electronic signature, clicks, or other actions) or otherwise, such terms and conditions will be deemed an amendment and will be incorporated into and made part of this Customer Agreement.

E*TRADE reserves the right to decline any Account Application, to terminate any Account at any time, and to decline to provide any service, in each case at E*TRADE's sole discretion. As part of the termination process, E*TRADE reserves the right to liquidate the Account Holder's positions upon 30 days' advanced notice to the Account Holder. The Account Holder understands and agrees to be responsible for the tax implications associated with E*TRADE's liquidation process.

To help the government fight the funding of terrorism and money laundering activities, E*TRADE is required by Applicable Law to obtain, verify, and record information that identifies any person who opens an Account.

Various features of the Account(s) with E*TRADE are offered or processed through service providers, which may be an unaffiliated company or an E*TRADE Entity.

**THE ACCOUNT HOLDER UNDERSTANDS THAT E*TRADE RESERVES THE RIGHT TO AMEND, MODIFY, OR TERMINATE THIS CUSTOMER AGREEMENT, INCLUDING THE FEE SCHEDULE, DISCLOSURES, AND SERVICES PROVIDED HEREUNDER, AT ANY TIME OR FROM TIME TO TIME IN ACCORDANCE WITH THE TERMS OF THIS CUSTOMER AGREEMENT AND APPLICABLE LAW. WHILE E*TRADE WILL ENDEAVOR TO PROVIDE 30 DAYS' PRIOR NOTICE OF ANY SUCH AMENDMENT TO THIS CUSTOMER AGREEMENT, THE ACCOUNT HOLDER UNDERSTANDS THAT, EXCEPT AS OTHERWISE INDICATED, ANY AMENDMENT TO THIS CUSTOMER AGREEMENT WILL BE EFFECTIVE AS OF THE DESIGNATED EFFECTIVE DATE. THE ACCOUNT HOLDER ALSO UNDERSTANDS THAT BY CONTINUING TO MAINTAIN AN ACCOUNT, THE ACCOUNT HOLDER IS ACCEPTING THE TERMS OF THE ACCOUNT AGREEMENT AS AMENDED AND WILL BE LEGALLY BOUND BY SUCH AMENDED TERMS AND CONDITIONS.**

## 2. DEFINITIONS

The terms set forth below have the following meanings as used in the Customer Agreement.

**"Access Means"** shall mean any logon, user ID, password, and authentication device by which the Account Holder may access the Account, Account features, or Service, whether provided by E*TRADE or any third party.

**"Account"** shall mean each account at E*TRADE established in the Account Holder's name alone, in the Account Holder's name together with others, or in which the Account Holder has a beneficial interest.

**"Account Application"** shall mean the application the Account Holder prepares and submits to open an Account with E*TRADE, including all information provided by the Account Holder to E*TRADE in connection with the opening or maintenance of the Account, and any amendments or subsequent applications submitted by the Account Holder to E*TRADE for additional Service or Account features and as part of which the Account Holder consents to the terms and conditions of this Customer Agreement (into which the Account Application is incorporated by reference) and which includes an acknowledgment and agreement to the applicable disclosures in Section 16 of this Customer Agreement, which disclosures may require separate endorsement.

**"Account Holder"** shall mean the person, corporation, partnership, trustee, custodian, or other entity that is the owner specified on the Account Application and in whose name the Account is opened. The singular of the Account Holder where appropriate shall include the plural and may also refer to any such person, corporation, partnership, trustee, custodian, or other entity that owns a legal or beneficial interest in the Account. Account Holders acknowledge that E*TRADE shall not have an obligation to deliver any Account documents, notices, or communications to an Authorized Agent unless explicitly instructed by Account Holder.

**"Applicable Law"** shall mean all applicable laws, rules, and regulations, including without limitation US federal, state, and local laws; the applicable laws of any foreign governmental authority; the constitution, by-laws, rules, regulations, customs, and uses of the exchange or market and its clearinghouse, if any, where any transaction for an Account is executed; and the applicable rules of any self-regulatory organization of which E*TRADE is a member.

**"ATM"** shall mean an automated teller machine.

**"Authorized Agent"** shall mean any person or entity authorized by the Account Holder to provide instructions to E*TRADE, including without limitation any person authorized by the Account Holder to make investment or trading decisions on behalf of the Account Holder or to withdraw funds from the Account. The term "Authorized Agent" shall include any investment adviser selected by the Account Holder, whether selected by the Account Holder independently or with assistance from E*TRADE, and shall include fiduciaries and/or Account Holder parties such as a Uniform Gifts to Minors Act ("**UGMA**") or Uniform Transfers to Minors Act ("**UTMA**") custodian, trustee, conservator, guardian, representative, administrator, executor, and attorney-in-fact.

**"Available Funds"** shall mean the sum of any Cash Balance, the value of any investments in a Sweep Product (as defined in Section 7 hereunder), less uncleared credits and any Debit Balance.

**"Banking Services"** shall mean certain Electronic Funds Transfer (as defined below), ATM, debit card, and related banking services accessible through the Account and provided by a bank or other depository institution.

**"Business Day"** shall mean Monday through Friday, excluding stock exchange holidays and closings. Although E*TRADE may conduct business on bank holidays, bank holidays are not considered Business Days for purposes relating to the Banking Services.

**"Cash Account"** shall mean an Account at E*TRADE offers in which the Account Holder makes all purchases for cash settlement, without credit.

**"Cash Balance"** shall mean any cash balances in the Account representing money owed to the Account Holder as a general obligation of E*TRADE on demand. E*TRADE is not a bank or other depository institution. Cash Balances are not bank deposits and are not insured by the FDIC (as defined below). The Cash Balance is the sum of the uninvested cash in the Account less the following: (i) funds necessary to pay for purchase transactions due to settle on or after the date the Cash Balance is to be determined; (ii) charges to the Account, including Electronic Funds Transfer and wire transfer charges; (iii) credit balances that are designated as collateral for the Account Holder's Obligations (as defined below) to cover margin loans, Short Sales, and/or options positions, or credit balances not otherwise payable on demand; and (iv) funds held in any Sweep Product (as defined in Section 7 hereunder).

"**Collateral**" shall mean all right, title, and interest of the Account Holder in and to (i) each deposit, custody, securities, commodity, or other Account maintained by the Account Holder with E*TRADE, including without limitation the Account; (ii) any cash, securities, commodity contracts, financial assets, or other property at any time carried in or credited to any such Account; (iii) all of the Account Holder's right, title, and interest in, to, or under any contract with, or obligation of, E*TRADE; (iv) any property of the Account Holder in which E*TRADE is granted a security interest (however held); and (v) all profits, dividends, interest, distributions, or other proceeds of any of the foregoing, in each case whether now existing or owned by the Account Holder or hereafter arising or acquired.

"**Control Securities**" shall have the meaning provided in Securities Act Rule 144.

"**Customer Agreement**" shall mean this base account agreement; applicable supplements, schedules, and exhibits; the Account Application; and any other agreement required to be entered into as a result of the account services or account type selected, all of which are incorporated by reference, entered into between the Account Holder and E*TRADE, which the Account Holder agrees to abide by when the Account Holder opens any Account, as may be amended from time to time, and which sets forth the terms and conditions under which E*TRADE will establish and maintain one or more Accounts on the Account Holder's behalf and will otherwise transact business with the Account Holder. If the Account Holder participates in other Services provided by E*TRADE, or elects certain account types, that require the Account Holder to agree to other specific terms and conditions (including electronically, through electronic signature, clicks, or other actions) or otherwise, such terms and conditions will be deemed an amendment and will be incorporated into and made part of this Customer Agreement.

"**Data Provider**" shall mean the Securities Information Processors, as defined in Section 11A of the Securities Exchange Act of 1934; securities and commodities futures exchanges; and data consolidators from which E*TRADE receives Market Data.

"**Debit Balance**" shall mean an Account balance representing amounts owed to E*TRADE.

"**Electronic Funds Transfer**" shall mean any transfer of funds that the Account Holder initiates or authorizes through an electronic payment system such as the Automated Clearing House ("**ACH**") Network.

"**E*TRADE**" shall mean E*TRADE Securities with respect to a securities Account and E*TRADE Futures with respect to a commodity futures Account. E*TRADE Securities and E*TRADE Futures are both E*TRADE Entities and affiliates of E*TRADE Bank.

"**E*TRADE Entity**" and "**E*TRADE Entities**" shall mean E*TRADE Securities, E*TRADE Futures, E*TRADE Bank, E*TRADE Savings Bank, any of their subsidiaries, parents (including the ultimate parent company, "**E*TRADE Financial Corporation**"), and affiliates and their officers, directors, employees, representatives, agents, successors, and assigns, as the context may require. All E*TRADE Entities, their agents, and service providers acting on behalf of any E*TRADE Entities under this Customer Agreement are authorized to perform the services contemplated by this Customer Agreement.

"**E*TRADE Futures**" shall mean E*TRADE Futures LLC.

"**E*TRADE Indemnified Parties**" shall mean all the E*TRADE Entities and their respective officers, directors, employees, and agents.

"**E*TRADE Securities**" shall mean E*TRADE Securities LLC.

"**Event of Default**" shall mean (i) any default on any Obligations (as defined below) under this Customer Agreement when due; (ii) Account Holder's becoming bankrupt, insolvent, or subject to any bankruptcy, reorganization, insolvency, or similar proceeding, or where all or substantially all of their assets become subject to a suit, levy, enforcement, or other legal process where a secured party maintains possession of such assets, Account Holder has a resolution passed for its winding-up, official management, or liquidation (other than pursuant to a consolidation, amalgamation, or merger), seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian, or other similar official for Account Holder or for all or substantially all of their assets, has a secured party take possession of all or substantially all of their assets, or Account Holder takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or (iii) where any representation or warranty made or deemed made under the Customer Agreement proves false or misleading in any material respect when made or deemed made.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**FDIC**" shall mean the Federal Deposit Insurance Corporation.

"**Fee Schedule**" shall mean the schedule of brokerage commissions, fees, and other charges applicable to the Account for the Service.

"**FINRA**" shall mean the Financial Industry Regulatory Authority, Inc., of which E*TRADE is a member firm. Where the context requires, FINRA also refers to any other FINRA affiliate or division such as FINRA Dispute Resolution.

"**Force Majeure Event**" shall mean any act beyond E*TRADE's control, including any earthquake, flood, severe or extraordinary weather conditions, natural disasters or other act of God; fire; acts of war; acts of foreign or domestic terrorism; insurrection, riot, strikes, labor disputes, or similar problems; accident; action of government; government restriction; exchange or market regulation; suspension of trading; communications, system, or power failures; cybersecurity incident; epidemic, pandemic, or disease outbreak; and equipment or software malfunction.

"**Good Deliverable Form**" shall mean the delivery to E*TRADE of freely transferable securities that are properly endorsed, registered, and fully negotiable.

"**Losses**" shall mean any and all costs, claims, liabilities, losses, judgments, awards, settlements, taxes, penalties, actions, damages, charges, expenses, or fees (including any special, indirect, incidental, punitive, or consequential loss or damage, attorney fees, and costs of collection) of any nature whatsoever.

"**Margin Account**" shall mean an Account that allows the Account Holder to make purchases, sell securities "short," and effect options transactions using funds or securities borrowed from E*TRADE.

"**Market Data**" shall mean all data distributed by E*TRADE regarding bids, offers, and market transactions and all information based on any such data.

"**NMS Security**" shall have the meaning provided to it in Exchange Act Rule 600(b)(46).

"**NYUCC**" shall mean the Uniform Commercial Code, as adopted and enacted and as in effect from time to time in the State of New York.

"**Obligations**" shall mean any and all obligations of the Account Holder to E*TRADE arising at any time and from time to time under or in connection with any and all agreements, including this Customer Agreement, with E*TRADE (including but not limited to obligations to deliver or return margin or other assets or property (howsoever described) under or in connection with any such agreement), in each case whether now existing or hereafter arising, whether or not mature or contingent.

"**Pattern Day Trader**" shall have the meaning provided in FINRA Rule 4210.

"**PIN**" shall mean personal identification number.

"**Recommendation**" shall have the meaning prescribed in Section 9.

"**Regulation Best Interest**" shall mean the requirements pursuant to Exchange Act Rule 15l-1.

"**Relationship Guide**" shall mean the disclosure provided by E*TRADE pursuant to Regulation Best Interest when making a Recommendation.

"**Relationship Summary**" shall mean the Form Customer Relationship Summary (CRS) for E*TRADE and E*TRADE Capital Management, LLC.

"**Restricted Securities**" shall have the meaning provided in Rule 144 under the Securities Act.

"**Retirement Account**" shall mean any Account that is opened in accordance with the terms of Section 6.

"**SEC**" shall mean the US Securities and Exchange Commission.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Service**" shall mean the securities brokerage, commodity futures brokerage, financial, and other services that E*TRADE may offer from time to time.

"**Settlement Date**" shall mean the date a purchase or sale in an Account is scheduled to be paid for or delivered.

"**Short Sale**" shall mean the sale of a security required to be marked "short" in accordance with Applicable Law. A Short Sale is generally any sale of a security that the Account Holder is not net "long," which the Account Holder intends to satisfy by delivery of borrowed securities, or which the Account Holder does not intend to deliver in Good Deliverable Form by the Settlement Date.

**Other Terminology**

Wherever required by the context of this Customer Agreement, the singular shall include the plural and vice versa, and the neutral gender shall include the masculine and feminine genders and vice versa. References to any agreement, document, or instrument shall be deemed to refer to such agreement, document, or instrument as amended, supplemented, or modified from time to time.

When used herein: (i) the word "or" is not exclusive unless the context clearly requires otherwise; (ii) the words "including," "includes," "included," and "include" are deemed to be followed by the words "without limitation"; (iii) the terms "herein," "hereof," and "hereunder" and other words of similar import refer to this Customer Agreement as a whole and not to any particular section, paragraph, or subdivision; and (iv) all section, paragraph, and clause references not attributed to a particular document shall be references to such parts of this Customer Agreement; and all exhibit, annex, and schedule references not attributed to a particular document shall be references to such exhibits, annexes, and schedules of this Customer Agreement.

## 3. GENERAL ACCOUNT TERMS

**Current and Accurate Information; Account Ownership**

The information the Account Holder has provided on the Account Application is current, accurate, truthful, and complete. The Account Holder agrees to notify E*TRADE of any change to the information provided on the Account Application promptly, but in any event within 30 days of such change. The Account Holder agrees to indemnify and hold the E*TRADE Entities harmless from and against any and all Losses arising out of or relating to the Account Holder's failure to provide true and accurate information on the Account Application or to update such information. The Account Holder further represents that no one else has an interest in the Account except for those persons whom the Account Holder has previously disclosed to E*TRADE through the Account Application or otherwise in a manner specified by E*TRADE.

**Fees and Commissions**

The Account Holder agrees to promptly pay all brokerage commissions, charges, securities-borrowed fees, regulatory pass-through fees, and other fees as may be applicable to the Account or any transaction in the Account based on the then-effective Fee Schedule. The Fee Schedule may require a minimum Account balance, assess fees for inactive Accounts, and assess fees for Account terminations or transfers. In addition, the Account Holder agrees to pay all taxes applicable to the Account, any transaction in the Account, or the use of any Service. The Account Holder authorizes E*TRADE to automatically debit the Account for any such brokerage commissions, charges, fees, and taxes.

The Account Holder understands that the Account Holder will be provided with an indicative "borrow rate" for a hard-to-borrow security at the time the Account Holder previews a short sell order for that security but that the actual "borrow rate" for the security may be different.

The fees and charges applicable to the Account for the Service are generally set forth in the Fee Schedule. The Fee Schedule is available on *etrade.com* and is incorporated by reference into this Customer Agreement. E*TRADE may, in its sole discretion, modify the Fee Schedule from time to time or at any time, with or without notice. Modifications to the Fee Schedule are effective as of the date of publication or the effective date as otherwise indicated by E*TRADE. Continued use of the Account or Service following modification of the Fee Schedule will evidence the Account Holder's consent. Certain fees and charges applicable to the Account for a particular Service may be assessed in conjunction with such Service and may not be included in the Fee Schedule. The Account Holder agrees to promptly pay all such fees and charges as a term and condition of using the particular Service. E*TRADE reserves the right to negotiate different fees and charges than those included in the Fee Schedule or elsewhere, including variable-rate commissions and interest charges.

**Applicable Law**

All transactions in the Account are subject to Applicable Law. In no event will E*TRADE be obligated to effect any transaction or act on any instruction that it believes would violate Applicable Law. The Account Holder agrees that E*TRADE and the Account Holder are each obligated to comply with Applicable Law. The Account Holder acknowledges that the Service is inherently a US service, subject to an extensive framework of US laws and regulations. E*TRADE shall have no duty to determine whether the Account Holder is in compliance with Applicable Law, and E*TRADE shall not be liable to the Account Holder as a result of any action or inaction taken by E*TRADE to comply with Applicable Law. If there is a change in any Applicable Law that is inconsistent with any provision herein, the affected provision shall be deemed modified or superseded, as the case may be, by the Applicable Law, and all other provisions of this Customer Agreement shall in all respects continue in full force and effect. The Account Holder acknowledges and agrees that the Account Holder does not have a private right of action with respect to any Applicable Law.

**Taxpayer Identification Number and Backup Withholding**

If a correct taxpayer identification number is not provided to E*TRADE, the Account Holder understands and agrees that the Account Holder may be subject to backup withholding tax at the appropriate rate on all dividends, interest, and gross proceeds paid to the Account Holder. Backup withholding taxes are sent to the appropriate taxing authority and cannot be refunded by E*TRADE.

**Account Types**

E*TRADE offers many different account types, including Retirement Accounts; custodial, business, and other nonpersonal accounts; and estate, trust, nonprofit, and partnership accounts. Account types may be subject to certain restrictions and eligibility requirements, and certain Services are not available to all Account Holders and account types, including without limitation Account Holders residing outside the United States. Although E*TRADE may provide educational tools about account types, the Account Holder is responsible for selecting the account type that is appropriate for the Account Holder's needs and circumstances. E*TRADE reserves the right to limit the number of Accounts the Account Holder maintains, or has a beneficial interest in, at any one time. An Account Holder using a single logon or user ID may not qualify for promotional benefits by opening multiple accounts. The Account Holder should refer to *etrade.com* for additional information about account types.

**Joint Accounts**

If there is more than one Account Holder, the legal ownership of the Account will be as designated on the Account Application. If no designation is made, each Account Holder directs E*TRADE to establish the Account as Joint Tenants with Rights of Survivorship account. In the limited case where a Joint Tenants by the Entirety account becomes custodied at E*TRADE, the account will be subject to and administered in accordance with this paragraph.

If there is more than one Account Holder, each Account Holder agrees to be jointly and severally liable for all Obligations arising under this Customer Agreement or otherwise relating to the Account, including, as mentioned herein, where the Account Holders have designated the legal ownership of the Account as a Joint Tenants by the Entirety account, whether or not the Account Holder participates in the transaction or benefits from its proceeds, including responsibility for orders entered through the Service or using any Access Means, regardless of which Account Holder gives such instructions, enters such orders, or changes any Access Means. Each Account Holder has full authority, acting individually and without notice to any other Account Holder (including as agent on behalf of any other Account Holder(s)), to take action on behalf of the Account and provide instructions to E*TRADE as fully and completely as if such Account Holder were the sole Account Holder. Each Account Holder authorizes E*TRADE to follow the instructions of any other Account Holder concerning any matter pertaining to the Account. This includes any purchase or sale of securities (on margin or otherwise) for the Account and any delivery or disbursement of any Collateral credited to the Account. E*TRADE is not responsible for determining the purpose or propriety of any instruction received from any Account Holder as against any other Account Holder or of any disposition of payments or deliveries of Collateral between or among Account Holders. E*TRADE will not notify other Account Holders of the actions taken by any one Account Holder. Each Account Holder agrees that notice provided to any one Account Holder will be deemed to be notice to all Account Holders for all purposes.

Notwithstanding the foregoing, E*TRADE, at its sole discretion, reserves the right to require written instructions from one or all Account Holders. If E*TRADE receives instructions from any Account Holder that, in E*TRADE's opinion, conflicts with instructions received from any other Account Holder, E*TRADE may, but is not obligated to, comply with any of these instructions or advise each Account Holder of the apparent conflict and take no action as to any of these instructions until it actually receives and has a reasonable amount of time to act on satisfactory instructions from any or all Account Holders. In addition, E*TRADE reserves the right to require the signature or consent of both Account Holders of a Joint Tenants by the Entirety account at any time with respect to any instruction.

E*TRADE reserves the right to require Account Holders of a Joint Tenants by the Entirety account to execute an amendment to the Customer Agreement, which may, among other terms, require the Account Holders to acknowledge joint and several liability for all Obligations that arise in the functioning and administration of the Account. In any such case where an Account's ownership indicates a Joint Tenants by the Entirety account, it shall be the Account Holders' sole responsibility to determine when such ownership titling is in compliance with Applicable Law. In no case shall such ownership in any way impair, alter, or prejudice E*TRADE's ability to enforce any Obligations against one or both Account Holders.

In the event of a dispute of which E*TRADE has notice between or among Account Holders, including where E*TRADE receives notice from an Account Holder of a Joint Tenants by the Entirety account revoking the authority of the other Account Holder(s) of such Joint Tenants by the Entirety account to act on the Account Holder's behalf, E*TRADE reserves the right, but is not obligated, to place restrictions on the Account. For example, if an Account Holder requests that a restriction be placed on access to funds in the Account because of a pending divorce, litigation, or dispute between Account Holders, E*TRADE may prohibit all transfers of funds from the Account, including canceling check-writing and debit card privileges, with such restrictions to remain in place until E*TRADE actually receives and has a reasonable amount of time to act on appropriate court documentation or a written, notarized instruction signed by all the Account Holders. In such a case, all Account Holders remain liable for any pending checks that have not yet cleared at the time

restrictions were put in place. E*TRADE Entities also may, at the expense of the Account Holders, commence or defend any action or proceeding for or in the nature of interpleader to have the dispute resolved judicially. If a suit or proceeding for or in the nature of interpleader is brought by or against E*TRADE Entities, E*TRADE may liquidate the securities positions in the Account and deliver the proceeds into the registry of the court, at which time the E*TRADE Entities will be deemed to be and will be released and discharged from all further Obligations and responsibilities under this Customer Agreement.

Each Account Holder agrees that, on the death or disability of another Account Holder, divorce of married Account Holders, or other event that causes a change in ownership or capacity with respect to the Account, the remaining Account Holder(s) will immediately notify E*TRADE of such change of ownership or capacity. No E*TRADE Entities will be responsible for any transfers, payments, or other transactions in the Account made at the direction of a former Account Holder or incapacitated Account Holder until E*TRADE has actually received and had a reasonable amount of time to act on such notice. Following receipt of such notice, E*TRADE Entities may require additional documents and reserve the right to retain such assets in and/or restrict transactions in the Account as E*TRADE deems advisable at its sole discretion. Any former Account Holder and the estate of any deceased or incapacitated Account Holder will remain jointly and severally liable to the E*TRADE Entities for any Losses in the Account arising out of or relating to transactions initiated before E*TRADE actually received and had a reasonable amount of time to act on such notice.

The pledge, assignment, or other transfer by an Account Holder of such person's interest as a joint tenant in a Joint Tenants by the Entirety account shall require written notice to E*TRADE and the written consent of all other Account Holders. In the case of any such transfer (other than a pledge), unless otherwise directed by the transferring Account Holder and the assignee and consented to by E*TRADE, the Account will be deemed to be reconstituted as a Joint Tenants with Rights of Survivorship account among the assignee and the remaining Account Holder(s), and the assignee and the remaining Account Holder(s) shall be required to execute (or co-execute) a new version or counterpart of this Customer Agreement.

From time to time, married individuals who reside in community property states may choose to include a community property designation in the joint account titling. In such cases, it is the Account Holders' responsibility to determine if this type of ownership is permitted under their state law. Account Holders may seek counsel to determine the availability and impact of the community property designation. Accounts bearing the community property designation will be subject to the terms of this "Joint Accounts" provision. E*TRADE may reasonably rely on the instructions provided by one Account Holder in a jointly owned community property Account, and the Account Holders agree to indemnify and hold E*TRADE harmless from any claims, losses, or damages caused by or related to E*TRADE's reliance on any instructions received from one Account Holder.

**Custodial Accounts**

If the Account is opened under either the UGMA or the UTMA, the custodian represents that all assets in the Account belong to the beneficiary and that the custodian will use the assets only for the beneficiary's benefit (even after the assets have been removed from the Account). The custodian agrees to promptly transfer and deliver to the beneficiary all securities and other property held in the Account upon the beneficiary's attaining the age specified by the governing state's law for termination of the custodianship. If the custodian does not indicate the age of termination, the Account will be set up using the default age of termination in the custodian's state of residence as indicated in the custodian's account-opening documentation. If the age of termination selected is different from the state's default age, the custodian agrees and acknowledges that they are responsible under the applicable UGMA or UTMA for determining the proper age of termination and that E*TRADE is not responsible for doing so. Upon the termination of the custodianship, the custodian agrees to provide to E*TRADE, on request, the beneficiary's address, phone number, and any other information that may help E*TRADE contact the beneficiary. In addition, the custodian acknowledges that E*TRADE may restrict the custodian's access to the Account upon termination of the custodianship.

**Account Deposits**

E*TRADE accepts deposits to the Account via cash, check, wire, and other sources. E*TRADE also credits the Account for securities sales proceeds, interest, dividends, and other distributions on Collateral in the Account. E*TRADE may, as a matter of bookkeeping convenience, credit the Account with funds deposited to the Account; the proceeds from the sale, redemption, or other disposition of Collateral; and income payable on Collateral prior to E*TRADE's actual receipt of final payment therefor. The Account Holder agrees that such bookkeeping credits may also be reflected as "immediately available" or "same day" funds or by some other characterization. Notwithstanding any such credit or characterization, all such credits shall be conditional on E*TRADE's actual receipt of funds or final payment and may be reversed by E*TRADE to the extent that final payment is not received.

If E*TRADE, at its sole discretion, permits the Account Holder to use funds credited to the Account prior to receipt by E*TRADE of final payment thereof, the Account Holder shall nonetheless continue to bear the risk of, and liability for, E*TRADE's nonreceipt of final payment in full; and to the extent that final payment in full for any Collateral delivered on any Business Day is not received by E*TRADE by the close of business on such day, the Account Holder shall immediately on demand reimburse E*TRADE for the amount so used in anticipation of final payment, plus interest thereon from and including the Business Day such final payment should have been received until such amount is repaid in full.

Funds received by E*TRADE are subject to E*TRADE's "Account Deposits" policy in accordance with this Section 3, "General Account Terms." E*TRADE reserves the right, at its sole discretion and without advance notice, to refuse certain types of additions of funds to the Account, including third-party checks or previously returned items. E*TRADE reserves the right to require the Account Holder to make requests for withdrawals from the Account in writing or to take other steps to verify the accuracy of withdrawal requests and the authorization of the party submitting instructions. The Account Holder understands that it is the Account Holder's responsibility to ensure that the instructions and information the Account Holder provides to E*TRADE in connection with any cash transfer are accurate. For additional information regarding acceptable forms of deposits, ACH transfers, and Electronic Funds Transfers, please refer to *etrade.com*.

**Preauthorized/Automatic Deposits and Transfers**

Preauthorized Electronic Funds Transfers (direct deposits) may be made to the Account from a third party (e.g., Social Security, a pension fund, or the Account Holder's employer) or from the Account to a third party (e.g., checks converted to electronic ACH transactions and recurring mortgage or insurance payments through the ACH). The Account Holder agrees that if recurring or other electronic payments are made into the Account, the payments may be impacted by a change in Account status or transfer. If the Account Holder plans to transfer the Account or change its status, the Account Holder agrees to contact E*TRADE in advance about the impact the change may have on the Account Holder's Electronic Funds Transfer services.

If the Account Holder has arranged to have direct deposits made to the Account at least once every 60 days from the same person or entity, the Account Holder can access *etrade.com* or call E*TRADE at 800-ETRADE-1 (800-387-2331) to find out whether the deposit has been made. From outside the United States, the Account Holder should call +1 678 624 6210.

If the Account Holder has arranged in advance to make regular payments out of the Account and these payments may vary in amount, the person to be paid shall notify the Account Holder of the amount and date of such payment at least 10 days before each payment. The Account Holder may choose to instead receive this notice only when the payment would differ by more than a certain amount from the previous payment or when the amount would fall outside certain limits that the Account Holder sets.

The Account Holder may request that E*TRADE stop a previously authorized transfer from the Account by going to the same location where the Account Holder had authorized such payments to be made. E*TRADE must receive the Account Holder's request at least three Business Days before the payment is scheduled to be made. If E*TRADE does not receive the request at least three Business Days prior to a transfer, E*TRADE may attempt, at its sole discretion, to stop the payment. E*TRADE assumes no responsibility for its failure or refusal to do so, however, even if E*TRADE accepts the request for processing. The Account Holder's request should specify the transaction that the Account Holder wants to stop and follow the instructions on *etrade.com*. Unless the Account Holder requests that all future transfers to a specific recipient are to be stopped, E*TRADE will treat the Account Holder's stop payment order as a request concerning only the one transfer. The Account Holder also agrees that if the Account Holder wishes that the designated payee be notified that the Account Holder is stopping payment, the Account Holder must provide that notice independently, as E*TRADE will not do so.

**Liability for Failing to Make Transfers**

If E*TRADE does not complete an Electronic Funds Transfer to or from the Account on time or in the correct amount, E*TRADE may be liable for the Account Holder's losses or damages in certain circumstances. No E*TRADE Entities will be liable, however, if:

- E*TRADE does not receive the request within a reasonable time to act on the Account Holder's instructions;
- Through no fault of the E*TRADE Entities, the Account Holder does not have enough Available Funds in the Account to make the transaction;
- The transfer would cause an overdraft;
- The ATM where the Account Holder made the transaction did not have enough cash or other supplies;
- Circumstances beyond the E*TRADE Entities' control (as identified under "Force Majeure Event") or a rolling blackout prevent or delay the transfer despite reasonable precautions taken by E*TRADE;
- The Service, ATM, or point-of-sale terminal was not working properly and the Account Holder knew about the problem when the Account Holder started the transaction;
- The funds in the Account are restricted, subject to legal process or an uncollected funds hold, or otherwise not available for withdrawal;
- The information supplied by the Account Holder or a third party is incorrect, incomplete, ambiguous, or untimely;
- E*TRADE Entities have reason to believe that the transaction may not have been authorized by the Account Holder;
- The transaction cannot be completed because the Account Holder's debit card is damaged;

- The payment is processed in a timely manner, but the payee rejects the payment or fails to process it in a timely manner; or
- The Account Holder fails to follow Service instructions for how to make a transfer or bill payment.

**Funds Transfers**

By sending E*TRADE a wire or check disbursement request (whether by telephone, electronically, or in writing), the Account Holder authorizes E*TRADE and its bank service provider to initiate such wire transfer or check disbursement on the Account Holder's behalf and to transmit payment instructions to the applicable bank. If a wire transfer or check disbursement request is received after the relevant cutoff time, the Account Holder's request may be treated as though it were received the next Business Day. E*TRADE may reject any wire transfer or check disbursement request.

It is the Account Holder's responsibility to ensure that the Account Holder's instructions are accurate before requesting that E*TRADE initiate a wire transfer or check disbursement. A wire or check disbursement request cannot be amended or canceled after E*TRADE receives it. E*TRADE, at its sole discretion, may attempt to abide by a subsequent request for a change, but it is not obligated to do so.

If the Account Holder arranges for a wire transfer to be directed to the Account, the Account Holder is responsible for ensuring that such wire is initiated properly, is addressed properly to E*TRADE's bank account, and bears appropriate wire instructions in exactly the form required by E*TRADE for identification of the Account Holder and the Account. The Account Holder understands that any erroneous, mismatched, or incomplete identifying information on an incoming wire transfer may result in such wire being rejected, lost, posted to an incorrect account, or returned to the originating bank without notice to the Account Holder.

**Inactive Accounts/Escheatment**

Inactive accounts and the escheatment process are governed by the unclaimed-property laws of the state of the last known address of the Account Holder.

To avoid escheatment of assets in the Account, the Account Holder must demonstrate activity in the Account or contact E*TRADE. If the Account becomes inactive and the Account Holder does not reactivate the Account or respond to notification(s) regarding the status of the Account, state law requires E*TRADE to deliver the assets as unclaimed property to the state of the Account Holder's last known residence. If the Account Holder's last known address is outside the United States, assets will be delivered to the state of incorporation for E*TRADE. Once remitted, the assets will be held by the state for safekeeping in accordance with state regulations. The Account Holder will then need to contact the respective state agency to reclaim the property.

**Liquidations and Disbursements of Assets**

E*TRADE may be required to liquidate or close out securities and/or other property in the Account to satisfy court orders, judgments, child support orders, garnishments, tax levies, tax withholding obligations, escheatment obligations, or other legal obligations. The Account Holder agrees to indemnify and hold E*TRADE harmless from any claims, losses, or damages caused by or related to any such transaction.

## 4. CHECKS, CHECK-WRITING, AND DEBIT CARD PRIVILEGES

**Check-Writing and Debit Card Privileges**

By requesting or using check-writing or debit card privileges offered for eligible account types, the Account Holder authorizes E*TRADE to honor debit card transactions and checks drawn on the Account, with payment for such checks and transactions made by withdrawing cash or redeeming securities from the Account. The Account Holder agrees to pay all fees and charges associated with check-writing and debit card services as set forth in the Fee Schedule and any third-party fees. The Account Holder understands and agrees that original canceled checks are not returned to the Account Holder; however, imaged copies are made available online, and all check-writing and debit card activity is reflected on the Account statements. If the Account Holder decides that they do not want to use their debit card, the Account Holder shall destroy it at once by cutting it in half and notifying E*TRADE in writing.

Check-writing and debit card privileges are processed through a bank service provider retained by E*TRADE, which may include E*TRADE Bank. E*TRADE may change the terms of or terminate the Account Holder's check-writing or debit card privileges at any time on notice in accordance with this Customer Agreement or Applicable Law, with or without cause and without affecting the Account Holder's outstanding Obligations under this Customer Agreement. When the Account is closed or the Account Holder's debit card or check-writing privileges are canceled or terminated, the Account Holder agrees to promptly destroy their debit card and any unused checks. E*TRADE may require the Account Holder to provide proof of destruction of the Account Holder's debit card or unused checks before releasing funds in the Account. Alternatively, the Account Holder agrees to return their debit card or unused checks to E*TRADE promptly on E*TRADE's request. The Account Holder also acknowledges that E*TRADE has the right to cause an ATM to retain the Account Holder's debit card at any time without prior notice to the Account Holder.

**Signature Card**

E*TRADE may require the Account Holder to provide a proper sample signature on a signature card before the Account Holder may participate in E*TRADE's check-writing service. If the Account has multiple authorized users, E*TRADE may require a proper sample signature from each Account Holder.

**Loss of Checks; Debit Card and PIN Security**

The Account Holder agrees to notify E*TRADE immediately, and in no event no more than 24 hours, after the loss or theft of any check or debit card, or if the Account Holder believes that their PIN or password has been lost or stolen, by calling E*TRADE at **800-ETRADE-1** (800-387-2331) or at **+1 678 624 6210** from outside the United States, or by writing to

E*TRADE
Attn: Cash Management Services
PO Box 484
Jersey City, NJ 07303-0484

The Account Holder agrees not to disclose or otherwise make the Account Holder's account number, Access Means, debit card, or PIN available to others. Debit card transactions are not considered unauthorized if they are made by a co–Account Holder, an Authorized Agent, or any other person with an interest in or authority to transact business on the Account, even if the person exceeds any authority the Account Holder has given them.

**Cooperation in the Event of Loss or Fraud**

The Account Holder agrees that, in the event of the loss or theft of their checks or debit card or of any fraudulent occurrence in the Account, including the writing of forged checks, the altering of checks written against the Account, the forging of endorsements on checks written against the Account, or the unauthorized use of their debit card, the Account Holder will report such loss or fraudulent occurrence promptly to the police. The Account Holder agrees to provide a copy of any police report to E*TRADE on request. The Account Holder agrees to cooperate fully with the police and with E*TRADE in any investigation of such fraudulent occurrence and will complete any required affidavits promptly, accurately, and thoroughly.

**Liability for Unauthorized Electronic Funds Transfers**

The Account Holder agrees to tell E*TRADE *immediately* if the Account Holder believes that their debit card, PIN, or password has been lost or stolen. Telephoning is the best way to keep the Account Holder's possible losses down. The E*TRADE number is 800-ETRADE-1 (800-387-2331). From outside the United States, call +1 678 624 6210. The Account Holder could lose all the money in the Account.

If someone used the Account Holder's debit card, PIN, or password without the Account Holder's permission and the Account Holder tells E*TRADE within two Business Days, the Account Holder can lose no more than $50. If the Account Holder does *not* tell E*TRADE within two Business Days after the Account Holder learns of the loss or theft of their debit card, PIN, or password and E*TRADE can prove that it could have stopped someone from using the Account Holder's debit card, PIN, or password without the Account Holder's permission if the Account Holder had told E*TRADE, the Account Holder could lose as much as $500. Unless E*TRADE determines that the Account Holder was grossly negligent or fraudulent in the handling of the Account or the debit card, the Account Holder will not be liable for the $50 or $500 amounts described above for transactions conducted with the Account Holder's debit card.

Also, if the Account Holder's statement shows transfers that the Account Holder did not make, the Account Holder will tell E*TRADE *immediately*. If the Account Holder does *not* tell E*TRADE within 60 days after the statement was mailed to the Account Holder, the Account Holder may not get back any money the Account Holder lost after the 60 days if E*TRADE can prove that it could have stopped someone from taking the money if the Account Holder had told E*TRADE in time. The Account Holder understands and agrees that the provisions of this "Liability for Unauthorized Electronic Funds Transfers" section apply only to Electronic Funds Transfers noted on the Account statement that the Account Holder believes are unauthorized. The Account Holder must notify E*TRADE of any other possible error noted on the Account Holder's Account statement in accordance with the "Transaction Confirmations and Account Statements" provision of Section 9, "E*TRADE Brokerage Services," and the "Customer Responsibility" provision of Section 11, "Trading System," of this Customer Agreement, as applicable.

E*TRADE, at its good-faith discretion, will extend the time periods in connection with any justifiable delay.

If, notwithstanding the foregoing, Applicable Law requires E*TRADE to return additional amounts to the Account Holder due to the contribution limits of the Retirement Account having already been met, the Account Holder agrees personally to indemnify and hold E*TRADE harmless for such additional amounts.

The Account Holder understands that, except as limited by Applicable Law, the Account Holder is liable for all unauthorized transactions made with the Account Holder's debit card or the PIN associated with the Account Holder's debit card that occur prior to the time the Account Holder notifies E*TRADE to cancel the Account Holder's debit card, that an unauthorized transaction has taken place, or that the Account Holder's debit card or PIN has been lost or stolen.

The Account Holder understands that if the Account Holder fails to notify E*TRADE or its bank service provider of unauthorized transactions within 60 days of the date of the first statement showing unauthorized activity, the Account Holder will be liable for unauthorized transactions that occur after the 60-day period.

**In Case of Errors or Questions About Electronic Transfers**

If the Account Holder believes that their statement shows transfers that the Account Holder did not make or if the Account Holder needs more information about an electronic transaction, the Account Holder will call E*TRADE at the number or write to E*TRADE at the address described above as soon as the Account Holder can. E*TRADE must hear from the Account Holder no later than 60 days after E*TRADE sent the *first* statement on which the problem or error appeared. When the Account Holder contacts E*TRADE, the Account Holder will:

   i. Tell E*TRADE the Account Holder's name, Account number, and debit card number;
   ii. Describe the error or the transfer the Account Holder is unsure about and explain as clearly as possible why the Account Holder believes it is an error or why the Account Holder needs more information;
   iii. Tell E*TRADE the dollar amount of the suspected error.

The Account Holder understands that it would be helpful if they provided E*TRADE with any supporting documentation related to the error. If the Account Holder tells E*TRADE orally, E*TRADE may require that they send E*TRADE their complaint or question in writing within 10 Business Days.

After E*TRADE hears from the Account Holder, within 10 Business Days E*TRADE will determine whether an error occurred and will correct any error promptly. If E*TRADE needs more time, however, E*TRADE may take up to 45 days to investigate the Account Holder's complaint or question. If E*TRADE decides to do this, E*TRADE will credit the Account within 10 Business Days for the amount the Account Holder thinks is in error so that the Account Holder will have the use of the money during the time it takes E*TRADE to complete its investigation. In certain instances, E*TRADE may provide credit sooner. If E*TRADE asks the Account Holder to put their complaint or question in writing and E*TRADE does not receive it within 10 Business Days, E*TRADE may not credit the Account.

For errors involving new Accounts, point-of-sale transactions, or foreign-initiated transactions, E*TRADE may take up to 90 days to investigate the Account Holder's complaint or question. For new Accounts, E*TRADE may take up to 20 Business Days to credit the Account for the amount the Account Holder thinks is in error.

E*TRADE will tell the Account Holder the results within three Business Days after completing its investigation. If E*TRADE decides that there was no error, E*TRADE will send the Account Holder a written explanation. The Account Holder may ask for copies of the documents that E*TRADE used in its investigation.

The Account Holder understands and agrees that this "In Case of Errors or Questions About Electronic Transfers" provision applies only to Electronic Funds Transfers noted on the Account statement that the Account Holder believes are unauthorized. The Account Holder must notify E*TRADE of any other possible error noted on the Account Holder's Account statement in accordance with the "Transaction Confirmations and Account Statements" provision of Section 9, "E*TRADE Brokerage Services," and the "Customer Responsibility" provision of Section 11, "Trading System," of this Customer Agreement, as applicable.

**Extraneous Information**

Although not obligated to do so, E*TRADE and its bank service provider may pay or accept checks and other items bearing restrictions or notations (e.g., "Void after 6 months," "Void over $50," "Payment in full," and the like), whether on the front or back, in any form or format. The Account Holder will not include such restrictions or notations on checks the Account Holder writes unless the Account Holder has given prior written notice to E*TRADE and E*TRADE has agreed in writing to the instructions. The Account Holder agrees that the notation will have no effect on E*TRADE and its bank service provider, and the Account Holder agrees to accept responsibility for payment of the item. E*TRADE shall not be liable for its or any third party's failure to comply with such restrictions or notations. The Account Holder agrees not to issue checks with features or marks that obscure, alter, or impair information on the front or back of a check or that otherwise prevent E*TRADE or any bank service provider from capturing such information during automated check processing.

**Charge-Backs**

E*TRADE and its bank service provider may charge back any item, or a photocopy or electronic image of the item, at any time before final payment, whether returned or not and whether drawn on an Account at E*TRADE, E*TRADE Bank, or another bank. E*TRADE may debit the Account for any exchange charges on items. E*TRADE may debit the Account into overdraft for any such purpose and will not be liable for damages to the Account Holder as a result of checks drawn on the Account that are dishonored because of the charge-back.

**Payment of Checks**

When processing checks drawn on the Account, E*TRADE and its bank service providers generally pay larger checks first, but they are not obligated to do so and may change the order in which they process the Account Holder's transactions without prior notice to the Account Holder. This may result in a greater number of insufficient fund ("**NSF**") charges and the possibility of returned items. To avoid NSF charges, the Account Holder should ensure that the Account contains sufficient collected funds for all of the Account Holder's checks drawn on the Account.

**Overdrafts**

If the Account Holder does not have sufficient Available Funds on deposit to cover the amount of a check or transaction (e.g., an automatic payment, ATM withdrawal, debit card transaction, or other Electronic Funds Transfer), E*TRADE and its bank service provider may return the check or reject the transaction without payment. If checks or other transactions are presented to E*TRADE for payment on the same day as any securities transactions in the Account (whether pursuant to the Account Holder's request or otherwise), the securities transactions will be settled before checks or other transactions are paid.

E*TRADE and its bank service provider may elect, at their sole discretion, to cause an overdraft by paying the check or permitting the transaction. The allowance of transactions that cause overdrafts in no way obligates E*TRADE and its bank service provider to continue that practice, and they may cease doing so without prior notice. E*TRADE charges a service fee for each overdraft item or transaction. If E*TRADE and its bank service provider permit an overdraft, the Account Holder agrees to promptly pay the amount of the overdraft, without notice or demand from E*TRADE and its bank service provider, together with interest on the overdraft at the maximum rate of interest allowed by Applicable Law. The Account Holder shall be responsible for repayment of any such overdraft amount. The Account Holder agrees that, to the fullest extent permitted by Applicable Law, subsequent deposits and other credits to the Account may be used to satisfy an overdraft, regardless of the source of such deposits, including without limitation deposits of government, welfare, retirement, or Social Security benefits.

**Stop Payments**

The Account Holder or any other owner or authorized signer on the Account may request, in writing, that E*TRADE and its bank service provider stop payment on a check. The Account Holder understands that there is a per-check/transaction charge for each stop payment order. E*TRADE and its bank service provider must receive stop payment orders at a time and in a manner that affords them reasonable time to act on them. E*TRADE and its bank service provider are not required to accept oral stop payment orders. If they elect to act on an oral stop payment order, however, the Account Holder agrees to promptly confirm the order in writing and deliver it to E*TRADE. If the Account Holder fails to do so within 14 calendar days, E*TRADE and its bank service provider may release the stop payment.

E*TRADE's records will be conclusive evidence of the existence, details of, and decision regarding any oral stop payment order or its revocation. Unless E*TRADE and its bank service provider agree to treat the Account Holder's stop payment order as permanent, it will remain valid for only six months. After that time, the check may be paid and charged to the Account unless the Account Holder renews the stop payment order for an additional fee. If the Account Holder requests a stop payment on any check issued in response to a check disbursement request, the Account Holder understands that they may not have access to the funds for up to 60 days. E*TRADE and its bank service provider will not be liable for paying a check or transaction over a stop payment order if the order is incomplete, incorrect, or not received in a timely fashion.

**Substitute Checks**

The Account Holder agrees not to deposit substitute checks, or checks bearing a substitute check legal equivalence statement (e.g., "This is a legal copy") to the Account without E*TRADE's prior written consent. Unless E*TRADE agrees otherwise in writing, its acceptance of such checks shall not obligate it to accept such items at a later time, and it may cease doing so without prior notice.

**Holds on the Account**

When the Account Holder uses their debit card to pay for goods or services, certain merchants may ask E*TRADE to authorize the transaction in advance and may estimate its financial value. When E*TRADE authorizes the transaction, E*TRADE commits to making the requested funds available when the transaction finally settles and may place a temporary hold on the Account for the amount indicated by the merchant. E*TRADE may also add an amount for certain merchants to ensure that sufficient funds will be available to cover the ultimate transaction. Until the transaction finally settles or E*TRADE determines that it is unlikely to be processed, the funds subject to the hold will not be available to the Account Holder for other purposes. E*TRADE will charge the Account only for the final amount of the financial transaction, however, and will release any excess amount when the transaction settles.

**Electronic Presentment/Posting**

If E*TRADE receives notice that a check or other item deposited to the Account is being returned or that a check or electronic payment (e.g., at a point of sale) is being processed for collection, E*TRADE may charge the Account on the day that a check or other transaction is presented (or returned) to E*TRADE directly or electronically for payment. E*TRADE may charge the Account or place a hold on funds at an earlier time.

**ATM and Point-of-Sale Limitations**

The Account Holder may withdraw up to $1,000 per calendar day for ATM transactions based on their available funds. The Account Holder may use their debit card for purchases up to $5,000 per calendar day based on their Available Funds. These amounts are subject to change at E*TRADE's discretion. The Account Holder does not have a right to stop payment on any card sales draft or cash withdrawal slip originated by the proper use of the Account Holder's debit card. For security reasons, there may be times when E*TRADE may further limit these amounts. Different limitations may apply at terminals that are not owned and operated by E*TRADE.

**Business and Other Nonpersonal Accounts**

E*TRADE's obligations and the limitation on customer liability set forth in this Customer Agreement under "Liability for Failing to Make Transfers," "Liability for Unauthorized Electronic Funds Transfers," and "In Case of Errors or Questions About Electronic Transfers," as well as those that appear within periodic statements, do not apply to business or other nonpersonal accounts. Thus, if the Account Holder is a business or other entity that is not a natural person, the Account Holder must notify E*TRADE immediately if the Account Holder discovers any unauthorized transactions or errors on the Accounts; the Account Holder must also send E*TRADE a written notice of the problem within a reasonable time not to exceed 14 days from the date of discovery or the Account Holder's receipt of the first statement or notice reflecting the problem, whichever occurs first. Under no circumstances will E*TRADE be liable for Losses, including any special or consequential damages involving such unauthorized transactions, in business or other nonpersonal Accounts. If the Account Holder is a business or other entity that is not a natural person, the Account Holder assumes sole responsibility for any unauthorized use of the Account's debit cards and/or PIN and shall indemnify, defend, and hold E*TRADE harmless from and against all Losses and damages related to or arising out of any unauthorized transactions.

**ATM Fees**

If the Account Holder conducts a transaction at an ATM that is not operated by an E*TRADE Entity, the Account Holder may be charged a fee by the ATM operator or any network used; the Account Holder may also be charged a fee for a balance inquiry even if the Account Holder does not complete a funds transfer.

## 5. FOREIGN CURRENCY

E*TRADE and its bank service provider may, at their discretion, refuse to accept any item payable in a foreign currency. In the event that E*TRADE and its bank service provider accept an item payable in a foreign currency, the Account Holder agrees to pay any fees that E*TRADE and its bank service provider may incur to convert foreign-currency items that the Account Holder places into the Account, including any fee charged by the Board of Governors of the Federal Reserve. E*TRADE, at its discretion, may impose additional fees for foreign items. E*TRADE reserves the right to change the amount of any fee imposed at any time. The Account Holder agrees that neither E*TRADE nor its bank service provider is responsible for any Losses resulting from delays in processing such items.

If the Account Holder submits a wire transfer or check disbursement request that involves a currency other than US dollars, the Account Holder's funds will be exchanged for such currency at the current rate of exchange according to E*TRADE's standard business procedures. The Account Holder is aware that currency exchange rates fluctuate over time, and the Account Holder accepts the risks of such fluctuation between the time the Account Holder sends a wire transfer or check disbursement request and the time the wire transfer or check disbursement is final. The Account Holder further agrees and acknowledges that when E*TRADE executes a foreign-currency transaction request, the foreign exchange rate may include a spread or markup as compensation to E*TRADE and its bank service provider for providing this service. In addition, foreign wire transfers and check disbursements may be subject to additional fees.

If the Account Holder conducts a transaction (e.g., an ATM withdrawal or debit card transaction) in a currency other than US dollars, the merchant, network, or processor will convert any related debit or credit into US dollars in accordance with its then current policies. The conversion rate applied may be different from wholesale interbank foreign-currency rates in effect on the date of the Account Holder's transaction, and the conversion rate may include or reflect a foreign-currency conversion fee. For more information about fees, please refer to the Pricing and Rates available at *us.etrade.com/what-we-offer/pricing-and-rates.*

## 6. RETIREMENT ACCOUNTS

Certain Service and Account features are not available to Retirement Accounts. E*TRADE does not act as a fiduciary, including with respect to Retirement Accounts. Additionally, activity in a Retirement Account may have different consequences, including different tax consequences, were the same activity to occur in or be effected through an Account other than a Retirement Account. The Account Holder acknowledges and agrees that they may be required to enter into one or more additional agreements with E*TRADE when opening a Retirement Account, the terms and conditions of which will become a part of this Customer Agreement.

**Check Writing and Debit Cards**

Check-writing and debit card privileges are not available for Retirement Accounts, except for Retirement Accounts of Account Holders who are age 59½ or older, who provide proof of age, who waive tax withholding, and who complete certain required paperwork. Such Account Holders understand that by writing a check against their Retirement Account or using a debit card linked to such Account, they are requesting a distribution from the Account; accordingly, if the Account Holder writes a check to purchase an investment or other asset, it will be held outside the Retirement Account and the Account Holder will not receive any tax benefits of the Account. If the Account Holder does not provide a written waiver of tax withholding or revoke the Account Holder's waiver, the Account Holder's check-writing and debit card privileges will be terminated.

If the Account Holder is requesting check-writing or debit card services for an individual Retirement Account, the Account Holder understands and agrees that only the Account Holder may authorize withdrawals from the Account, and the Account Holder certifies that each withdrawal is at the Account Holder's request and under the Account Holder's signature or PIN.

**Unrelated Business Taxable Income Provisions**

The Account Holder understands that certain assets held in a Retirement Account may generate unrelated business taxable income ("**UBTI**") for which the Account Holder is responsible. The Account Holder is also responsible for preparing any required tax returns for UBTI reporting and submitting them to E*TRADE for filing in accordance with the terms of the Account Holder's Individual Retirement Custodial Account Agreement. E*TRADE will file Form 990-T or any other required documentation in accordance with Account Holder's instructions; however, the Account Holder agrees to indemnify E*TRADE from any claims that arise regarding UBTI.

## 7. CASH SWEEP AND PAYMENT OF INTEREST ON CASH BALANCES

E*TRADE may, at its discretion, pay interest on any Cash Balances awaiting investment. E*TRADE may permit the Account Holder to invest or place available Cash Balances over certain minimum amounts to be swept or automatically invested, either weekly or daily, depending on the amount of the Cash Balance and according to a periodic sweep schedule determined by E*TRADE, at its discretion, in money market funds ("**MMF Sweep Product**") in FDIC-insured bank deposit accounts maintained with E*TRADE Bank, E*TRADE Savings Bank, and/or other banks (E*TRADE Bank or any such other bank, a "**Program Bank**," and any such investment, the "**Bank Sweep Product**"), as cash deposits in the Account Holder's brokerage account (the "**Cash Balance Program**"), or such other accounts or arrangements as E*TRADE may make available to the Account Holder (each a "**Sweep Product**" and collectively the "**Sweep Options**").

The Account Holder understands that Account statements will reflect the payment of interest on any Cash Balance and the corresponding transactions (including purchases, redemptions, dividends, and dividend reinvestments). These Account statements are provided in lieu of separate confirmations of these transactions. E*TRADE may change or replace the Sweep Options available to the Account Holder at its discretion, although the Cash Balance Program will remain available. E*TRADE reserves the right to change the Account Holder's participation from a MMF Sweep Product or a Bank Sweep Product to the Cash Balance Program if E*TRADE reasonably determines that the change is necessary, for example where an Account is designated as a Pattern Day Trader.

E*TRADE will provide the Account Holder with 30 days' advance written notice, if required by Applicable Law, that will describe relevant Sweep Option updates, as well as the Sweep Options available to the Account Holder if they do not accept the new terms and conditions or option. Unless the Account Holder notifies E*TRADE in a timely manner of an objection to any such change, the Account Holder authorizes E*TRADE to withdraw cash or redeem securities maintained in the prior Sweep Option and to invest or place the proceeds in the replacement Sweep Option. The Account Holder understands that they will be bound by the terms and conditions of the Sweep Option that is associated with each Account. Changes to the default Sweep Option (applicable if the Account Holder does not select a Sweep Product) do not require advance notice.

In addition, the Account Holder understands that different Sweep Options may be offered by E*TRADE in connection with various accounts, services, and products. If the Account Holder decides to enroll an Account in a new service with different available Sweep Options, absent the Account Holder's affirmative election of a particular Sweep Option available under this new service, the Account Holder authorizes E*TRADE to withdraw cash or redeem securities maintained in the prior Sweep Option for the Account and to reinvest or place the proceeds in the new Sweep Option. The Account Holder is responsible for any investment Losses associated with their decision to enroll the Account in a new service with a different Sweep Option or with changes to a Sweep Option for which the Account Holder does not make an affirmative election or for which the Account Holder does not notify E*TRADE of their objection.

Additionally, the Account Holder may change their selection among the available Sweep Options, or the Account Holder may elect, subject to any limitation set forth in any Sweep Product agreement or, where applicable, under federal banking laws (which include without limitation Program Banks' potential requirement of seven days' notice before permitting a withdrawal or transfer of funds from an account), that the balance in the bank deposit account be returned or the shares of the money market mutual fund be liquidated and the proceeds reinvested, as applicable, to the Account or remitted to the Account Holder. With respect to any Cash Balance that the Account Holder opts to have automatically transferred to an account at a bank via the Bank Sweep Product, the Account Holder agrees that they are responsible for monitoring the balance of their Bank Sweep Product accounts deposited with the Program Banks to determine whether the Account Holder has total deposit balances held in the same capacity at any Program Bank in excess of the $250,000 FDIC deposit insurance limit.

For more information about the general terms and conditions of the available Sweep Products, go to *etrade.com/sweepoptions.*

Cash Balances and cash in the Cash Balance Program are insured by the Securities Investor Protection Corporation ("**SIPC**"), as described in Section 10, "Trading Provisions." Bank Sweep Products are insured by the FDIC up to the applicable limit but are not insured by the SIPC and are not obligations of E*TRADE. Money market funds are securities that may increase or decrease in value. They are not insured or guaranteed by the FDIC, any other government agency, E*TRADE, or E*TRADE Bank, and there can be no assurance that such funds will maintain their net asset value.

**Interest Rate Information**

Interest paid on Sweep Products is calculated using the interest rates, calculation methodology, and compounding frequency set by E*TRADE, which are subject to change by E*TRADE from time to time without prior notice. The current simple rate at which interest is paid on Cash Balances in a Sweep Product and the corresponding annual percentage yield ("**APY**") at which Cash Balances would earn interest each are as specified at *etrade.com/rates.*

**Use of Cash Balance and Payment of Fees to Others**

Any Cash Balances in the Account in the Cash Balance Program (i) can be maintained in the Account and will earn interest as described above and (ii) are held unsegregated and may be used by E*TRADE in the conduct of its business, subject to the limitations of Exchange Act Rule 15c3-3. E*TRADE reserves the right to stop paying interest on the Cash Balances, to close the Account, or to take any other action if E*TRADE, at its sole discretion, determines that the Account Holder is maintaining a Cash Balance solely for the purpose of receiving interest payments.

The Account Holder authorizes E*TRADE, without notice to the Account Holder, to withdraw cash or redeem securities maintained in a Sweep Product to satisfy any Debit Balance; to settle a transaction; to serve as collateral for a margin loan, Short Sale, or options position; or to satisfy any other indebtedness or obligation to any E*TRADE Entities, including any Obligations, or otherwise with respect to the Account in an amount sufficient to satisfy any such indebtedness or Obligations. If the Account Holder intends to provide funds to settle securities transactions, E*TRADE must receive such funds at least one Business Day before the Settlement Date to prevent a withdrawal or redemption from a Sweep Product. The Account Holder authorizes E*TRADE to act as the Account Holder's agent to purchase and redeem Sweep Products in connection with the investment of Cash Balances under this Customer Agreement.

The Sweep Products may, to the extent permitted by Applicable Law, include money market mutual funds or other Sweep Products for which E*TRADE receives compensation in connection with the purchase and holding of Sweep Products (such as administration, transfer agency, distribution, and shareholder services). For more information about payments regarding money market funds, go to *etrade.com/prospectus.* E*TRADE may receive from E*TRADE Bank or other Program Banks or providers of Sweep Products fees for, among other things, maintaining customer records or providing other services. No portion of these fees will reduce or offset the fees otherwise due to E*TRADE in connection with the Account unless required by Applicable Law. There may be certain minimum requirements for initial and subsequent investments in the money market funds or other products. Investments in each money market fund are subject to restrictions, charges, and expenses as described in the applicable prospectus, which the Account Holder will receive separately and agrees to read carefully.

## 8. MAINTENANCE OF COLLATERAL

E*TRADE holds Collateral for itself and also as agent and bailee for all other E*TRADE Entities are secured parties under any agreement with E*TRADE or as to which the Account Holder has any indebtedness or other Obligations (which will include any and all Obligations of the Account Holder to E*TRADE arising at any time and from time to time under or in connection with any and all agreements with E*TRADE, including but not limited to Obligations to deliver Collateral or indebtedness). Except where otherwise required by Applicable Law or where adverse regulatory capital, reserve, or other similar costs ("**Adverse Costs**") would thereby arise, the security interests of E*TRADE in any Collateral shall rank in such order of priority as E*TRADE may agree from time to time, provided, however, that E*TRADE shall have a first-priority security interest in the Collateral. In the event that E*TRADE is obliged by Applicable Law to maintain a first-priority lien, or where E*TRADE would suffer Adverse Costs if it did not maintain a first-priority lien, E*TRADE's interest in the applicable Collateral shall have priority to the extent required to satisfy the requirements of Applicable Law or avoid such Adverse Costs.

In the event that two or more E*TRADE Entities are so obliged to maintain a first-priority lien, or would suffer Adverse Costs if they did not maintain a first-priority lien, the relevant E*TRADE Entities shall determine among themselves the priority of their respective interests in the relevant Collateral. Notwithstanding anything herein to the contrary, except as otherwise agreed by E*TRADE, the security interest of E*TRADE in any Collateral consisting of the Account Holder's right, title, or interest in, to, or under this Customer Agreement or any other agreement between the Account Holder and any E*TRADE Entities shall be subject to any enforceable right of setoff or netting that the E*TRADE Entities that are party to such agreement may have with respect to the Obligations of the Account Holder to E*TRADE (whether arising under this Customer Agreement or any other agreement with E*TRADE).

Each E*TRADE Entity that is the "bank" with respect to any "deposit account" constituting Collateral, or to which any Collateral is credited or in which any Collateral is held or carried, agrees with the Account Holder and each other E*TRADE Entity (each of which so agrees with it) that it will comply with instructions originated by E*TRADE directing disposition of the funds in such deposit account without further consent by the Account Holder. The Account Holder hereby consents to the foregoing agreements of the E*TRADE Entities. Each E*TRADE Entity that is the bank with respect to any deposit account represents and warrants that it has not agreed, and that it will not agree, to comply with entitlement orders, directions, or instructions concerning any such account (whether it is an Account or other account) that originated with any person other than (i) E*TRADE or, (ii) until E*TRADE shall have given a "notice of sole control," the Account Holder. E*TRADE hereby notifies each other E*TRADE Entity of its security interest in, and the assignment by way of security to it of, the Collateral. E*TRADE acknowledges such notice from each other E*TRADE Entity, and E*TRADE and the Account Holder consent to the security interest granted by this Section 8, "Maintenance of Collateral." For purposes of this Section 8, the terms "entitlement orders," "bank," and "deposit account" shall have the respective meaning given to such terms under the NYUCC.

The Account Holder authorizes E*TRADE to register any Collateral in the Account in the name of E*TRADE or any other nominee, including sub-custodians, or to cause the Collateral to be registered in the name of, or in the name of any nominee of, a recognized depository clearing organization. The Account Holder's ownership of the Collateral is reflected in E*TRADE's records. Without abrogating any of E*TRADE's rights under this Customer Agreement, Account Holder's prior satisfaction of any indebtedness the Account Holder may have to the E*TRADE Entities and the payment of any applicable fees detailed in the Fee Schedule, the Account Holder is entitled to receive physical delivery of any Collateral from the Account capable of being produced and obtained by E*TRADE in physical form.

The Account Holder understands and agrees that any Retirement Account, and any assets contributed to such Retirement Account, may be treated as Collateral in some circumstances and may not be treated as Collateral in other circumstances.

**Satisfaction of Indebtedness**

The Account Holder agrees to satisfy any Obligations to E*TRADE and to pay any Debit Balance in any of the Accounts on demand. If the Account Holder has a Debit Balance in the Account and the Account Holder owns an interest in any other account (including other accounts held by the Account Holder with any E*TRADE Entities), E*TRADE may, to the extent permitted by Applicable Law, effect a transfer or demand a distribution from such other account to cover any Debit Balance due to E*TRADE without notice to the Account Holder. The Account Holder agrees that, on E*TRADE's written demand, the Account Holder will execute all documents necessary to effect a distribution from such other account and to cause such funds to be paid immediately to satisfy the Account Holder's Obligations to E*TRADE. E*TRADE's rights under this paragraph are in addition to and with full reservation of E*TRADE's rights to take any additional action, including legal action, to recover any Obligations the Account Holder may owe to E*TRADE.

Account Holders of a Joint Tenants by the Entirety account agree to indemnify and hold E*TRADE harmless against any claims made by a creditor or other claimant against assets in the Account. In the event of any unsecured balance or margin or cash deficiency in a Joint Tenants by the Entirety account, each individual agrees that E*TRADE may use funds in any of the other individual or joint accounts to offset such unsecured account balance or margin or cash account deficiency.

**Transfers Between Accounts**

At any time at E*TRADE's sole discretion and to the extent permitted by Applicable Law, E*TRADE may transfer Collateral from any Account in which the Account Holder has an interest to any other Account in which the Account Holder has an interest, regardless of whether there are other Account Holders on either Account, and E*TRADE may transfer Collateral between any sub-accounts of the Account. In addition, E*TRADE Securities may transfer Collateral from the Account to any commodity, futures, or other account carried by E*TRADE Futures in which the Account Holder has an interest, to the extent necessary to satisfy any margin call by E*TRADE Securities, and E*TRADE Futures may transfer Collateral from the Account to any securities or other account carried by E*TRADE Securities in which the Account Holder has an interest, to the extent necessary to satisfy any margin call by E*TRADE Futures.

**Liquidation and Remedies**

The Account Holder understands that E*TRADE, to the extent permitted by Applicable Law, may at any time and without giving the Account Holder prior notice, use, liquidate, and/or transfer any or all Collateral to satisfy any Obligations to E*TRADE, however such Obligations may have arisen. In the event of a breach or default by the Account Holder under this Customer Agreement, E*TRADE will have the rights and remedies available to a secured creditor under Applicable Law in addition to the rights and remedies provided in this Customer Agreement.

The Account Holder further agrees that if: the Account Holder defaults on any of its Obligations under this Customer Agreement; the Account Holder becomes bankrupt, insolvent, or subject to a similar condition or subject to any bankruptcy, reorganization, insolvency, or other similar proceeding; or E*TRADE, at its discretion, deems it advisable for its protection, E*TRADE may, at any time and without prior notice to the Account Holder: (i) cancel, terminate, accelerate, liquidate, and/or close out any or all agreements or transactions between the Account Holder and E*TRADE or otherwise relating to the Account and calculate damages in a manner it believes appropriate; (ii) pledge, transfer, or sell any Collateral; or (iii) take any other action as E*TRADE, at its discretion, deems appropriate with respect to any of the foregoing and apply the proceeds to the discharge of the Obligations. In pursuing the remedies available to it, E*TRADE may, without limiting its rights under this paragraph, set off amounts that the Account Holder owes to it against any amounts that it owes to the Account Holder, and the Account Holder will remain liable for any deficiency. In enforcing its rights hereunder, E*TRADE may act at its discretion without regard to any tax or other consequences that the Account Holder may face as a result of such actions.

**Interest Charges on Debit Balances**

The Account Holder will be charged interest on any Debit Balance in any of the Accounts and on any and all monies owed by the Account Holder to E*TRADE following liquidation of the Collateral or termination of the Account. For additional information and a detailed explanation of the computation of interest charges applicable to Debit Balances in Margin Accounts, visit *etrade.com*.

**Worthless and Nontransferable Securities**

E*TRADE reserves the right to remove from the Account any Collateral that is deemed to have been canceled or otherwise invalidated. In determining that Collateral has been canceled or invalidated, the Account Holder agrees that E*TRADE is entitled to rely, without liability, on third-party determinations that the Collateral has been canceled or invalidated. Canceled or invalid Collateral may include but is not limited to bankruptcy or charter or registration revocation. E*TRADE will notify the Account Holder of any removal from the Account of canceled or otherwise invalid Collateral. The Account Holder hereby waives any claim to ownership of, and any future distribution from, such Collateral unless the Account Holder provides E*TRADE with written notice objecting to the removal of the Collateral within 60 days of notice from E*TRADE of the decision to remove the Collateral. In addition, E*TRADE reserves the right to charge an additional servicing fee for Collateral that E*TRADE has identified as worthless and which E*TRADE is unable to transfer to the Account Holder (**"Nontransferable Securities"**).

**Transfer of Accounts**

Where an Account Holder is transferring Collateral from their Account to an account with another custodian, or where the Account Holder is transferring assets from their account with another custodian to E*TRADE, the Account Holder is required to submit to E*TRADE an account transfer form in the format provided by E*TRADE.

By submitting an outgoing Account transfer request, the Account Holder authorizes E*TRADE to act on the Account Holder's behalf to initiate a transfer of the Collateral in the Account to an account the Account Holder has established with another custodian. Once E*TRADE receives an outgoing transfer request in good order, E*TRADE will review the request and submit the transfer instructions to the other custodian, which is then responsible to facilitate delivery/receipt of the Collateral subject to the transfer request. E*TRADE may, under certain circumstances, reject the transfer request before or after initiation, and the Account Holder will be notified of any such rejection.

Where the Account Holder contacts the delivering or receiving custodian directly, the Account Holder acknowledges and agrees that they are responsible for ensuring that such transfer is initiated properly and that the delivering or receiving custodian provides instructions to E*TRADE in exactly the format required by E*TRADE for identification of the Account Holder and the Account for proper transaction posting. The Account Holder understands that any erroneous, mismatched, or incomplete identifying information on an incoming or outgoing transfer request may result in such transfers being rejected, lost, posted to an incorrect account, or returned to the originating firm without notice to the Account Holder.

Unless otherwise indicated on E*TRADE's account transfer form, the Account Holder authorizes E*TRADE to liquidate any positions in Nontransferable Securities, set off against any Debit Balance, and transfer the resulting balance. The Account Holder understands that after receiving a transfer request, E*TRADE will cancel, or will instruct the delivering firm to cancel, all open orders for the Account and to fulfill the transfer request as needed.

## 9. E*TRADE BROKERAGE SERVICES

**Self-Directed Investing**

**UNLESS OTHERWISE PROVIDED IN THIS SECTION 9 FOR RECOMMENDATIONS, THE ACCOUNT HOLDER ACKNOWLEDGES THAT THE ACCOUNT HOLDER ALONE IS RESPONSIBLE FOR DETERMINING THE SUITABILITY OF THEIR INVESTMENT CHOICES IN LIGHT OF THEIR PARTICULAR CIRCUMSTANCES. THE ACCOUNT HOLDER UNDERSTANDS THAT E*TRADE ASSUMES NO RESPONSIBILITY FOR SUCH DETERMINATION. As a self-directed investor, the Account Holder assumes full responsibility for each and every transaction in or for their Account and for their own investment strategies and decisions. The Account Holder understands and agrees that E*TRADE Entities have no liability whatsoever for the results of the Account Holder's investment strategies, transactions, and decisions.**

**In a brokerage relationship, even if E*TRADE Securities makes a Recommendation to the Account Holder, the Account Holder is ultimately responsible for making investment decisions for the Account. E*TRADE does not make investment decisions for the Account Holder and does not exercise investment discretion over the Account. E*TRADE will only buy or sell securities for the Account at the Account Holder's direction.**

**No Advice**

The Account Holder acknowledges and agrees that E*TRADE is not acting as an investment adviser with respect to the Account or Account Holder and that the Service provided is brokerage and not advisory services. Except as set forth below with respect to Recommendations (as defined below), any collection of financial data from the Account Holder, and any evaluation or analysis of such data by E*TRADE, is to assist E*TRADE's compliance and risk management efforts and is not for the purpose of rendering advice regarding the suitability, profitability, or appropriateness for the Account Holder of any security, investment, financial product, investment strategy, or other matter. The Account Holder acknowledges and agrees that the Account Holder and the Account Holder's investment adviser, if any, are solely responsible for all investment decisions regarding the Account and will not rely on any general information provided by E*TRADE as the sole basis for any investment decision. The Account Holder also acknowledges that no E*TRADE Entities assume responsibility for or guarantee the accuracy, currency, completeness, or usefulness of any general information, commentary, or other materials that may be accessed by the Account Holder through the Service.

The Account Holder understands that the research, analysis, news, tools, and other information made available through the Service is not in any way tailored to reflect the Account Holder's personal financial circumstances or investment objectives, and the securities and investment strategies discussed

may not be suitable for the Account Holder and do not in any way constitute a Recommendation as provided below of an account type, particular security, or investment strategy by E*TRADE.

**Recommendations**

As part of the Service provided by E*TRADE Securities, E*TRADE Financial Consultants are available to address questions the Account Holder may have regarding the Account and may, from time to time, make Recommendations (each a Recommendation) as noted in E*TRADE's Relationship Summary. To receive a Recommendation, the Account Holder must provide a customer profile which, among other things, provides information relating to the Account Holder's securities-related experience, financial sophistication, assets, and investment objectives, and the Account Holder agrees that prior to receiving any Recommendation, the Account Holder shall notify the Financial Consultant of any changes to the information the Account Holder has provided on their account application and customer profile. Recommendations will be clearly identified as such by the Financial Consultant and pertain only to the particular Account that is the subject of the Recommendation and not any other account held by the Account Holder at E*TRADE.

In conjunction with a Recommendation, the Account Holder will be provided the Relationship Guide and the Account Holder agrees to review and understand the Relationship Guide, and disclosures referenced therein before acting on a Recommendation. Although the Account Holder's Financial Consultant and E*TRADE believe that the Recommendation is provided to the Customer in accordance with the requirements of Regulation Best Interest, by acting on the Recommendation, the Account Holder understands that the accuracy and timeliness of the information on which such Recommendation is based is not guaranteed. Neither Regulation Best Interest nor any best interest obligation extends to any other dealings or services E*TRADE provides, including, without limitation, how E*TRADE markets securities and services, execute trades, the fees that E*TRADE charges, or E*TRADE's duty to deal fairly with retail customers.

E*TRADE Securities' compliance with Regulation Best Interest (and any similar state laws) with regards to a Recommendation shall be determined as of when the Recommendation is given, based upon the price and characteristics of the recommended investment on such date compared to the value of your account as of the most recent valuation date, and shall not be impacted as a result of changes in value or status of an investment or a corporate re-organization, regulatory or tax change, or other similar event affecting an investment following its initiation. The Account Holder acknowledges that Recommendations are provided to the Account Holder by E*TRADE Securities and no other E*TRADE Entities. The Account Holder further acknowledges that factors such as economic, political, or market volatility may affect such Recommendations. Although quotes, news, and research data provided by Financial Consultants are obtained from sources E*TRADE believes to be reliable, the Account Holder acknowledges that E*TRADE may not independently verify the accuracy or validity of the information provided by these sources, and the Account Holder agrees to hold the E*TRADE Entities harmless from any damages resulting from the receipt of such information. The Account Holder further acknowledges that their receipt of Market Data or research does not constitute a Recommendation or a solicitation by any E*TRADE Entities for the purchase or sale of any securities described therein.

The Account Holder understands that Recommendations are intended to be acted on immediately or within a reasonable period from the time they are provided, and the Account Holder acknowledges that market conditions may change at any time after such Recommendations are given and that such changes may render any Recommendation untimely or otherwise not in the Account Holder's best interest. The Account Holder also understands that, as a one-time Recommendation, the Financial Consultant has no obligation to notify the Account Holder of any changes regarding the Recommendation and that E*TRADE does not provide any monitoring of Accounts. In providing a Recommendation, the Financial Consultant will not have discretion over the Account, and the Account Holder agrees that the Account Holder or the Account Holder's Authorized Agent remains responsible for all decisions regarding the Account. A Recommendation does not constitute investment advice or "investment advisory services" as governed by the Investment Advisers Act of 1940.

The Account Holder agrees to implement a Recommendation that is securities-related by placing an order with the Account Holder's Financial Consultant, who will, on receipt of the Account Holder's order, enter such trades with E*TRADE Securities as solicited trades. The Account Holder understands that commissions or markups/markdowns, if applicable, associated with solicited trades may be higher for some products than those associated with unsolicited trades as a result of the Recommendation provided. Any transactions in securities for or about which the Account Holder has received a Recommendation that are effected by any means other than by placing such trades with a Financial Consultant will be treated as an unsolicited trade, and neither any E*TRADE Entity nor the Financial Consultant assumes any liability or responsibility arising from any unsolicited trades or the results of any investment strategies, transactions, or decisions relating thereto. The Account Holder acknowledges that Financial Consultants are only permitted to make Recommendations that are specified in the Relationship Summary, and therefore are not authorized to recommend retirement account rollovers, a particular type of brokerage or retirement account (such as joint versus individual), individual common stock, mutual fund, or exchange-traded fund transactions, futures transactions or futures strategies, options transactions or options strategies, the use of margin, securities lending, lines of credit, or any other type of investment or strategy that is not specified in the Relationship Summary. Under Applicable Law, E*TRADE Securities and its Financial Consultants are required to act in your best interest at the time of a Recommendation. This requirement does not extend to any other dealings or services provided by E*TRADE Securities, including, without limitation, its marketing of securities and services and trade execution, and how it establishes its fees and charges. Recommendations do not include, without limitation, marketing materials, educational materials, statements of philosophy and investment principles, descriptions of strategies and risks, and generic advice.

**No Account Monitoring and No Tax, Legal, or Accounting Advice**

While E*TRADE may make certain general information available to the Account Holder, under no circumstances do any E*TRADE Entities provide legal, tax, estate-planning, or accounting advice. E*TRADE also does not provide account monitoring as part of the Service.

**Advisory Services and Trading Authorization for Advisory Accounts**

E*TRADE may make information available to the Account Holder about various investment advisers that the Account Holder may contact. The Account Holder may also contract with other investment advisers that the Account Holder independently identifies to manage the Account (such Accounts, "**Advisory Accounts**"). No E*TRADE Entities have any responsibility or liability for any advice, recommendation, or trading by any Authorized Agents, except as provided in (vi) below. The Account Holder understands that the Authorized Agent is an agent of the Account Holder and not of any E*TRADE Entities and that the terms of this Customer Agreement will continue to govern the terms of the Service provided by E*TRADE to the Account Holder. Without limiting any other provision of this Customer Agreement, the Account Holder understands and agrees that, between the Account Holder and E*TRADE:

  i.   The Account Holder agrees not to allow any person to place orders or provide instructions with respect to the Account unless a trading authorization
       for that person has been received and approved by E*TRADE.
  ii.  The Account Holder has selected the Account Holder's Authorized Agent based on criteria that the Account Holder deems appropriate for the
       Account Holder's investment needs and will not hold E*TRADE responsible for the Account Holder's decision to hire the Authorized Agent(s).
  iii. All decisions relating to the Account Holder's investment or trading activity shall be made solely by the Account Holder or the Authorized Agent.
  iv.  E*TRADE is authorized to accept and act on the instructions of the Authorized Agent until E*TRADE receives the Account Holder's written notice
       revoking such authority and has had a reasonable amount of time to act on such notice. This authorization shall be applicable to all Collateral in the
       Account.
  v.   E*TRADE is further authorized to act on the Authorized Agent's instructions to aggregate orders for the Account with orders for one or more other
       accounts over which the Authorized Agent has trading authorization or to accept or deliver assets in transactions executed by third parties where
       the Authorized Agent has so aggregated orders.
  vi.  Where the Account Holder's Authorized Agent is an E*TRADE Entity, the terms of any such agreement between the Account Holder and such
       E*TRADE Entity shall govern the provision of investment advisory services, and in no event will E*TRADE be responsible for or assume the
       obligations of such other E*TRADE Entity.
  vii. No Authorized Agent, whether or not affiliated with E*TRADE, is authorized to make representations or act on behalf of E*TRADE.
  viii. E*TRADE has no responsibility for and will not participate in or review the Authorized Agent's trading decisions or in any way review, monitor, or
        supervise the suitability or frequency of the investment or trading activity in the Account.
  ix.  E*TRADE will not have any duty to inquire into the authority of the Authorized Agent to engage in particular transactions or investment strategies or
       to monitor the terms of any oral or written agreement between the Account Holder and the Authorized Agent, including where an E*TRADE Entity
       other than E*TRADE is an Authorized Agent.

**Account Statements**

It is the Account Holder's responsibility to review account statements immediately upon receipt, whether delivered to the Account Holder electronically, by interactive voice response, by postal mail, or otherwise.

The Account Holder will be sent a monthly Account statement unless there are no transfers or transactions in the Account during a particular month. To the extent the Account has any Collateral in the Account or Account activity, the Account Holder will be sent a statement at least quarterly. The Account Holder understands that to the extent the Account has no security positions, money balances, or Account activity in a given quarter, the Account Holder will not receive an Account statement for that corresponding quarter. The Account Holder agrees to review all Account statements and to notify E*TRADE within 10 Business Days of receipt of any Account statement that the Account Holder believes contains any error or unauthorized transaction or transfer, unless the error or unauthorized activity is reported on a transaction confirmation, which is subject to the notification time period noted below.

**Transaction Confirmations**

It is the Account Holder's responsibility to review all confirmations of transactions immediately upon receipt, whether delivered to the Account Holder electronically, by interactive voice response, by postal mail, or otherwise.

The Account Holder will notify E*TRADE of any objection to the terms of a confirmation within two Business Days after receipt of the confirmation. In all cases, E*TRADE reserves the right to determine the validity of the Account Holder's objection. If the Account Holder objects to a transaction for any reason, the Account Holder agrees that they will attempt to limit any Losses that may result from such transaction. The Account Holder understands and agrees that unless they take such action to limit Losses, they will bear sole responsibility for any and all further Losses that may occur thereafter, even if their objection to the initial transaction is ultimately determined to be valid.

The Account Holder agrees that E*TRADE is not obligated to provide them with any trade status report other than the official confirmation. E*TRADE may nevertheless provide electronic or other trade status reports as a courtesy only, but E*TRADE does not guarantee the accuracy or timeliness of such interim trade status reports, and neither it nor any other E*TRADE Entities are liable for any Losses arising out of or relating to delayed issuance or failure to issue an electronic or other trade status report or from errors in such reports that are subsequently corrected by E*TRADE in official confirmations.

In all cases, E*TRADE reserves the right to determine the validity of the Account Holder's objection to the information on or in any Account statement or transaction confirmation.

**Cancelations; Late and Corrected Reports**

E*TRADE has no responsibility for any errors in submission or transmission of orders by the Account Holder or any Authorized Agent and may execute any order on the terms of such order as actually received by E*TRADE. The Account Holder is responsible for the settlement of all transactions resulting from executions of orders (including partial executions), (i) regardless of any delay in transmission or receipt of a transaction confirmation or execution report and (ii) whether the Account Holder received an electronic acknowledgment of the order executed by E*TRADE. The Account Holder understands that when they place a request to cancel an order, the cancelation of that order is not guaranteed. The order will be canceled only if the request is received by the market center to which the order was routed and matched with the order to be canceled before it is executed and that mere submission of a cancelation request prior to receipt of notice of an execution does not ensure that an order will not be executed. In addition, any reporting or posting errors, including errors in reporting or posting execution prices and confirmations of cancellations, will be corrected to reflect the actual market center execution and the related E*TRADE settlement obligation. The Account Holder is responsible for knowing the status of their pending orders before entering additional orders. Any duplication by the Account Holder of a pending order will be considered authorized and intended by the Account Holder, even if the execution of the order exceeds their Available Funds, purchasing power, or available position.

**Obvious Error; Trade Nullification and Adjustment**

The Account Holder understands that a transaction may be nullified or adjusted under Applicable Law or the rules or agreements of a market center if the transaction or its execution was the result of an "obvious" or "catastrophic" error. In addition, E*TRADE reserves the right to adjust, cancel, correct, or take any other appropriate action when, in its reasonably exercised, good-faith discretion, it deems a transaction to be erroneous in nature, even if such transaction would not be required to be or subject to nullification or adjustment pursuant to Applicable Law or the rules or agreements of a market center.

Unless required under Applicable Law, E*TRADE has no obligation to nullify or adjust any transaction executed in accordance with the Account Holder's instructions. The Account Holder, however, may request review of a transaction that results from an obvious or catastrophic error by promptly contacting E*TRADE at 800-ETRADE-1 (800-387-2331) or their designated representative. E*TRADE will use reasonable efforts to request nullification or adjustment of a transaction deemed to have been executed in error through its market centers. Trade nullification or adjustment requests submitted more than 15 minutes after execution generally cannot be acted upon by E*TRADE or its outside market centers. E*TRADE reserves the right to deny any trade nullification or adjustment request.

**Assets Held Away**

If E*TRADE allows the Account Holder to reflect on the Account statement positions that they hold at another custodian, E*TRADE reports these positions to the Account Holder as a service based solely on information provided by the Account Holder and/or the Account Holder's custodian. The Account Holder agrees that E*TRADE makes no representation whatsoever concerning the accuracy of this information and, in particular, the accuracy of the position, its custodial location, the valuations reflected for the position, the Account Holder's ability to liquidate the assets or obtain the stated values on liquidation, the cost basis, or the existence of any corporate action affecting the position. To the extent that any advice or results of any analytic tools that the Account Holder uses depend on information about positions held away, the Account Holder agrees that the advice or results depend on the accuracy, timeliness, and completeness of the information provided to E*TRADE, for which the Account Holder remains solely responsible. The Account Holder agrees that E*TRADE Entities have no liability for any Losses arising, directly or indirectly, to any assets held away.

**Notices and Other Communications**

It is the Account Holder's responsibility to review all notices and other communications immediately upon receipt, whether delivered to the Account Holder electronically, by interactive voice response, by postal mail, or otherwise.

E*TRADE Financial Corporation's Privacy Statement (the "**Privacy Statement**") (which includes the Gramm–Leach–Bliley Act Privacy Notice) is available at *us.etrade.com/l/f/privacy-statement*. The Account Holder understands that E*TRADE reserves the right to amend the Privacy Statement at any time or from time to time in accordance with its terms and Applicable Law. The Account Holder further understands that any changes are effective as of posting to *etrade.com*. The Account Holder agrees that by continuing to maintain the Account, the Account Holder is accepting the terms of the Privacy Statement as amended and is legally bound by such amended terms and conditions.

The Account Holder agrees to receive updates to the Privacy Statement via *etrade.com*. In accordance with the Gramm–Leach–Bliley Act, E*TRADE satisfies its obligation to annually deliver the Privacy Statement, as applicable, by posting it to *etrade.com*.

E*TRADE will forward to the Account Holder any and all notices and other communications relating to the Account, including the Relationship Summary, prospectuses, and, where required by Applicable Law, any proxy materials, annual reports, notices of meetings, and other material furnished to E*TRADE by issuers whose securities the Account Holder owns, by sending such notices and other communications to the postal or electronic address the Account Holder has specified. Such notices are deemed to constitute good and effective delivery to the Account Holder when sent by E*TRADE whether or not actually or timely received or accessed, unless E*TRADE receives actual notice to the contrary (by rejected email delivery notice, returned mail from the US Postal Service, or the like).

The Account Holder is responsible for reading the notices posted to the electronic message box for the Account at *etrade.com* and for notifying E*TRADE immediately of any change to the postal or electronic address specified. Certain notices and communications may also be provided to the Account Holder orally. Such notices left by voicemail or otherwise will be deemed to have been delivered whether or not actually received. The Account Holder waives all claims resulting from any failure to receive the notices and communications specified in this Section 9. Communications to be sent to multiple persons with the same last name at a single address may be satisfied by delivery of a single communication to that address. Communications sent to the Account Holder shall be deemed to satisfy delivery to an Authorized Agent unless the Account Holder requests in writing to E*TRADE that the Authorized Agent receive notices and communications.

**Communications and Monitoring**

By providing E*TRADE Entities with any telephone number, the Account Holder is expressly consenting to the E*TRADE Entities' and its service providers' contacting them at that number. The Account Holder consents to E*TRADE's contacting their past, present, and future phone service providers to verify information they provided against the records of the service provider; the Account Holder also consents to the service provider's verifying any phone numbers they have supplied with the name, address, and status on their records. For E*TRADE to service the Account or collect any amounts the Account Holder may owe, the Account Holder agrees that the E*TRADE Entities may contact them using any contact information related to the Account, including any number (i) provided by the Account Holder, (ii) from which the Account Holder contacted an E*TRADE Entity, or (iii) that an E*TRADE Entity obtained and reasonably believes may be a means of contacting them.

E*TRADE and its service providers may use any means to contact the Account Holder, including automated dialing devices ("autodialers"), prerecorded or artificial voice messages, mail, email, text messages, and calls to the Account Holder's mobile phone or Voice over Internet Protocol service, or any other data or voice transmission technology. The Account Holder is responsible for any service provider charges as a result of such contact.

**Fraud-Related Alerts**

As part of its efforts to safeguard client accounts, E*TRADE may send alerts to the Account Holder's mobile phone related to potentially fraudulent or suspicious activity. By providing a mobile phone number to E*TRADE, the Account Holder expressly consents to receiving alerts about potentially fraudulent or suspicious activity by prerecorded or artificial voice message and/or text message, including via the use of an autodialer, at any mobile phone number the Account Holder provides. The Account Holder may opt out of these alerts by texting "STOP" to short code 91869 from their mobile phone, which revokes their consent to receive fraud-related alerts to that mobile phone but does not revoke any other consent they may have provided. The Account Holder may obtain help by texting "HELP" to short code 91869 or by contacting Customer Service at 800-ETRADE-1 (800-387-2331) for domestic callers or +1 678 624 6210 for international callers. This program is free to the Account Holder. Message frequency is based on the Account Holder's profile. The Privacy Statement is available at *us.etrade.com/l/f/privacy-statement*. E*TRADE does not use SMS text messages associated with fraud-related alerts to contact Account Holders for debt collection purposes. The Account Holder agrees that neither E*TRADE nor its service providers is liable for any delays, failure to

deliver, or misdirected delivery of any communication; for any errors in the content of a communication; or for any actions taken or not taken by the Account Holder or any third party in reliance on a communication.

**Monitoring**

The Account Holder understands and agrees that E*TRADE may, at its discretion, monitor or record any of the Account Holder's telephone conversations with E*TRADE for quality control purposes and for its own protection. E*TRADE may also monitor and make a record of the Account Holder's use of the Service and any other communications between E*TRADE and the Account Holder and may use the resulting information for internal purposes or as may be required by Applicable Law. Unless otherwise agreed to in writing, E*TRADE does not consent to the recording of telephone conversations by any third party or by the Account Holder. The Account Holder acknowledges and agrees that not all telephone lines or calls are recorded by E*TRADE and that E*TRADE does not guarantee that recordings of any particular telephone calls will be retained or can be retrieved. The Account Holder hereby waives any right to object to the admissibility into evidence of such recordings or transcripts in any court, arbitration, or other legal proceeding.

**Trusted Contact Person and Temporary Holds on an Account**

The Account Holder may designate an individual at least 18 years of age as their Trusted Contact Person ("**TCP**") at their discretion. Although the Account Holder is not required to elect a TCP, E*TRADE is required to make reasonable efforts to obtain the name and contact information for a TCP for the Account. E*TRADE may monitor the Account to prevent financial exploitation of vulnerable customers.

By designating a TCP, the Account Holder is authorizing E*TRADE to disclose information about the Account in certain circumstances, including to address possible financial exploitation, and to confirm the specifics of the Account Holder's current contact information, their mental and physical health status, or the identity of any legal guardian, executor, trustee, or holder of a power of attorney or as otherwise permitted by Applicable Law.

The Account Holder authorizes E*TRADE to place a temporary hold on disbursements of funds or securities from the Account or, in some cases, a temporary hold on transactions if E*TRADE reasonably believes that financial exploitation has been attempted or has occurred in the Account or in other circumstances that E*TRADE believes are necessary for the Account Holder's protection. The Account Holder acknowledges that E*TRADE may report any reasonable belief of financial exploitation, or in other circumstances that E*TRADE believes are necessary for the Account Holder's protection, to the applicable state securities administrator, to a state adult protective services agency, or to law enforcement agencies.

Designating a TCP does not ensure that financial exploitation will not be attempted or occur. The Account Holder agrees to indemnify and hold harmless E*TRADE, its affiliates, and their directors, officers, employees, and agents from and against all claims, actions, costs, and liabilities, including attorney fees, arising out of or relating to: E*TRADE's contacting the Account Holder's TCP; E*TRADE's putting a temporary hold on disbursements of funds and/or securities from the Account; and E*TRADE's *not* contacting the TCP or placing temporary holds on disbursements of funds and/or securities from the Account.

**Information Made Available Through the Service**

The Account Holder agrees to use the Service for lawful purposes, for personal and non-commercial use, and as permitted by this Customer Agreement. The Account Holder agrees that they are permitted to store, display, analyze, modify, reformat, and print the information made available to the Account Holder through the Service only for the Account Holder's own use. The Account Holder will not transmit through *etrade.com* any material that violates or infringes in any way on the rights of others or that would encourage conduct that may give rise to civil or criminal liability. The Account Holder will not modify, copy, publish, transmit, license, participate in the transfer or sale of, reproduce, create derivative works from, distribute, redistribute, display, or in any way exploit the Service. The Account Holder will not upload, post, decompile, reverse-engineer, disassemble, modify, copy, distribute, transmit, reproduce, republish, license, display, sell or transfer, or create derivative products from the Service. Software accessed on the E*TRADE website(s) is subject to US export controls and may not be downloaded by any person prohibited from doing so by Applicable Law.

The Account Holder will not publish, transmit, or otherwise reproduce this information, in whole or in part, in any format to any third party without the express written consent of E*TRADE. The Account Holder will not use, alter, obscure, or remove any copyright, trademark, or any other notices that are provided to the Account Holder in connection with the information. The Account Holder represents and warrants that: (i) the Account Holder will not use the Service in contravention of this Customer Agreement, (ii) the Account Holder will use the Service only for the benefit of the Account and not on behalf of any other person, and (iii) with the exception of a web browser and other applications specifically approved by E*TRADE in writing, the Account Holder agrees to not use (or allow another person to use) any software, program, application, or other device, directly or indirectly, to access or obtain information through the Service or to automate the process of accessing or obtaining such information.

**Personal Information**

The respective rights and responsibilities of each E*TRADE Entity and the Account Holder regarding the collection, processing, use, retention, and disclosure of the Account Holder's personal information and the Account Holder's rights with respect to such information are set forth in the Privacy Statement published on *etrade.com*, as amended from time to time. Such rights and responsibilities are further defined by Applicable Law. In the event of any controversy regarding E*TRADE's collection, processing, use, retention, or disclosure of any information about the Account Holder, the Account Holder agrees that its remedies are expressly limited to those specifically provided by Applicable Law.

The Account Holder expressly authorizes each E*TRADE Entity, from time to time and without notifying the Account Holder, to obtain reports and any other such information that may be available from public or proprietary sources concerning, among other things, the Account Holder's credit standing, credit capacity, credit payment history (including without limitation any bankruptcy filing), criminal history, business conduct, character, general reputation, personal characteristics or mode of living, or any other such information ("**Consumer Reports**") that any E*TRADE Entity, at its respective good-faith discretion, deems material to, among other things, the maintenance, review, extension, or renewal of the Account; determinations with respect to extensions of credit; and the provision or restriction of any Service provided pursuant to the terms of this Customer Agreement or general enterprise-level risk management.

E*TRADE, on written request, will advise the Account Holder whether E*TRADE obtained Consumer Reports and, if so, will provide the name and address of the reporting agency that furnished the reports. In addition, the Account Holder understands that each E*TRADE Entity reserves the right to report to consumer and securities credit-reporting agencies any Debit Balance or negative credit information pertaining to any Account held by the Account Holder at E*TRADE.

The Account Holder acknowledges that each E*TRADE Entity may share credit bureau information and any other personal information that such E*TRADE Entity obtains with any other E*TRADE Entity and with unaffiliated third parties in accordance with the Privacy Statement published on *etrade.com*.

E*TRADE (on behalf of itself and other E*TRADE Entities) will provide notification to the Account Holder of any Adverse Action taken with respect to the Account in a manner consistent with the requirements of the Fair Credit Reporting Act. For the purposes of this Section 9, "**Adverse Action**" has a meaning consistent with the definition of such term in the Fair Credit Reporting Act and which for the purposes of this Customer Agreement and the Service provided under this Customer Agreement includes any restriction on or termination of the Account, requests for repayment of credit previously extended or refusal of future credit extensions, increases in fees or interest or other charges, or any other action that has a negative impact on the Account Holder, in each case that is based in whole or in part on the Consumer Reports.

By providing a mobile phone number to E*TRADE or when contacting Customer Service to request assistance with certain transactions, the Account Holder authorizes their wireless operator (e.g., AT&T, Sprint, T-Mobile, US Cellular, Verizon, or any other branded wireless operator (together "**Wireless Operator**")) to use their mobile phone number, name, address, email address, network status, customer type, customer role, billing type, mobile device identifiers (i.e., International Mobile Subscriber Identity and International Mobile Equipment Identity), and other subscriber status details, if available, to allow verification of the Account Holder's identity and to compare information they have provided to E*TRADE with their Wireless Operator account profile information for the duration of the business relationship.

## 10. TRADING PROVISIONS

**Settlement of Transactions**

The Account Holder agrees to pay for all Collateral purchased for the Account and to deliver Collateral sold for the Account in Good Deliverable Form by the Settlement Date or, in the event the Account is a Margin Account, on demand by E*TRADE. In the case of a sale of Collateral, E*TRADE is authorized to borrow or otherwise obtain the Collateral as necessary to enable E*TRADE to make delivery or guarantee such delivery, and the Account Holder is liable for any fees in accordance with the Fee Schedule for any failure to deliver the Collateral by the Settlement Date.

**SIPC and Other Insurance Coverage**

E*TRADE is a member of the Securities Investor Protection Corporation. SIPC currently protects the securities and Cash Balances in each of the Accounts up to $500,000, including $250,000 for claims for cash in accordance with the Securities and Investor Protection Act of 1970. Please note that money market fund balances are securities and not cash for this purpose. Visit *sipc.org* or call 202-371-8300 for more information, including a brochure about SIPC protection.

E\*TRADE offers additional protection secured through an independent insurer. Account protection and coverage (either under SIPC or the additional insurance secured by E\*TRADE) does not cover fluctuations in the market value of the Account Holder's investments and any Losses resulting therefrom. Positions not custodied by E\*TRADE but reflected on Account statements as a service to the Account Holder are not covered by the SIPC insurance relating to, or the additional insurance secured by, E\*TRADE.

**FINRA BrokerCheck®**

FINRA BrokerCheck, formally known as the FINRA Public Disclosure Program, allows investors to learn about the professional background, business practices, and conduct of FINRA member firms and their associated persons. The telephone number for FINRA BrokerCheck is 800-289-9999; the website is *finra.org*. An investor brochure that includes information describing FINRA BrokerCheck is also available on request.

**Order Types; Generally**

The various order types and the terms of each such order type offered by E\*TRADE as part of the Service may vary in certain cases from those of other broker-dealers. The Account Holder agrees to review and become familiar with the terms of all orders made available as part of the Service prior to use. A detailed description of the terms of all orders is available at *us.etrade.com/e/t/prospectestation/help?id=1301020000*. E\*TRADE reserves the right to modify the Service at any time, including the terms of any orders offered as part of the Service, and the Account Holder acknowledges that they are solely responsible for ensuring that they remain familiar with E\*TRADE's order terms prior to placing such orders. Without limiting the foregoing, the Account Holder understands that:

  i.   whether the Account Holder places a market or limit order, the Account Holder receives the price at which the order is executed in the marketplace, which, particularly during periods of high volume, illiquidity, fast movement, or volatility in the marketplace, may differ from the quoted market at the time of order submission;
  ii.  "firm" price quotes are for only the size specified; the Account Holder may receive multiple executions or partial executions, including at prices worse than the quoted market at the time of order submission if the Account Holder's order is in excess of the quoted size or other orders are received by the market center at the same time or ahead of the Account Holder's order;
  iii. limit orders may not be executed in full at any particular time or at all if there is not sufficient liquidity offered at or better than the limit price specified by the Account Holder;
  iv.  securities may open for trading at prices substantially higher or lower than the previous closing price; and
  v.   E\*TRADE may cancel orders designated "good until canceled" after 60 calendar days and prior to certain corporate actions that would require adjustment of the order in accordance with Applicable Law, but in no event shall E\*TRADE be required to cancel any such orders, and E\*TRADE may, at its sole discretion, adjust such orders in accordance with Applicable Law.

**Transactions in Over-the-Counter Equity Securities**

Trading in over-the-counter ("**OTC**") equity securities carries a high degree of risk and may not be appropriate for all Account Holders. In particular, OTC equity securities present trading risks, as they are generally "thinly traded," or more illiquid, than exchange-listed securities, which tends to increase price volatility and impair an Account Holder's ability to buy or sell within a reasonable period of time without adversely impacting execution price(s). As a self-directed investor, the Account Holder assumes full responsibility for each and every transaction in or for their Account and for their own investment strategies and decisions, including with respect to any transactions in OTC equity securities.

To the extent that an Account Holder participates in any OTC equity security transaction, the Account Holder acknowledges that they understand that OTC equity securities may be subject to different trading rules and systems than other securities and that they may encounter significant delays in executions, reports of executions, and updating of quotations in OTC equity securities. E\*TRADE, at its sole discretion, may require an Account Holder to place limit orders to trade certain OTC equity securities, and E\*TRADE reserves the right to reject any order.

Although market data relating to OTC equity securities may be updated from time to time, displayed pricing information and other market data relating to OTC equity securities, including but not limited to OTC equity securities traded on the OTCQX, OTCQB, and Pink Markets: OTCBB and Pink Sheet quoted securities; and OTC equity securities classified as "Penny Stocks," "Bulletin Board," or "Grey Market" securities, may not be available or current at any given point in time. In some cases, certain OTC equity securities may not trade for extended periods of time. Accordingly, last-sale information may not reflect a recent transaction price or current interest in the market, which may be at prices significantly different from the displayed last-sale price.

Under certain circumstances, OTC equity securities may not be registered with the SEC and therefore are not subject to the same reporting, disclosure, and regulatory oversight requirements as apply to SEC-registered securities. In some cases, issuers of OTC equity securities may have no obligation to provide information to investors, and in many cases reliable information regarding issuers of OTC equity securities, their prospects, or the risks associated with the business of such issuers may not be available. As a result, it may be difficult to properly value an investment in an OTC equity security. Accordingly, the Account Holder should exercise additional care and perform thorough due diligence before making any investment decision regarding an OTC equity security. The Account Holder understands and agrees that E\*TRADE, its direct and indirect parent companies, and its affiliates have no liability whatsoever for the results of the Account Holder's investment strategies, transactions, and decisions, including with respect to transactions in OTC equity securities.

Account Holders are strongly advised to proceed with caution and thoroughly research companies before transacting in OTC equity securities. Certain OTC equity securities transactions may involve companies that are not able or willing to provide current disclosure to the public markets, including companies that have ceased operations as well as "dark" companies with unknown management practices and market disclosure policies. Publicly traded companies that are not willing to provide information to investors should be treated with suspicion, and their securities should be considered highly risky. Other OTC equity securities transactions may involve companies that are under investigation for or have previously engaged in misleading or manipulative stock promotion, disruptive corporate activities, and potentially fraudulent acts. As a self-directed trader, the Account Holder acknowledges that they, and not E\*TRADE, are solely and exclusively responsible for their investment decisions, including with respect to transactions in OTC equity securities.

**Free-Riding**

Transactions in violation of the cash account provisions of Regulation T of the Federal Reserve Board that generate a profit in the Account are, to the extent permitted by Applicable Law, forfeited to E\*TRADE. Losses in connection with transactions that violate the cash account provisions of Regulation T of the Federal Reserve Board remain the responsibility of the Account Holder.

**Order-Routing Practices**

The Account Holder understands that, subject to the terms of an order, E\*TRADE exercises discretion over the market center to which an order is routed and the manner in which the order is handled. In determining the market center to which E\*TRADE directs an order, E\*TRADE considers a wide variety of factors, including the speed of execution, price improvement opportunities (executions at prices superior to the then prevailing inside market), automatic execution guarantees, liquidity enhancement, the availability of efficient and reliable order-handling systems, the level of service provided, the cost of executing orders, whether E\*TRADE receives cash or non-cash payments for routing order flow to the market center, and reciprocal business arrangements.

The Account holder acknowledges and agrees that E\*TRADE may participate in retail liquidity and priority programs offered by one or more national securities exchanges under which eligible customers' orders marked with specific order-handling codes may receive priority ahead of all other available interest at a given price level or other enhanced execution benefits. E\*TRADE reviews customers' activity on a periodic basis to determine program eligibility. E\*TRADE reserves the right to choose, at its sole discretion, whether to participate in such programs.

In accordance with Exchange Act Rule 606, E\*TRADE makes available a report detailing the material market centers to which E\*TRADE routes orders in NMS Securities and E\*TRADE's material relationships with those market centers. This report is made available quarterly at *us.etrade.com/l/quarterly-order-routing-report*. On the Account Holder's request, E\*TRADE will provide the Account Holder with the identity of the market center to which the Account Holder's orders were routed for execution in the six months prior to the request, whether the orders were directed, at the Account Holder's request, to a specific market center for execution and the time of the executions, if any, that resulted from those orders. The Account Holder should contact E\*TRADE at 800-ETRADE-1 (800-387-2331) for additional information.

Certain orders, at E\*TRADE's sole discretion, may be subject to manual review, which may cause delays in the execution of the Account Holder's orders or cause their orders to be executed at prices that are significantly different from the quotes provided at order entry. The Account Holder authorizes E\*TRADE to submit their orders jointly with other orders for other customers, and the Account Holder acknowledges that the average price for executions resulting from bunched orders will be assigned to the Account. To prevent unintended Short Sales, once a long sell order is placed with respect to a position in the Account, E\*TRADE generally does not allow placement of another sell order marked long relating to those same securities until the first order is confirmed to have been canceled. For E\*TRADE's protection against credit risk and other conditions, E\*TRADE may, without prior notice, decline, reject, cancel, or reverse an Account Holder's orders and may place trading, disbursement, and other restrictions on the Account.

**Payment for Order Flow**

E\*TRADE receives remuneration for directing orders in securities to particular market centers for execution. The Account Holder understands that this remuneration, known as "payment for order flow," is considered compensation to E\*TRADE, and the source and amount of any compensation received by

E*TRADE in connection with a particular transaction is disclosed on the Account Holder's written request. For more information about E*TRADE's quarterly order routing report pursuant to Exchange Act Rule 606, see https://us.etrade.com/l/quarterly-order-routing-report.

**No Recommendation of Day Trading**

By providing the means to place trades electronically, E*TRADE does not recommend or endorse what is commonly referred to as "day trading," that is, the practice of purchasing and selling (or selling and purchasing) the same security within one day's trading. The Account Holder understands that engaging in the practice of day trading is extremely risky and is not appropriate for customers with limited resources, limited investment or trading experience, or a low risk tolerance. Additional information about day trading and the associated margin requirements is available at *etrade.com*.

**E*TRADE as Agent; Affiliates**

The Account Holder understands that E*TRADE is acting as the Account Holder's agent unless E*TRADE notifies the Account Holder on the transaction confirmation that they are acting as principal for their own Account or as a dual agent for the Account Holder and another person. The Account Holder agrees that E*TRADE may provide certain securities brokerage, execution, futures brokerage, or other services to the Account Holder with or through other E*TRADE Entities. The Account Holder also understands and agrees that, in the event an order is executed with an E*TRADE Entity acting as principal, such E*TRADE Entity may receive a profit (or loss) in connection with such execution in addition to any commission, commission equivalent, markup, or fee paid to E*TRADE.

Nothing in this Customer Agreement nor any information made available through the Service is to be construed as an offer to buy or sell, or the solicitation of an offer to buy or sell, any security, financial product, or instrument or to participate in any particular trading strategy in any jurisdiction in which such offer, solicitation, or trading strategy would be unlawful or the giving of advice where giving such advice would be unlawful.

**Disclosures to Issuers**

E*TRADE is required to disclose to an issuer the name, address, and position of each customer who is a beneficial owner of that issuer's securities unless the Account Holder objects. This is done to comply with Exchange Act Rule 14b-1(c). Unless the Account Holder notifies E*TRADE of such objection in writing, E*TRADE will make such disclosures to issuers.

**Reorganizations and Corporate Actions**

Certain securities may impart valuable rights that expire unless the holder takes some action. The Account Holder understands that they are responsible for knowing the rights and terms of all securities in the Account. E*TRADE is not obligated to notify the Account Holder of any upcoming expiration or redemption dates or to take any other action on their behalf without specific instructions from the Account Holder, except as required by Applicable Law. If any such right is about to expire, become worthless, or be redeemed for significantly less than its fair market value, however, and the Account Holder has not provided instructions to E*TRADE, E*TRADE may, at its discretion, take action on the Account Holder's behalf and credit the Account with the proceeds. Although E*TRADE has the discretion to take such action, E*TRADE is not obligated to do so. The Account Holder agrees not to hold any E*TRADE Entities liable for any Losses or expiration of rights arising out of or relating to the Account Holder's failure to act or to give instructions to E*TRADE to act on the Account Holder's behalf.

The Account Holder is responsible for knowing about voluntary and mandatory reorganizations related to securities that they hold, including mergers, name changes, stock splits, and reverse stock splits. E*TRADE is not obligated to notify the Account Holder of any such reorganizations before they occur. The Account Holder understands that E*TRADE will not allocate securities or funds resulting from reorganizations until such securities or funds are received by E*TRADE from the paying agent or depository. On voluntary reorganization instructions (tender or exchange offers), the Account Holder agrees to provide instructions to E*TRADE's Corporate Actions Department no later than two Business Days prior to the expiration of the offer, to allow E*TRADE sufficient time to act on the Account Holder's instructions. Any instructions received after that time are processed on a "reasonable efforts" basis only. Additionally, the Account Holder is solely responsible for also knowing about periodic payment activities, including cash, stock, and optional dividends. E*TRADE is not obligated to notify the Account Holder of any such activities.

The Account Holder is responsible for knowing when a reorganization, such as a stock split, has changed the symbol and/or the number of shares represented by an options contract. If the Account Holder trades options during a tender offer, merger, or other pending reorganization, they must exercise particular care to ensure that they understand the price of the options, the number of shares per contract, and the terms on which options contracts will adjust for such corporate actions. If, due to a reorganization, the Account Holder sells more shares of a security than they own, if the Account Holder becomes uncovered on an options position, or if the Account Holder becomes otherwise exposed to risk requiring E*TRADE to take market action in the Account, the Account Holder is responsible for any Losses incurred. Overselling in a Cash Account or Margin Account is an impermissible Short Sale and may result in the Account's being restricted.

The Account Holder acknowledges and understands that certain corporate actions, including without limitation bankruptcies, mergers, foreign American Depository Receipts ("ADRs"), reorganizations, and dividend payments, may be subject to court review, changes, and delays. The Account Holder will not hold E*TRADE liable for following court instructions or for reversals or delays related to foreign ADRs.

**Dividends, Interest, and Subscription Rights**

E*TRADE receives periodic payments, such as dividends and interest, on the Account Holder's behalf and credits the Account on or shortly after the date funds are received by or on behalf of E*TRADE. Foreign dividends and interest are credited to the Account on or shortly after the date funds are received by or on behalf of E*TRADE and converted to US currency. With respect to open orders on foreign securities for which a corporate action is declared, however, please review the relevant sections of this Customer Agreement and check *etrade.com* for more information.

**Impartial Lottery Allocation System**

When E*TRADE holds on the Account Holder's behalf bonds or preferred stocks in street or bearer form that are callable, the Account Holder agrees to participate in an impartial lottery allocation system. The Account Holder understands that E*TRADE may not receive allocation rights from the issuer, transfer agent, and/or depositary "calling" such Collateral.

**Control or Restricted Securities**

The Account Holder agrees to notify E*TRADE prior to depositing in the Account, or selling for the Account, any Restricted Securities or the securities of any issuer of which the Account Holder is an affiliate (Control Securities), as those terms are defined in Securities Act Rule 144. The Account Holder is obligated to notify E*TRADE of any and all restrictions on the sale of Collateral, including restrictions imposed by the issuer or any other third party, prior to depositing the securities in the Account or placing an order in connection with the sale or transfer of Control or Restricted Securities. The Account Holder agrees to furnish E*TRADE with the necessary documents (including opinions of legal counsel, if requested) to clear legal transfer of any such securities. The Account Holder further agrees that E*TRADE processes the removal of restrictive legends on a best-efforts basis only. The Account Holder agrees not to hold any E*TRADE Entities liable for the loss of market value in Restricted Securities while the removal process is pending.

If the Account Holder sells stock that is later found to be nontransferable, the Account Holder is responsible for all costs associated with processing the security, including the cost to repurchase stock. E*TRADE, at its sole discretion, may require that securities not be sold or transferred until they first clear legal transfer. The Account Holder also acknowledges and agrees that they are responsible for all reporting Obligations with regard to the sale of Control or Restricted Securities, including without limitation the filing of Form 3, Form 4, Form 5, and Form 144.

The Account Holder understands that proceeds from the sale of Restricted Securities may not be made available to the Account Holder for withdrawal or reinvestment until E*TRADE receives securities from the transfer agent in Good Deliverable Form. Even if the necessary documents are furnished in a timely manner, there may be delays processing such Restricted Securities. The Account Holder further agrees that E*TRADE is not liable for delays in the sale or settlement of such securities or the release of proceeds from such sale resulting from any delay or failure to receive securities in Good Deliverable Form from the Account Holder or the issuer or its agents.

**Trading in Non-US Markets**

The Account Holder understands that investing in markets outside the United States involves additional risks related to clearance and settlement, currency fluctuations, economic and political instability, and differences in accounting standards. The Account Holder agrees that to trade in non-US markets, the Account Holder first must either: (i) convert US dollars held in the Account to the applicable currency of the non-US market in which they will incur a settlement obligation or (ii) transfer into the Account the applicable non-US currency. Securities transactions executed on non-US exchanges may be effected by an E*TRADE Entity or an unaffiliated third party, which may be compensated for their services. Such compensation may be in addition to the fees charged by E*TRADE under this Customer Agreement.

## 11. TRADING SYSTEM

The Account Holder understands and agrees that E*TRADE does not guarantee uninterrupted access to the Service or any feature of the Service. E*TRADE reserves the right to suspend access to the Service without prior notice during scheduled or unscheduled system repairs or upgrades and to modify the Service at any time without prior notice.

**Alternative Access Means**

E*TRADE offers a variety of ways to access the Account, including telephone, online, mobile application, and interactive voice response services. The Account Holder agrees that if they experience any difficulties accessing the Service through any Access Means, particularly during periods of heavy trading and volatile market conditions, they will attempt to use alternate methods to access the Service. E*TRADE, however, will not accept orders or instructions by email, facsimile, or postal mail (including US mail and overnight delivery). Visit the Help Center at *etrade.com* for further information about submitting orders.

**Customer Responsibility**

The Account Holder understands that they are responsible for all acts and omissions relating to the use of the Service, including all orders entered through the Service using the Access Means. The Account Holder understands and agrees that it is their responsibility to maintain the confidentiality of the Access Means and to regularly change their passwords for any Access Means and to keep them confidential.

The Account Holder agrees to notify E*TRADE immediately if: (i) an order is placed through the Service and the Account Holder does not receive an order number; (ii) an order is placed through the Service and the Account Holder does not receive an accurate acknowledgment of the order or its execution; (iii) the Account Holder receives acknowledgment of the execution of an order that the Account Holder believes they did not place; or (iv) the Account Holder becomes aware of any unauthorized use of their Access Means. If the Account Holder fails to notify E*TRADE as soon as practicable when any of the above conditions occur, neither E*TRADE nor any E*TRADE Entities will be liable to the Account Holder or to any other person for any resulting Losses.

**Market Data**

The Account Holder understands that neither E*TRADE nor any participating Data Provider guarantees or makes any warranty of any kind, express or implied, regarding the timeliness, sequence, accuracy, or completeness of Market Data. The Account Holder agrees that neither E*TRADE nor a Data Provider will be held liable for any Losses arising out of or relating to: (i) any inaccuracy, defect, or omission in Market Data; (ii) any error or delay in the transmission of Market Data; or (iii) interruption in any Market Data service due to any cause beyond E*TRADE's control.

The Account Holder also understands that each Data Provider asserts a proprietary interest in all the Market Data it furnishes. The Account Holder will use Market Data (including real-time quotes) only for the Account Holder's individual nonbusiness use. The Account Holder will not provide or redistribute Market Data to any third party or entity. The Account Holder understands that Data Providers may enforce the terms of this Customer Agreement directly against the Account Holder.

Unless otherwise noted, news, commentary, and research reports provided to the Account Holder as part of the Service are from third-party sources unaffiliated with E*TRADE and are for informational purposes only. E*TRADE does not endorse or adopt third-party content provided to the Account Holder as part of the Service, and the Account Holder agrees that E*TRADE is not liable for any claims relating to the Account Holder's consumption of such content.

## 12. ARBITRATION AGREEMENT AND DISCLOSURES

**This Customer Agreement contains a predispute arbitration clause. By signing an arbitration agreement, the parties agree as follows:**

   i. **All parties to this Customer Agreement are giving up the right to sue each other in court, including the right to trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.**
   ii. **Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration is very limited.**
   iii. **The ability of the parties to obtain documents, witness statements, and other discovery is generally more limited in arbitration than in court proceedings.**
   iv. **The arbitrators do not have to explain their reason(s) for their award unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the final scheduled hearing date.**
   v. **The panel of arbitrators may typically include a minority of arbitrators who were or are affiliated with the securities industry.**
   vi. **The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.**
   vii. **The rules of the arbitration forum in which the claim is filed and any amendments thereto shall be incorporated into this Customer Agreement.**

**The Account Holder agrees to resolve by binding arbitration any controversy that may arise between E*TRADE Securities or its affiliates and the Account Holder relating in any way to the Account Holder's relationship with E*TRADE, any Account held with E*TRADE, or any service provided to the Account Holder by E*TRADE. This arbitration agreement includes any controversy involving transactions of any kind made on the Account Holder's behalf by or through E*TRADE or the performance, construction, or breach of this Customer Agreement or any other written agreement between E*TRADE and the Account Holder. Such arbitration will be conducted in accordance with the FINRA rules then in effect unless the rules of another self-regulatory organization to which E*TRADE is subject mandate arbitration before that organization, in which case the arbitration will be conducted in accordance with the rules then in effect of that organization. Any dispute or claim involving a dollar amount in excess of $100,000 will be before a panel of at least three arbitrators. The Account Holder makes this arbitration agreement on behalf of itself and the Account Holder's heirs, administrators, representatives, executors, successors, and assigns and together with all other persons claiming a legal or beneficial interest in the Account.**

**Any award of the arbitrator or a majority of the arbitrators will be final and binding, and judgment on such award may be entered in any court having jurisdiction. This arbitration provision will be enforced and interpreted exclusively in accordance with applicable federal laws of the United States, including the Federal Arbitration Act. Any costs, attorney fees, or taxes involved in confirming or enforcing the award will be fully assessed against and paid by the party resisting the confirmation or enforcement of said award.**

**No person will bring a putative or certified class action to arbitration nor seek to enforce any predispute arbitration agreement against any person who has initiated in court a putative class action or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until:**

   i. **the class certification is denied;**
   ii. **the class is decertified; or**
   iii. **the customer is excluded from the class by the court.**

**Such forbearance to enforce an agreement to arbitrate will not constitute a waiver of any rights under this Customer Agreement except to the extent stated herein.**

**If the Account Holder is not residing in the United States at the time a controversy arises between E*TRADE and the Account Holder, the Account Holder agrees to the provisions described above and the following additional provisions:**

   i. **The Account Holder agrees that any arbitration hearing will be held in New York, New York, unless otherwise agreed to between E*TRADE and the Account Holder or unless FINRA (or other self-regulatory organization administering the arbitration) designates another hearing location;**
   ii. **The Account Holder agrees to the personal jurisdiction of the courts of the State of New York to interpret and enforce these arbitration provisions described in this Customer Agreement; and**
   iii. **All arbitrations will be held in the English language unless otherwise agreed to by the parties.**

## 13. MUTUAL FUND AND EXCHANGE-TRADED FUND TRADING

The Account Holder agrees that when placing an order to purchase, sell, redeem, or exchange a mutual fund or exchange-traded fund ("**ETF**"), E*TRADE's policies and procedures will govern such transactions, in addition to those described in the mutual fund's or ETF's prospectus. The Account Holder understands that E*TRADE may have policies and procedures pertaining to minimum investment requirements, exchanges, or redemptions of mutual fund and ETF shares and dates for payment of accrued dividends that may vary from those applicable to direct mutual fund shareholders.

**Mutual Fund Orders and Settlements**

E*TRADE establishes cut-off times for orders in mutual funds that it makes available through the Service. The Account Holder understands that they should review their order confirmation screen closely, as it displays the day that the Account Holder's order is submitted. In the event that E*TRADE places an order by phone, it is their responsibility to verify the day on which the order is submitted to the fund company. Generally, orders received by E*TRADE before the cut-off times receive the net asset value ("**NAV**") calculated on that Business Day, whereas orders received by E*TRADE after the cut-off time receive the NAV calculated on the next Business Day. E*TRADE's cut-off time for submitting mutual fund orders may be earlier than the cut-off time set by the mutual fund in its prospectus. It is the Account Holder's responsibility to verify with E*TRADE the cut-off time by which the Account Holder must place their order to receive that day's NAV.

**Mutual Fund and ETF Restrictions**

The Account Holder may purchase, sell, redeem, and exchange shares only of mutual funds that have entered into selling agreements with E*TRADE. With respect to mutual funds that have no selling agreement with E*TRADE, the Account Holder may redeem only mutual fund shares that they own and may not purchase additional shares or enter into new positions with that particular mutual fund company. The Account Holder understands that some mutual funds require original written redemption instructions. E*TRADE reserves the right to reject any orders to purchase mutual fund securities because such securities are not authorized for sale in the Account Holder's state or for any other reason.

The Account Holder understands that mutual fund companies may restrict the ability of their shareholders to engage in frequent purchases, redemptions, and exchanges of mutual fund shares (herein defined as "**market timing**"). The Account Holder understands that E*TRADE fully cooperates with specific fund company requests intended to permit the fund company to monitor and/or restrict market timing, which may include a request to limit order size or revoke trading privileges in a particular fund or an entire fund family. The Account Holder further understands that a mutual fund company may reject an order, at its sole discretion, for any reason.

**Other Important Fund Information**

Before investing in mutual funds and ETFs through E*TRADE, the Account Holder agrees to the following:

   i. By making mutual funds and ETFs available to the Account Holder for unsolicited trades, E*TRADE does not make any representation of suitability of any mutual fund or ETF and makes no recommendation of any kind.
  ii. E*TRADE provides, for informational purposes only, data about various mutual funds and ETFs published by independent third parties. While E*TRADE believes that the data provided by these third parties is reliable, it has not attempted to verify the accuracy or completeness of the information provided. No recommendation or endorsement by any E*TRADE Entities as to any investment may be inferred from the data provided.
 iii. Through the Service, the Account Holder can obtain the prospectus for mutual fund and ETF shares available for purchase through E*TRADE. The Account Holder agrees to read the prospectus carefully before investing in the securities of any fund. The prospectus contains important information about the goals, risks, expenses, and investment strategies applicable to the fund. No E*TRADE Entities guarantee or verify the accuracy or completeness of any mutual fund's or ETF's prospectus, statement of additional information, report to shareholders, or proxy solicitation materials.
  iv. Performance data provided represents past performance. Past performance is no indication of future results, and mutual fund and ETF share values fluctuate daily. The Account Holder's investment may be worth more or less than its original cost when the Account Holder redeems their shares.
   v. Some funds impose a sales charge on the purchase of their securities, known as a "**sales load**." In other instances, the Account Holder may be able to purchase mutual fund shares without paying a sales load, although the Account Holder may pay a "**back-end load**" on redemption of the shares. The money assessed from sales loads is generally used to help market the shares of a particular mutual fund. An E*TRADE Entity may receive all or part of a sales load in connection with the Account Holder's purchase or sale of a fund's
  vi. Some mutual funds impose a marketing fee, known as a "**12b-1 fee**." This fee is computed into a fund's overall expense ratio and is used to help market the shares of that fund. An E*TRADE Entity may receive 12b-1 fees in connection with the Account Holder's purchase or continued investment in a fund's shares. An E*TRADE Entity may also enter into contractual arrangements with a fund and/or its affiliates to receive revenue share associated with an Account Holder's investment in a fund's shares and for providing shareholder-related services to shareholders of the fund who are Account Holders.
 vii. E*TRADE may impose a transaction fee for the purchase or redemption of shares of mutual funds that do not impose a sales load. Such fees are not reflected in a mutual fund's performance data. If these fees were factored into the performance, the mutual fund's results would be lower. The Account Holder may be able to purchase shares of a mutual fund directly from, or redeem shares directly to, such mutual fund without paying a transaction fee.
viii. E*TRADE Entities may offer mutual funds without a transaction fee, or for certain load funds the load may be waived. Such offers are pursuant to contractual agreements, and E*TRADE Entities may be compensated for offering such mutual funds without a transaction fee. The load or transaction fee may be reinstated at any time without notice.
  ix. E*TRADE Securities seeks to make available mutual funds and share classes of mutual funds on a self-directed basis or through its affiliate's investment advisory program and unaffiliated investment advisers. The Account Holder acknowledges that they may not be eligible to invest in certain share classes, and that E*TRADE Securities may not offer all available share classes to the Account Holder. Eligibility to acquire certain share classes is determined by the specific issuer of the mutual fund, and not by E*TRADE Securities.
   x. E*TRADE Securities does not offer mutual funds or share classes that are necessarily the least expensive. Other mutual funds and share classes that E*TRADE Securities does not make available (and that may be available through other firms) and in which Account Holder may be eligible to invest may have different prices, fees, and expenses, which may be lower than the charges, fees, and expenses of the mutual funds and share classes that E*TRADE Securities makes available.
  xi. E*TRADE Securities and its affiliates may receive additional compensation from mutual funds and their sponsors and advisers, including, without limitation, Rule 12b-1 fees, revenue sharing, shareholder servicing fees, and other payments for marketing, support, and educational services, in connection with the Account Holder's investments in mutual funds. This additional compensation offsets the costs of providing services to the Account Holder and other customers. The Account Holder understands and agrees that, if E*TRADE Securities did not receive this additional compensation, E*TRADE Securities may charge higher account-level fees and other charges for the Service.

## 14. LIMITATION OF LIABILITY

To the maximum extent permitted by Applicable Law, no E*TRADE Indemnified Parties shall be liable for any action taken or not taken by any of them hereunder or in connection herewith except for their breach of this Customer Agreement, gross negligence, or willful misconduct. No E*TRADE Indemnified Parties shall be liable for any actions taken or not taken in accordance with any instruction from the Account Holder or the Account Holder's agents, including any Authorized Agent. The E*TRADE Indemnified Parties may consult with legal counsel, and any action taken or suffered in good faith in accordance with the advice of such counsel shall be full justification and protection for them.

**No Liability for Indirect, Consequential, Exemplary, or Punitive Damages; Force Majeure Events**

In no event shall any E*TRADE Indemnified Parties be held liable for (i) indirect, consequential, exemplary, or punitive damages or (ii) any loss of any kind caused, directly or indirectly, by any Force Majeure Event, and the Account Holder unconditionally waives any right they may have to claim or recover such damages (even if the Account Holder has informed an E*TRADE Indemnified Party of the possibility or likelihood of such damages).

**Automated Systems**

The Account Holder consents to the E*TRADE Entities' use of automated systems or service bureaus in conjunction with: the receipt and handling of orders; the reporting of order acknowledgments, cancelations, and executions; the clearing and settlement of transactions for the Account; tax and cost basis reporting; the delivery of issuer information with respect to Collateral; and similar recordkeeping and reporting services and account reconciliation and risk management (collectively, "**Automated Systems**"). The Account Holder understands that the use of Automated Systems entails risks, including but not limited to interruption of service, systems or communications failures, delays in service, cyberattacks, and errors in the design or functionality of such Automated Systems (collectively, a "**System Failure**") that could cause substantial damage, expense, or liability to the Account Holder.

THE E*TRADE INDEMNIFIED PARTIES MAKE NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE SELECTION, DESIGN, SECURITY, FUNCTIONALITY, OPERATION, TITLE, OR NONINFRINGEMENT OF ANY AUTOMATED SYSTEM. THE E*TRADE INDEMNIFIED PARTIES MAKE NO EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND SPECIFICALLY DISCLAIM ANY IMPLIED WARRANTY WITH RESPECT THERETO. WITHOUT LIMITING THE FOREGOING, E*TRADE INDEMNIFIED PARTIES EXPRESSLY DISCLAIM ANY REPRESENTATION THAT ANY AUTOMATED SYSTEM WILL OPERATE UNINTERRUPTED OR BE ERROR-FREE.

**Other Third Parties**

The E*TRADE Indemnified Parties shall have no responsibility or liability to the Account Holder (i) in connection with the performance or nonperformance of any market center, clearinghouse, clearing firm, or other third party (including banks) of its obligations with respect to any order for, transaction in, or Collateral for the Account; (ii) any instructions, notices, and communications that the E*TRADE Indemnified Parties believe to be from an individual authorized to act on behalf of Account Holder; or (iii) as a result of any action taken by or on behalf of an E*TRADE Indemnified Party or such party's failure to act, if such action or inaction is necessary to comply with Applicable Law.

**Where Limited by Applicable Law**

Because some states prohibit the limitation of liability for consequential or incidental damages, in such states the limitation of liability only with respect to consequential or incidental damages may not apply, and the respective liabilities of the E*TRADE Indemnified Parties are limited to the greatest extent allowable under Applicable Law in those states. In the event that a court or arbitration panel, as the case may be, holds that the limitations of liabilities or remedies available as set forth in this Customer Agreement, or any portions thereof, are unenforceable for any reason, or that any of the Account Holder's remedies under this Customer Agreement fail, the Account Holder expressly agrees that under no circumstances will the total, aggregate liability of E*TRADE Indemnified Parties to the Account Holder or any party claiming by or through the Account Holder, for any cause whatsoever, exceed $1,000, regardless of the form of action and whether in contract, statute, tort, or otherwise.

## 15. INDEMNIFICATION

The Account Holder agrees fully to indemnify, hold harmless, and reimburse the E*TRADE Indemnified Parties, on a current basis, from and against any and all Losses arising out of or relating to:

    i.  Any transaction effected for or in the Account in accordance with any communication, notice, instruction, or order received from the Account Holder, the Account Holder's agent, or an individual whom any E*TRADE Indemnified Party believes to be authorized to act on behalf of the Account Holder;

    ii.  any erroneous, mismatched, or incomplete identifying information on any Electronic Funds Transfer instruction;

    iii.  failure of the Account Holder to perform their Obligations hereunder, including without limitation failure to satisfy any Obligations due to E*TRADE or to deliver in a timely manner in Good Deliverable Form any Collateral sold for the Account;

    iv.  breach of any representation, warranty, or covenant made by the Account Holder hereunder or any subsequent false or misleading statement or representation made by the Account Holder or its agents;

    v.  any act or omission by the Account Holder with respect to any of their Accounts;

    vi.  the Account Holder's failure to comply with any provision of Applicable Law;

    vii.  any action taken by any E*TRADE Entity to enforce its rights under this Customer Agreement;

    viii.  any Event of Default by the Account Holder; and

    ix.  any violation or infringement by the Account Holder or its agents of any copyright or other intellectual property right.

## 16. <u>OTHER PROVISIONS AND DISCLOSURES</u>

**Receipt and Review of Certain Disclosures**

The Account Holder acknowledges that they have received, read, and understood each of the following disclosures provided by E*TRADE, in each case to the extent applicable to the Account and the Service use by the Account Holder:

    i.  Relationship Summary

    ii.  Characteristics and Risks of Standardized Options

    iii.  Special Statement for Uncovered Option Writers

    iv.  Disclosure of Credit Terms [See Margin Account Supplement]

    v.  Margin Risk Disclosure Statement

    vi.  Day Trading Disclosure Statement

    vii.  Portfolio Margin Disclosure Statement

    viii.  Extended Hours Trading Disclosure

    ix.  Business Continuity Plan

    x.  Regulation S-P Privacy Statement

    xi.  CFTC 1.55 Risk Disclosure Statement

    xii.  E*TRADE's FCM-Specific Disclosure

    xiii.  E*TRADE Futures' Financial Reporting Disclosures

**Compliance with Laws**

The Account Holder agrees to comply with Applicable Law, including without limitation the economic sanctions administered by the US Treasury's Office of Foreign Assets Control. The Account Holder may not use their Account or the Service for illegal activity. The Account Holder agrees to indemnify, defend, and hold E*TRADE harmless from every action, proceeding, claim, loss, cost, and expense (including attorney fees) suffered or incurred by E*TRADE due to any US or foreign government entity's seizing, freezing, or otherwise causing E*TRADE to assert control over any Account or funds in an Account of the Account Holder (or E*TRADE) when purportedly caused by or arising out of the Account Holder's action or inaction. This applies whether or not such action is ultimately determined to be authorized under the laws of the United States or its territories or of any foreign jurisdiction. E*TRADE is not required to inquire about or determine the authority of any action taken by the US or foreign government entity prior to acceding to any legal process initiated by it.

**Modification of Customer Agreement or Service**

E*TRADE may amend or terminate this Customer Agreement at any time subject to Applicable Law. E*TRADE will generally endeavor to provide 30 days' prior notice to the Account Holder of any changes to the terms of the Customer Agreement, although E*TRADE is not obligated to do so. Where prior notice is not practicable at E*TRADE's sole discretion, E*TRADE will endeavor to provide such notice as soon as reasonably practicable. Any amendment to or modification of this Customer Agreement will be posted to *etrade.com* when made and will be effective as of the effective date noted therein. Where notice of any such amendment or modification is made by E*TRADE, unless the Account Holder has communicated otherwise to E*TRADE in writing that the Account Holder wishes to receive such notice in paper form, the Account Holder accepts notice by electronic means as reasonable and proper notice. No provision of this Customer Agreement can be amended by the Account Holder or waived by E*TRADE except by written agreement executed by an authorized officer of E*TRADE. Notwithstanding the forgoing, E*TRADE may amend, modify, or terminate the Fee Schedule and the Service provided hereunder at any time and without prior notice. Account Holders are encouraged to contact E*TRADE at 800-ETRADE-1 or their designated representative regarding any questions about this Customer Agreement. By utilizing the Service, the Account Holder acknowledges its receipt and understanding of the Customer Agreement and the Service.

**Severability, Waiver, and Effectiveness**

If any provision of this Customer Agreement is held to be invalid, void, or unenforceable by reason of any law, rule, administrative order, or judicial decision, that determination will not affect the validity of the remaining provisions of this Customer Agreement. Except as specifically permitted in this Customer Agreement, no provision of this Customer Agreement can be, nor will it be deemed to be, waived, altered, modified, or amended unless agreed to in writing and signed by an authorized officer of E*TRADE.

**Non-Waiver**

E*TRADE's failure to insist on strict compliance with this Customer Agreement or any other course of conduct on its part will not be deemed a waiver of E*TRADE's rights under this Customer Agreement.

**Successors and Assignment**

This Customer Agreement will pass to the benefit of E*TRADE and its successors, assigns, and agents. In addition, the Account Holder hereby agrees that this Customer Agreement and all the terms hereof will be binding on the Account Holder's heirs, executors, administrators, personal representatives, and any assigns permitted by E*TRADE.

E*TRADE may assign its rights and duties under this Customer Agreement to any of its successors or to any E*TRADE Entities without giving the Account Holder notice, or to any other entity on prior written notice to the Account Holder. The Account Holder may not assign their rights and Obligations under this Customer Agreement without first obtaining the prior written consent of E*TRADE. Any purported assignment in violation of this Customer Agreement will be void.

**Power of Attorney**

The Account Holder agrees and hereby irrevocably appoints E*TRADE, with full power as the Account Holder's true and lawful attorney-in-fact, to the full extent permitted by Applicable Law, for the purpose of carrying out the provisions of this Customer Agreement and taking any action and executing any instrument that E*TRADE deems necessary or advisable to accomplish the purposes of this Customer Agreement.

**Power and Authority**

If the Account Holder is a natural person, the Account Holder represents that they have attained the age of majority and have the legal capacity to enter into this Customer Agreement and perform the Account Holder's Obligations under it. If the Account Holder is a legal entity, including a corporation, partnership, estate, or trust, the Account Holder represents that they have all necessary power and authority to execute and perform this Customer Agreement and that the execution and performance of this Customer Agreement will not cause the Account Holder to violate any provisions in the Account Holder's charter, by-

laws, partnership agreement, trust agreement, or other constituent agreement or instrument. The Account Holder further represents that this Customer Agreement, as amended from time to time, is the Account Holder's legal, valid, and binding obligation, enforceable against the Account Holder in accordance with its terms.

**Headings**

The heading of each provision of this Customer Agreement is for descriptive purposes only and will not be deemed to modify or qualify any of the rights or obligations set forth in each such provision.

**Entire Understanding**

This Customer Agreement, all other written agreements, and terms on statements and confirmations contain the entire understanding between E*TRADE and the Account Holder. This Customer Agreement supersedes any previous agreements that the Account Holder has made with E*TRADE with regard to the Account to the extent that the subject matter is covered by this Customer Agreement. If the Account is held jointly, this Customer Agreement supersedes any previous agreements made by the same parties to this Customer Agreement with E*TRADE.

**Choice of Law**

The Account Holder understands that this Customer Agreement will be deemed to have been made in the State of New York and will be construed, and the rights and liabilities of the parties determined, in accordance with the internal laws of the State of New York.

**Electronic Signatures**

The Account Holder's intentional action in electronically signing the Account Application is valid evidence of the Account Holder's consent to be legally bound by this Customer Agreement and by other documentation submitted by the Account Holder or provided to the Account Holder in the Account Application process (this Customer Agreement and any such other documentation, the "**Account Documents**") or governing the Account Holder's relationship with the E*TRADE Entities in connection with the Account and the Service provided hereunder. The use of an electronic version of the Account Documents fully satisfies any requirement that they be provided to the Account Holder in writing so long as the Account Holder has not opted out of electronic delivery in accordance with Section 17, "Electronic Delivery of Documents," of this Customer Agreement.

The Account Holder acknowledges that they may access and retain a record of the Account Documents that they electronically sign through *etrade.com*. The Account Holder is solely responsible for reviewing and understanding all the terms and conditions of these Account Documents.

The electronically stored copy of this Customer Agreement is considered the true, complete, valid, authentic, and enforceable record of the Customer Agreement, admissible in judicial or administrative proceedings to the same extent as if the documents and records were originally generated and maintained in printed form. The Account Holder agrees to not contest the admissibility or enforceability of E*TRADE's electronically stored copy of the Customer Agreement in any proceeding arising out of the terms and conditions of the Customer Agreement. If more than one individual has electronically acknowledged this Customer Agreement, their Obligations under this Customer Agreement will be joint and several and identical to the Obligations of joint Account Holders who have acknowledged a paper Customer Agreement.

## 17. ELECTRONIC DELIVERY OF DOCUMENTS

**Consent to Electronic Delivery**

By agreeing to electronic delivery, the Account Holder is giving their informed consent to electronic delivery of all Account Communications (as defined below), other than those the Account Holder has specifically requested to be delivered in paper form. "**Account Communications**" means all current and future Account statements, trade confirmations, notices, disclosures, regulatory communications (including prospectuses, proxy solicitations, and the Privacy Statement and any updates thereto), and other information, documents, data, and records regarding the Account and the Service (including amendments to this Customer Agreement) delivered or provided to the Account Holder by E*TRADE, the issuers of the Collateral in which the Account Holder invests, and other parties.

**Revocation of Consent**

The Account Holder may revoke or restrict their consent to electronic delivery of Account Communications at any time, subject to the terms of this Customer Agreement, by notifying E*TRADE in writing or by phone of their intention to do so. The Account Holder also has the right to request paper delivery of any Account Communications that the law requires E*TRADE to provide in paper form. The Account Holder understands that if they revoke or restrict their consent to electronic delivery of Account Communications or request paper delivery, E*TRADE, at its discretion, may charge the Account Holder a reasonable service fee for the delivery of Account Communications that would otherwise be delivered electronically, restrict the Account, or close the Account and terminate access to the Service. Neither the Account Holder's revocation or restriction of consent and the Account Holder's request for paper delivery nor E*TRADE's delivery of paper copies of Account Communications will affect the legal effectiveness or validity of any electronic communication provided while the Account Holder's consent was in effect. The Account Holder understands that it may take up to three days to process a revocation of consent to electronic delivery and that they may receive electronic notifications in the interim.

**Electronic Delivery System**

E*TRADE notifies the Account Holder by email when Account Communications are posted to *etrade.com* if required by Applicable Law. The Account Holder may have access through *etrade.com* to an archive of documents they received via electronic delivery for at least the current year, such as account statements, tax documents, and trade confirmations. The Account Holder may obtain copies of earlier documents on request to E*TRADE for up to six years for Account statements and three years for trade confirmations.

The Account Holder acknowledges that the internet is not a secure network and that communications transmitted over the internet may be accessed by unauthorized or unintended third parties. Email notifications sent by E*TRADE do not contain sensitive or confidential customer information, including account numbers and the identity of the security purchased. Due to security risks, the Account Holder should not send any sensitive information, such as account numbers or passwords, in an unencrypted email.

On rare occasions emails may fail to transmit properly. Regardless of whether the Account Holder receives an email notification, the Account Holder agrees to check *etrade.com* regularly for up-to-date information and to avoid missing time-sensitive information. The Account Holder agrees that, for their own records, they can download and save or print the Account Communications they receive via electronic delivery. In the event that an email notification sent to the Account Holder is returned to E*TRADE as undeliverable, a letter will be sent to the Account Holder's postal mail address of record, notifying the Account Holder that Account Communications will be delivered by regular mail until E*TRADE receives verification of an email address from the Account Holder. The Account Holder understands that if they are deemed to have revoked their consent to electronic delivery, E*TRADE, at its discretion, may charge the Account Holder a reasonable service fee for the delivery of Account Communications that would otherwise be delivered electronically or restrict the Account.

The Account Holder understands that E*TRADE reserves the right to post certain Account Communications to *etrade.com* without providing notice to the Account Holder. The Account Holder agrees to check *etrade.com* regularly, as they may have no other means of knowing that certain information and Account Communications have been delivered to them. The Account Holder agrees that all Account Communications provided to them in any of the ways described above will be deemed to be good and effective delivery to the Account Holder when sent by E*TRADE, regardless of whether the Account Holder actually receives or accesses the Account Communications in a timely manner.

The Account Holder agrees to promptly and carefully review all Account Communications as and when delivered and to notify E*TRADE by telephone within, unless otherwise provided herein, five days of delivery if the Account Holder objects to the information provided. E*TRADE is entitled to treat such information as accurate and conclusive unless the Account Holder objects in writing within five days of delivery.

**Costs**

Potential costs associated with electronic delivery of Account Communications include charges from internet access providers and telephone companies, and such charges are borne by the Account Holder. E*TRADE does not charge the Account Holder additional online access fees for receiving electronic delivery of Account Communications.

**Hardware and Software Requirements**

The Account Holder understands that to receive electronic deliveries, the Account Holder must have internet access, a valid email address, the ability to download such applications as E*TRADE may specify and to which the Account Holder has access, and a printer or other device to download and print or save any information the Account Holder may wish to retain. E*TRADE will notify the Account Holder of any changes in the hardware and software requirements needed to access electronic records covered by this consent.

**Consent and Representations**

The Account Holder hereby agrees that they have carefully read the above information regarding informed consent and fully understand the implications thereof. The Account Holder hereby agrees to the conditions outlined above concerning electronic delivery of Account Communications. The Account Holder also agrees that they will maintain a valid email address and continue to have access to the internet. If the Account Holder's email address changes, the Account Holder agrees to notify E*TRADE of their newest email address immediately in writing (for example, by submitting a completed change of email address electronically through *etrade.com*).

## 18. THIRD-PARTY WEBSITES AND CONTENT PROVIDERS

By accessing other websites through links provided on *etrade.com*, the Account Holder agrees to the following terms and conditions. The material available on these sites has been produced by independent providers unaffiliated with E*TRADE. Any opinions or recommendations expressed are solely those of the independent providers and are not the opinions or recommendations of any E*TRADE Entities. In addition to E*TRADE's policies and procedures, the Account Holder may be subject to various policies and procedures that govern handling data from these independent providers, which may differ from E*TRADE's policies and procedures.

### 19. FINANCIAL CONSULTANT DESIGNATIONS

Financial Consultants may hold professional designations or credentials, such as, for example, "certified financial professional," accountants, or lawyers, which are optional for their employment with E*TRADE and their responsibilities to customers. E*TRADE is not bound by either the requirements of any associations' requirements for such designations or supervision of Financial Consultants' compliance and continuing eligibility requirements for use of the designations even if Financial Consultants make known their designations or credentials. The Account Holder acknowledges that their relationship with E*TRADE is governed solely by the terms of this Customer Agreement and any federal or state laws and regulations, and rules of self-regulatory organizations, to which both E*TRADE and the Financial Consultants are subject.

### OPTIONS SUPPLEMENT

The Account Holder understands that options trading is highly speculative and contains a high degree of risk and that options trading may not be suitable for all investors. The Account Holder agrees that prior to completing the "Options" section of an Account Application (or a separate E*TRADE application for an Options Account), the Account Holder will carefully review and consider their financial situation, risk tolerance, and investment objectives. The Account Holder will engage in options trading only if, based on that review, they are fully prepared financially to undertake such risks, withstand any and all Losses incurred, including total loss of the premium plus transaction costs (including but not limited to any applicable hard-to-borrow interest charges). The Account Holder understands that E*TRADE reserves the right to terminate, restrict, or reduce the Account Holder's options trading privileges if it determines that the Account Holder's trading activities or options positions present a risk to E*TRADE.

### 1. OCC DISCLOSURE; APPLICABLE RULES AND REGULATIONS

The Account Holder agrees not to enter into any purchase or sale of any listed options without having read and fully understood the terms, conditions, and risks of options trading as set forth in the "Characteristics and Risks of Standardized Options" document issued and amended from time to time by the Options Clearing Corporation ("**OCC**"). By entering into this Customer Agreement, the Account Holder acknowledges receipt of the "Characteristics and Risks of Standardized Options" document and understands and agrees that each options transaction is subject to Applicable Law.

The Account Holder agrees that, acting alone or in concert with others, the Account Holder will not violate directly or indirectly, or contribute to the violation of, any position or exercise limits imposed by Applicable Law, including by the OCC and any other regulatory authority having jurisdiction over any exchange or market on which options are traded.

### 2. ACCURACY OF SUPPLIED INFORMATION

The Account Holder represents that all information furnished to E*TRADE in connection with the opening of the options account is complete and accurate. The Account Holder agrees to immediately advise E*TRADE of any significant changes in their financial situation or investment objectives.

### 3. MARGIN REQUIREMENTS AND OPTIONS TRADING

An options purchase cannot be margined. There are, however, special margin requirements (discussed in the OCC's "Characteristics and Risks of Standardized Options" document) governing the writing of options that the Account Holder should review before entering into any options transaction. To process options orders, E*TRADE generally requires that the Account contain Available Funds equal to or greater than the purchase price of the options.

E*TRADE may process orders to purchase options even if an Account does not contain sufficient Available Funds. The Account Holder understands that they are responsible for their own orders, including any orders that may exceed Available Funds in the Account.

The Account Holder agrees that E*TRADE is not liable in connection with any market makers' execution, handling, purchasing, exercising, and endorsing of options for the Account. If the Account Holder fails to make payment or to pay Debit Balances when due, E*TRADE is authorized, at its sole discretion and without notice, to take any and all action necessary to protect itself in connection with options transactions for the Account, provided, however, that E*TRADE may not use Available Funds from an Account to pay a Debit Balance in a Retirement Account nor use Available Funds in a Retirement Account to satisfy a Debit Balance in any other Account.

### 4. ASSIGNMENTS AND EXERCISES

E*TRADE has no obligation to exercise any option absent specific instructions from the Account Holder. E*TRADE reserves the right to require sufficient securities and/or other property in the Account prior to enabling the Account Holder to exercise an option. E*TRADE may reduce the number of options exercisable based on the securities and/or other property in the Account and the credit risk to E*TRADE as determined by E*TRADE. The Account Holder acknowledges that the OCC and the national securities exchanges have established cut-off times for delivering exercise instructions and that such cut-off times may be modified from time to time by the OCC and the national securities exchanges.

The Account Holder understands that E*TRADE may, at its sole discretion, require that exercise instructions be delivered prior to such cut-off times. The Account Holder agrees that it is their sole responsibility to (i) understand the applicable cut-off times for delivering exercise instructions on the options contracts in the Account and (ii) deliver said instructions to E*TRADE by the applicable cut-off time. The Account Holder understands and agrees that their failure to do so may result in the option's expiring worthless, even though it might have a monetary value on the expiration date. E*TRADE is not obligated to give the Account Holder prior notice of options expiration dates or any cut-off times for delivering exercise instructions, and the Account Holder has the sole responsibility for taking action to exercise an options contract.

If the Account Holder has not provided any instructions to E*TRADE in accordance with the previous paragraph and they own options that are about to expire "in the money," E*TRADE may, at its sole discretion and without notice to the Account Holder, exercise the option. If such an exercise would require the purchase or sale of the underlying security for which the Account Holder does not have sufficient funds or securities available, E*TRADE may, at its sole discretion and without notice to the Account Holder, enter offsetting transactions to close out the position. Although E*TRADE has the discretion to take such action, E*TRADE is not obligated to do so. In the event that E*TRADE exercises an in-the-money options contract for the Account, and in the absence of instructions from the Account Holder, E*TRADE may thereafter close out any resulting positions (e.g., buy-in short positions or sell long positions).

In the case of an option sold or written by the Account Holder in a Cash Account:

   i.  With respect to a call option, which if exercised against the Account Holder will require the delivery of securities sold, the Account Holder will keep such securities in the Account until the expiration of the options period and will not sell or withdraw such securities. If the option is exercised, E*TRADE may deliver such securities to the purchaser without previous notice to the Account Holder.

   ii.  With respect to any put option, which if exercised against the Account Holder will require payment for securities purchased, the Account Holder will keep in the Account sufficient funds for such payment until the expiration of the options period and will not withdraw such funds or use them for any purpose. If the option is exercised, E*TRADE may use such funds for the purchase of such securities without previous notice to the Account Holder.

In the case of an option sold or written by the Account Holder in a Margin Account where an exercise notice is assigned to the Account, the Account Holder must have enough cash in the Account to meet applicable margin requirements.

The Account Holder acknowledges that selling or writing options may result in a short equity position in the Account on which daily interest charges will accrue until the position is closed and settled if the options are exercised or assigned. Short positions are subject to daily interest charges even if closed on the same day as the exercise or assignment, and multiple days of interest will accrue for closing transactions that settle over weekends or holidays.

### 5. OPTIONS ACTIVITY; GENERALLY

Unless the Account Holder receives written authorization from E*TRADE, the Account Holder agrees that they will not engage in transactions that are not permissible under the options level for which the Account Holder is approved.

The Account Holder also agrees that E*TRADE may exercise discretion in the selection of the exchange or marketplace for the execution of multiple listed options.

**6. UNCOVERED OPTIONS DISCLOSURE**

There are special risks associated with uncovered options writing that expose the Account Holder to potentially significant loss. Therefore this type of strategy may not be suitable for all Account Holders approved for options transactions.

    i.  The potential loss of uncovered call writing is unlimited. The writer of an uncovered call is in an extremely risky position and may incur large Losses if the value of the underlying instrument increases above the exercise price.

    ii.  As with writing uncovered calls, the risk of writing uncovered put options is substantial. The writer of an uncovered put option bears a risk of Losses if the value of the underlying instrument declines below the exercise price. Such Losses could be substantial if there is a significant decline in the value of the underlying instrument.

    iii.  Uncovered options writing is thus suitable only for the knowledgeable investor who understands the risks, has the financial capacity and willingness to incur potentially substantial Losses, and has sufficient liquid assets to meet applicable margin requirements. In this regard, if the value of the underlying instrument moves against the Account Holder's uncovered options position, E*TRADE may request significant additional margin payments. If the Account Holder does not make such margin payments, E*TRADE may liquidate stock or options positions in the Account(s) without notice to the Account Holder.

    iv.  For combination writing, where the Account Holder writes both a put and a call on the same underlying instrument, the potential risk is unlimited.

    v.  If a secondary market in options were to become unavailable, the Account Holder could not engage in closing transactions and an options writer would remain obligated until expiration or assignment.

    vi.  The writer of an American-style option is subject to being assigned an exercise at any time after they have written the option until the option expires. By contrast, the writer of a European-style option is subject to exercise assignment only during the exercise period.

    vii.  More information about uncovered options sales is available in the section titled "Risks of Buying and Writing Options" in the "Characteristics and Risks of Standardized Options" This statement is not intended to enumerate all the risks entailed in writing uncovered options.

**7. RANDOM ALLOCATION DISCLOSURE**

The Account Holder understands that exercise assignment notices for options contracts are allocated among customer short options positions in accordance with a random allocation method and agrees to be bound by E*TRADE's allocation method. A more detailed description of E*TRADE's random allocation method is available on request.

**8. OTHER ACCOUNTS**

In accordance with applicable regulations and E*TRADE policies, options trading in Retirement Accounts or custodial accounts carry special provisions and may be limited at E*TRADE's discretion.

**9. OPTIONS AGREEMENT**

The Account Holder releases and agrees to indemnify and hold the E*TRADE Entities harmless from and against any Losses arising out of or relating to any action taken pursuant to this Options Supplement.

**10. MARGIN RETIREMENT ACCOUNTS**

    i.  Certain options transactions can be conducted only in a Margin Account. The use of margin to permit options transactions in Retirement Accounts presents certain risks that do not exist with similar transactions in other non-Retirement Margin Accounts. The Account Holder should consider that the Internal Revenue Code of 1986, as amended (the **"Code"**), places restrictions/limits on the amount of funds that can be deposited to Retirement Accounts and that deposits to Retirement Accounts in excess of such limits (such as to add Collateral to cover margin calls) may cause adverse tax consequences, including but not limited to forfeiture of tax advantages inherent in certain Retirement Accounts and/or the risk of penalties imposed by the Internal Revenue Service.

        a.  By requesting approval of margin for a Retirement Account, the Account Holder represents that they are familiar with the terms, conditions, and risks associated with options, including spreads, in Retirement Accounts and that they understand the potential tax consequences of the planned options activity.

        b.  The Account Holder understands that under Section 408(e)(4) of the Code, if the Account Holder pledges any part of their Retirement Account as security for a loan, the part pledged will be treated as a distribution to the Account Holder. The Account Holder hereby confirms that they have discussed the use of options spreads in a Retirement Account with their professional tax advisor, who has advised the Account Holder that the use of options, including spreads, in a Retirement Account will not result in a prohibited pledge of the assets and therefore will not result in a deemed distribution from the Retirement Account. The Account Holder also hereby confirms that they have consulted their professional tax advisor concerning whether engaging in anticipated options transactions in a Retirement Account could give rise to any prohibited transactions within the meaning of Section 4975(c)(1) of the Code or other Applicable Law and that the Account Holder's tax advisor has advised the Account Holder that engaging in the anticipated options transactions will not give rise to any prohibited transactions. The Account Holder assumes all responsibility for reviewing the terms of their options transactions in a Retirement Account and agrees not to implement options transactions, including spreads, that can result in Obligations in excess of the Retirement Account balance.

        c.  E*TRADE is not responsible for the dishonor of any transaction due to an insufficient balance in a Retirement Account and may not be able to transfer assets to a Retirement Account from a non-Retirement Account.

    ii.  The Account Holder agrees to indemnify and hold harmless the E*TRADE Indemnified Parties from and against any Losses arising directly or indirectly from the Account Holder's use of options in a Retirement Account.

**MARGIN ACCOUNT SUPPLEMENT**

    1.  **The Account Holder understands that when they trade on margin, they are borrowing money or securities from E*TRADE. The Account Holder understands that while trading on margin may present a greater opportunity for profit, it also presents a higher degree of risk and the possibility of greater Losses than in transactions where the Account Holder does not borrow money. The Account Holder agrees to carefully consider whether trading on margin is suitable in light of their financial resources, investment objectives, risk tolerance, and other relevant circumstances.**

    2.  A Margin Account allows the Account Holder, in accordance with all Applicable Law, to borrow money or securities from E*TRADE using acceptable securities or cash as collateral. While all Collateral is pledged as collateral to secure Obligations to E*TRADE, only certain securities, as specified by Applicable Law and/or determined by E*TRADE at its sole discretion, will constitute acceptable Collateral when calculating the Account Holder's margin requirement. The amount of Collateral required by E*TRADE in connection with a margin loan will be the greater of the amount required by Applicable Law or the amount required by E*TRADE at its sole discretion. E*TRADE reserves the right to refuse to extend credit or permit trading on margin at any time.

    3.  **Collateral**

        i.  **Security interest.** The Account Holder agrees that all Collateral (including Collateral held by the Account Holder at an E*TRADE Entity other than E*TRADE) will secure any Obligations the Account Holder has to E*TRADE in connection with activity in the Account. The Account Holder acknowledges that securities and/or other property will constitute Collateral even where such securities and/or other property have no margin value under Applicable Law or E*TRADE's policies.

        ii.  **No other liens.** All Collateral upon delivery to E*TRADE shall be free and clear of all prior liens, claims, and encumbrances (other than liens solely in favor of E*TRADE), and the Account Holder will not cause or allow any of the Collateral, whether now owned or hereafter acquired, to be or become subject to any liens, security interests, mortgages, or encumbrances of any nature other than security interests solely in E*TRADE's favor. Furthermore, Collateral consisting of securities and other property shall be delivered in Good Deliverable Form (or E*TRADE shall have the power to place such securities in Good Deliverable Form) in accordance with the requirements of the primary market or markets for such securities.

        iii.  **Perfection.** The Account Holder shall execute such documents and take such other actions as E*TRADE shall reasonably request to perfect E*TRADE's rights with respect to any such Collateral. The Account Holder shall pay the fees for any filing, registration, recording, or perfection of any security interest contemplated by this Customer Agreement and pay, or cause to be paid, from the Account(s) any and all taxes imposed on the Collateral by any authority. E*TRADE and the Account Holder each acknowledges and agrees that each Account maintained by E*TRADE to which any Collateral is credited is a "securities account" within the meaning of Article 8 of the Uniform Commercial Code, as in effect in the NYUCC, with respect to securities held in the Account and a "deposit account" within the meaning of Article 9 of the NYUCC with respect to cash deposited in or credited to the Account, and that all property and assets held in or credited from time to time to such an Account other than cash shall be treated as a "financial asset" for purposes of Article 8 of the NYUCC. E*TRADE

represents and warrants that it is a "securities intermediary" within the meaning of Article 8 of the NYUCC and is acting in such capacity with respect to each such Account it maintains.

    iv. **Effect of security interest.** E*TRADE's security interest in the Collateral shall (i) remain in full force and effect until the payment and performance in full of the Account Holder's Obligations under this Agreement; (ii) be binding on the Account Holder, its successors, and permitted assigns; and (iii) inure to the benefit of, and be enforceable by, E*TRADE and its respective successors, transferees, and assigns.

4. **Margin Requirements**

    i. E*TRADE will not extend credit to a Margin Account that does not have at least $2,000 ($25,000 in the case of Pattern Day Traders) in equity or such higher amount as E*TRADE or Applicable Law may require. Generally, E*TRADE may loan up to 50% of the value of common stock purchased in the Account, although the initial margin requirements for individual securities and transactions may differ according to Applicable Law and at E*TRADE's sole discretion. The Account Holder agrees that they will deposit sufficient funds into the Margin Account prior to settlement of any transaction effected in the Margin Account.

    ii. The Account Holder must maintain a minimum amount of equity in the Margin Account to collateralize all outstanding loans and Obligations. If the value of the Collateral in the Margin Account falls, or if the value of a security sold short increases, the Account Holder may be required to deposit more assets (a "margin call") into the Margin Account as additional Collateral. E*TRADE may require a maintenance margin of an amount and type that varies from the requirements of Applicable Law.

    iii. In the event the Account Holder fails to make a required deposit, E*TRADE may liquidate all or part of the Account Holder's securities and/or other property or buy-in any securities sold short—all without prior notice to the Account Holder.

    iv. E*TRADE generally imposes an initial and maintenance margin requirement of $1.50 per share for any security priced between $2.00 and $2.99 per share. The Account Holder is generally not permitted to use as Collateral any security priced below $2.00 per share. If the market value of a security drops below E*TRADE's per-share threshold, the margin maintenance requirement on the security will be 100%. E*TRADE's margin terms, policies, and procedures are subject to change without notice.

    v. Certain securities and/or other property may not serve as Collateral in the Margin Account. E*TRADE retains the right to refuse at any time to offer credit on certain securities due to concentration, price, market volatility, or other conditions. All margin loans are fully callable without notice.

5. **Short Sales**

    i. Short Sales in a Margin Account are subject to initial margin and margin maintenance requirements equal to the greater of the amount required by Applicable Law or the amount required by E*TRADE at its sole discretion.

    ii. E*TRADE generally applies an initial equity requirement for the Short Sale of an equity security equal to 150% of the sale proceeds of the security plus applicable fees and commissions. Different requirements may apply to non-equity securities. Applicable interest is charged on each short position open in the Account whether the position is held overnight or day traded. Positions opened and closed on the same day incur a minimum of one day's interest or, if settlement spans weekends or holidays, multiple days' interest.

    iii. If the Account Holder sells a security short, E*TRADE will borrow the security from a third party for delivery at settlement. If a borrowed security is recalled by the lender, E*TRADE will attempt to reborrow the security. If E*TRADE is unable to reborrow the security, E*TRADE may cover the Account Holder's short position by purchasing the security on the open market, at the then current market price, without notice to the Account Holder.

    iv. For E*TRADE's protection, E*TRADE, at its sole discretion and without notice, may immediately cover any short position in the Margin Account by purchasing securities to replace those it has sold short.

    v. The price of covering a short position may be higher than the price at which the Account Holder sold short; therefore, the Account Holder may sustain Losses on that transaction.

    vi. Short Sale proceeds are part of the Collateral securing E*TRADE's loan of the security to the Account Holder, and the Account Holder may not withdraw these proceeds from the Margin Account. The Account Holder is liable for all dividends paid on securities they have sold short.

    vii. When E*TRADE borrows securities for the Account Holder's Account, E*TRADE is generally obligated to return the securities to the lender on demand. If the Account Holder is unable to cover a short position (either through delivery of the security or through E*TRADE's buying-in the Account Holder's position) in enough time for E*TRADE to deliver the security to the lender, the Account Holder agrees to pay E*TRADE for any Losses it sustains as a result of the failure to deliver. For instance, if the Account Holder has a short position in a security that is subject to a tender offer and the Account Holder is unable to cover the position in time for E*TRADE to deliver the security to the lender, E*TRADE may hold the Account Holder responsible for the economic value of the tender offer.

6. **Collateral; Liquidations and Covering Positions**

    i. E*TRADE may issue a margin call for any of the following reasons:

        a. the value of the Account's equity falls or if the initial equity requirement is raised;
        b. the value of any security sold short in the Account rises;
        c. the Account Holder fails to promptly meet any call for additional Collateral;
        d. the Account Holder indicates to E*TRADE that they do not intend to meet a call for additional Collateral;
        e. the Account Holder files a petition for bankruptcy or such a petition is filed against the Account Holder;
        f. the Account Holder seeks or acquiesces to the appointment of a receiver;
        g. an attachment is levied against any account in which the Account Holder has an interest;
        h. the Margin Account is closed;
        i. the Account Holder dies; or
        j. any other circumstances that in E*TRADE's opinion warrant such actions.

    ii. Margin calls require prompt delivery to E*TRADE of either additional funds or acceptable securities. E*TRADE retains absolute discretion in determining whether, when, and in what amounts it will require additional Collateral. E*TRADE is not obligated to notify the Account Holder when a margin call is due and can liquidate positions or buy-in any security to cover positions at any time without demand for additional funds, even if the Account Holder has notified E*TRADE that they will be providing additional Collateral. E*TRADE can liquidate any and all securities and/or other property in the Account, whether individually or jointly with others. E*TRADE can buy and sell securities and/or other property that may be short in such Accounts or cancel any open orders. E*TRADE may, at its sole discretion, choose which securities and/or other property to buy or sell, which transactions to close, and the sequence and timing of such transactions.

If E*TRADE elects to sell any Collateral, buy-in any property, or cancel any orders, such sale, purchase, or cancelation may be made on the exchange or other market where such business is then usually transacted, or at public auction or private sale, without advertising the same and without any notice to the Account Holder of the time or place of the sale, and without prior tender, demand, or call of any kind upon the Account Holder. E*TRADE may purchase or sell the property to or from E*TRADE or third parties in whole or in any part thereof free from any right of redemption, and the Account Holder shall remain liable for any deficiency. Any prior demand or prior course of conduct, dealings, or notice will not be deemed a waiver of E*TRADE's right to take these actions.

**The Account Holder understands that their financial exposure could exceed the value of assets in the Account, and in all cases the Account Holder will remain liable for any Losses in the Account, payable on demand.**

    iii. Interest will accrue on any Debit Balance at prevailing margin rates until paid in full. The Account Holder agrees to reimburse E*TRADE for all reasonable costs and expenses incurred in the collection of any debts, including but not limited to attorney fees.

7. **Loan or Pledge of Securities**

    i. The Account Holder authorizes E*TRADE to lend either to itself or to others any Collateral to the extent permitted by Applicable Law. The Account Holder understands that, within the limitations imposed by Applicable Law, all Collateral may be pledged and repledged and hypothecated and rehypothecated or otherwise used by E*TRADE, with all the attendant rights of ownership (including the right to vote the securities), for the sum due to E*TRADE or for a greater sum and for a period of time longer than the Obligations to which such Collateral was pledged by the Account Holder and without E*TRADE's retaining in its possession and control a like amount of similar Collateral. In the event that E*TRADE pledges, repledges, hypothecates, or rehypothecates any Collateral, E*TRADE may receive and retain certain benefits to which the Account Holder will not be entitled. Any dividend, interest payment, or other distribution paid to the Account Holder with respect to such Collateral will be a payment in lieu of the dividend (also known as a "substitute payment") and credited to the Account. Payments in lieu of dividends are reported as ordinary income, which would cause Account Holders with taxable Accounts to lose the benefit of preferential tax rates on qualified dividend income under US tax laws.

The Account Holder understands that E*TRADE does not offer tax advice and that the Account Holder will consult his tax advisor as necessary. In certain circumstances, the Account Holder may not be able to exercise voting rights of the securities that are lent by the Account Holder or which have been pledged, borrowed, hypothecated, or rehypothecated by E*TRADE. For the purposes of the return of any Collateral to the Account Holder, E*TRADE's return obligations shall be satisfied by delivering securities and/or other property of the same issuer, class, and quantity as the Collateral initially transferred. Any such pledge, repledge, hypothecation, or rehypothecation of any Collateral can occur without the Account

Holder's being notified, either separately or together with other securities and/or other property of other customers of E*TRADE, for any amount due E*TRADE in any Account in which the Account Holder has an interest.

8. **Disclosure of Credit Terms**

   i. The Account Holder will be charged interest on a daily basis on all credit extended to the Account Holder. Margin interest is calculated by multiplying the average daily Debit Balance by the daily margin interest rate described in (iv) below. The Account Holder's average daily Debit Balance is the sum of the daily Settlement Date Debit Balances in the Account during the calculation period divided by the number of days in such calculation period. All interest charges are calculated on a 360-day basis using Settlement Date balances. The Account Holder understands that the use of a 360-day year results in a higher effective rate of interest than if a 365-day year were used.

   ii. The Account Holder's daily Debit Balance is calculated by adjusting the Account Holder's previous day's Debit Balance by the debits and credits associated with the Account for the current day. The Account Holder's daily Debit Balance is further adjusted on a weekly basis by any change in the value of any short positions ("mark-to-market") for the preceding week. Any increase in the market value of short securities is treated as a debit and is added to the Debit Balance. Dividends and interest are credited to the Account and are considered part of a Cash Balance when calculating interest (unless the Account Holder has a different Sweep Option, in which case dividends and interest are credited to such Sweep Option account). If the Account Holder's daily Debit Balance is reduced because a check or other item provided by the Account Holder is later returned to E*TRADE unpaid, E*TRADE may adjust the Account to reflect interest charges the Account Holder may have incurred.

   iii. Margin interest charges are generally posted to the Account on the last Business Day of each month. If the Account has a Debit Balance, Settlement Date Debit Balances and Cash Balances in the Cash Account are applied to the Account balance for calculation purposes. The Account Holder understands that margin interest will accrue to the Account each day. E*TRADE will include accrued interest charges in the following day's opening Debit Balance and will charge interest on such amounts accordingly. The margin interest rates described in (iv) below do not reflect compounding of unpaid interest charges; the effective margin interest rate, taking into account such compounding, will be higher.

   iv. Current margin interest rates can be found at etrade.com/marginrates and are also available by calling Customer Service at 800-ETRADE-1 (800-387-2331) for domestic callers or +1 678 624 6210 for international callers. The stated interest rate is subject to change without notice during each period in accordance with fluctuations in the Account Holder's average daily Debit Balance and changes to the base rate that are attributable to a change in the federal funds rate; additional information regarding the base rates charged by E*TRADE is available at the website referenced above. E*TRADE will provide the Account Holder with at least 30 days' prior written notice before changing the Account Holder's stated interest rate for any other reason.

   v. The Account Holder, prior to exercising their margin privileges, acknowledges that they have carefully considered their financial condition, investment objectives, and tolerance for risk, along with the provisions of this Customer Agreement, the Relationship Summary, and the information in the FINRA Margin Disclosure Statement provided by E*TRADE. Based on that review, the Account Holder found their particular situation to be appropriate for trading on margin.

**COMMODITY FUTURES SUPPLEMENT**

**1. INTRODUCTION**

This section supplements the Customer Agreement and sets forth additional terms and conditions that govern any Account for the purchase or sale of Commodity Interests (as defined below). Except as specifically supplemented herein, all terms and conditions of the Customer Agreement remain unchanged and in full force and effect and wherever the Customer Agreement refers to "Securities or Equities," it shall equally apply to Commodity Interests as appropriate. Furthermore, in the event of a conflict between the terms of this Supplement and the terms of the Customer Agreement with respect to the subject matter hereof, the terms of this Supplement shall control.

**2. DEFINITIONS**

Terms not otherwise defined herein have the meaning set forth in the Customer Agreement. References herein to E*TRADE shall refer to E*TRADE Futures LLC. The terms set forth below have the following meanings.

**"CFTC"** shall mean the Commodity Futures Trading Commission of the United States of America and any successor thereto.

**"Commodity Exchange Act"** shall mean the Commodity Exchange Act of 1936, as amended, or any successor federal statute, and the rules and regulations thereunder, all as the same shall be in effect at the time.

**"Commodity Interest"** shall mean physical commodities, commodities futures, options on commodities and commodities futures, forwards, single-stock futures and other security futures, spot foreign exchange, foreign exchange forward contracts, options on foreign exchange, exchange for physicals, and any other similar derivative instrument.

**"DSRO"** shall mean E*TRADE's designated self-regulatory organization.

**"EFP"** shall mean exchange for physical.

**"FCM"** shall mean a futures commission merchant.

**"IB"** shall mean introducing broker.

**"NFA"** shall mean the National Futures Association (and any successor thereto).

**"SSF"** shall mean single-stock futures.

**3. RISK DISCLOSURE**

TRADING CONTRACTS IN COMMODITY INTERESTS IS HIGHLY SPECULATIVE. CERTAIN COMMODITY INTERESTS MAY TRADE OR SETTLE BELOW ZERO OR AT NEGATIVE PRICING, AND TRADING IN COMMODITY INTERESTS IS SUITABLE ONLY FOR THOSE CUSTOMERS WHO UNDERSTAND AND ARE WILLING TO ASSUME THE ECONOMIC, LEGAL, AND OTHER RISKS INVOLVED AND ARE FINANCIALLY ABLE TO ASSUME LOSSES SIGNIFICANTLY EXCEEDING THE VALUE OF ANY MARGINS OR DEPOSITS. THE LOW MARGIN DEPOSITS ASSOCIATED WITH VOLATILE PRICE MOVEMENTS IN THE MARKET FOR COMMODITY INTERESTS CAN RESULT IN RAPID AND SUBSTANTIAL LOSSES. YOU MAY SUSTAIN A TOTAL LOSS OF FUNDS THAT YOU DEPOSIT WITH E*TRADE TO ESTABLISH OR MAINTAIN A POSITION IN THE COMMODITY INTERESTS MARKET, AND YOU MAY INCUR LOSSES BEYOND THESE AMOUNTS. IF THE MARKET MOVES AGAINST YOUR POSITION, YOU MAY BE CALLED UPON BY E*TRADE TO DEPOSIT A SUBSTANTIAL AMOUNT OF ADDITIONAL MARGIN FUNDS ON SHORT NOTICE IN ORDER TO MAINTAIN YOUR POSITION. IF YOU DO NOT PROVIDE THE REQUIRED FUNDS WITHIN THE TIME REQUIRED BY E*TRADE, YOUR POSITION MAY BE LIQUIDATED AT A LOSS, AND YOU WILL BE LIABLE FOR ANY RESULTING DEFICIT IN YOUR ACCOUNT. NO ONE (INCLUDING ANY FCM, IB, ASSOCIATED PERSON, AUTHORIZED AGENT, FUND MANAGER, OR COMMODITY POOL OPERATOR) CAN GUARANTEE PROFITS OR THE ABSENCE OF ANY LOSSES.

**4. TRADING**

   i. **Use of the services of other FCMs and broker-dealers.** For any service provided by E*TRADE hereunder, E*TRADE may provide such service directly or use the services of a third party, including establishing an omnibus clearing arrangement with another FCM or using a third party that is a member of any contract market or exchange of which E*TRADE is not a member. E*TRADE is authorized to make arrangements with any such third party without further authorization from the Account Holder.

   ii. **Execution and clearing.** E*TRADE is authorized to execute any order and clear any purchase, sale, and delivery of the underlying Commodity Interest on any recognized contract market as E*TRADE deems appropriate, except where instructed otherwise in writing by the Account Holder. All orders accepted by E*TRADE for handling are, at all times, subject to prevailing market conditions. In addition, in the case of market orders, certain order routers and exchanges may process or match orders through conversion to marketable limit orders for order protection, order matching, and other purposes. Accordingly, E*TRADE does not guarantee that any particular order will be filled and, in the case of a market order, E*TRADE does not guarantee that the order will be filled at a particular price, within a particular timeframe, or at all.

   iii. **Give-ups.** Except as otherwise agreed to in writing, E*TRADE may, at its sole discretion, but shall have no obligation to, accept for clearance or settlement from any other broker any contract for a Commodity Interest executed by such broker for the Account Holder. Where E*TRADE accepts such contract, the Account Holder authorizes E*TRADE to pay and debit the Account any give-up or clearing fee that may be charged by any exchange or clearinghouse or by any executing firm or broker whom the Account Holder or its Authorized Agent has authorized for execution in the Account Holder's Account.

   iv. **Positions**

   a. The Account Holder agrees to comply with all trading and position limits established by Applicable Law and acknowledges and agrees that E*TRADE, at its sole discretion, may establish trading and position limits that are more restrictive than those required by Applicable Law and may limit the number of open positions in any Account. The Account Holder agrees: (1) not to place any order which, if executed, would have the effect of exceeding any such position limit; (2) that E*TRADE may require at any time that the Account Holder reduce any open positions; and (3) that E*TRADE may refuse to accept any order, establish any new position, or modify any existing order in accordance

with such trading or position limits. The Account Holder further agrees to promptly notify E*TRADE if they are required to file position reports with any regulatory organization, DSRO, or any exchange and agrees to furnish E*TRADE with copies of any such report.

    b.  The Account Holder acknowledges that approval for hedge margins does not exempt any Account from any speculative position limits. To be exempt from speculative position limits requires application and approval of a hedge exemption from the CFTC and the respective exchange on which the Commodity Interest is traded.

    c.  If the Account Holder maintains separate accounts in which, pursuant to CFTC Regulation 1.46, offsetting positions are not closed out, E*TRADE hereby advises the Account Holder that any offsetting long and short hedge position held open in separate accounts may result in the Account Holder's being charged additional fees and commissions and the payment of additional margin, even though such offsetting positions result in no additional market gain or loss.

v. **Cross transactions.** To comply with Applicable Law regarding cross trade procedures and the execution of trades in which a floor broker or brokerage firm may be directly or indirectly involved as a principal, the Account Holder agrees to E*TRADE's execution of any order against which E*TRADE Entities and/or E*TRADE Indemnified Parties may directly or indirectly become the opposite party, without prior notice, provided that any such execution is made in accordance with Applicable Law or regulation. This consent shall remain in effect until the Account Holder delivers written notice to E*TRADE revoking such consent.

vi. **Deliveries and delivery month liquidation instructions.** The Account Holder is responsible for providing to E*TRADE within a reasonable time appropriate liquidating instructions, funds, or documents relating to any open position maturing in a delivery month but no later than (1) in the case of a long position, five Business Days prior to the First Notice Day or expiration, whichever occurs first, and (2) in the case of a short position, five Business Days prior to the last trading day or expiration, whichever occurs first. As a general matter, E*TRADE does not permit physical delivery of commodities or digital assets and expressly prohibits physical delivery on any contract held to maturity. At E*TRADE's sole discretion, Account Holders may be prohibited from holding contracts to maturity or settlement and Account Holders may be prohibited from trading to the nearest expiration date for a Commodity Interest contract (also referred to as front, near, or spot month trading), the result of which may result in forced liquidation of Account Holder's position or account. If the Account Holder fails to provide timely instructions, funds, or documents, E*TRADE may, without notice, liquidate or cover any open position, make or receive delivery on behalf of the Account Holder on such terms and by such methods that E*TRADE deems proper at its sole discretion, or undertake any other action permitted pursuant to Section 6, "Representations and Warranties," below, as appropriate, including at a loss to Account Holder and such actions may be subject to fees to be paid by Account Holder. In the event the Account Holder fails to deliver to E*TRADE any physical commodity sold short in compliance with Applicable Law, or where E*TRADE deems it necessary to replace any physical commodity previously delivered to it for the Account with another physical commodity of like kind or amount, the Account Holder designates E*TRADE as its agent to borrow or buy and deliver the same.

vii. **Exercise and assignment of commodity options.** Although certain exchanges and clearinghouses automatically exercise some "in-the-money" options, the Account Holder is solely responsible for taking action to exercise or prevent the exercise of any options contract and agrees to instruct E*TRADE as to the exercise or other disposition of any options contract. E*TRADE is not required to take any action with respect to any option, including any action to exercise a valuable option before its expiration date or to prevent the automatic exercise of any option. The Account Holder understands that: (1) the Account Holder is responsible at all times to notify E*TRADE of their intent to exercise an option no later than 3:15 p.m. Chicago time on the Business Day prior to the last day of trading for that option; (2) E*TRADE's date and time for the tendering of exercise instructions may be earlier than those set by any exchange, board of trade, market, or clearinghouse; and (3) failure to provide E*TRADE with any instruction may constitute an abandonment of the option, and the Account Holder's option may become worthless in the event that they do not deliver instructions prior to E*TRADE's established expiration times. All short options positions are subject to assignment at any time, including positions established on the same day that exercises are assigned. Exercise and assignment notices are allocated randomly among all short options positions subject to exercise. If the Account Holder fails to timely provide E*TRADE with any required instruction, E*TRADE is authorized, at its sole discretion, to exercise or liquidate all or any portion of the option for the Account and at the Account Holder's

Continue....

---

Investment Products: • Not FDIC Insured   • No Bank Guarantee   • May Lose Value

**PLEASE READ THE IMPORTANT DISCLOSURES BELOW**

Securities products and services offered by E*TRADE Securities LLC, Member FINRA/SIPC. Investment advisory services are offered through E*TRADE Capital Management, LLC, a Registered Investment Adviser. Commodity futures and options on futures products and services offered by E*TRADE Futures LLC, Member NFA. Banking products and services are offered by E*TRADE Bank, a federal savings bank, Member FDIC, or its subsidiaries. E*TRADE Securities LLC, E*TRADE Capital Management LLC, E*TRADE Futures LLC, and E*TRADE Bank are separate but affiliated companies.

**System response and account access times may vary due to a variety of factors, including trading volumes, market conditions, system performance, and other factors.**

Statement of Financial Condition   |   About Asset Protection   |   Customer Account Agreements   |   Quarterly 606 Report   |   Business Continuity Plan   |   About Our Ads

© 2020 E*TRADE Financial Corporation. All rights reserved. Version 1.0. 32w401m5.3

⚡Screen Share ⓘ

**E✳TRADE**

---

**5. MARGIN AND SECURITY**

i.  **Margin and deposit requirements.** The Account Holder agrees to provide to and maintain with E*TRADE Collateral in such amount and in such form as E*TRADE may from time to time require, at its sole discretion. The margin requirements of E*TRADE may exceed margins established by Applicable Law. E*TRADE may change margin requirements at any time without prior notice and call for additional Collateral, including without limitation on an intraday basis. The Account Holder agrees to immediately forward sufficient Collateral to cure any margin deficiency and deposit additional Collateral when and as required by E*TRADE. The Account Holder agrees to promptly meet all margin calls or cure any margin deficiency in any manner as E*TRADE designates, at its sole discretion, including by immediate wire transfer. The Account Holder is solely responsible for monitoring the Account to ensure that the Collateral is sufficient at all times without waiting for notice or a call for margin. Any deposits or funds remitted to E*TRADE are deemed made or received only when cleared funds are actually received by E*TRADE. The Account Holder agrees that E*TRADE may, at any time and without first calling for additional margin, take action to reduce or eliminate any margin deficiency by liquidating positions in the Account without prior notice to the Account Holder. The Account Holder acknowledges that E*TRADE may liquidate any position, all positions, or the Account Holder's account with or without notice due to market risks identified solely by E*TRADE and may result in losses to be borne solely by Account Holder.

ii. **Rehypothecation and transfer of collateral.** Subject to the segregation requirements of the Commodity Exchange Act, the Account Holder grants to E*TRADE the right to pledge, repledge, hypothecate, rehypothecate, sell or purchase, invest or loan, either separately or with the property of other customers, any Collateral credited to the Account or held by E*TRADE to any exchange or clearinghouse through which the Account Holder's trades are executed. To the extent permitted under Applicable Law, E*TRADE may, without prior notice to the Account Holder, use, credit, apply, or transfer any Collateral interchangeably between any Account in which the Account Holder has an interest to any other account in which the Account Holder has an interest, regardless of whether there are other Account Holders on either account, and may transfer Collateral between any sub-accounts of the Account. In addition, the Account Holder hereby consents to the transfer by E*TRADE of Collateral from the Account to any securities account carried by E*TRADE Securities LLC in which the Account Holder has an interest, whether or not such transfer is necessary to satisfy a margin call in such account carried by E*TRADE Securities LLC. E*TRADE will confirm such application or transfer within a reasonable time. Any transfers of Collateral from this Account to a securities account carried by E*TRADE Securities LLC will be noted on the Account statement.

iii. The Account Holder unconditionally and irrevocably guarantees full and prompt payment to E*TRADE Futures of all sums owed to E*TRADE Futures by the Account Holder, whether such sums are now existing or are hereafter created. The Account Holder waives any notice of default or dishonor of presentment of payment, notice of nonpayment protest, or any other notice and agrees that E*TRADE Futures has no obligation at any time to resort

payment from the Account Holder or from any other person, firm, or corporation liable for the guaranteed debt before proceeding on this provision. The Account Holder agrees to pay all reasonable attorney fees and court costs, if any, incurred by E*TRADE Securities or E*TRADE Futures in connection with the endorsement of this provision. All monies, securities, negotiable instruments, open positions on futures contracts, options premiums, commodities, or other property belonging to the Account Holder now or at any future time that are on deposit with E*TRADE Futures, for any purpose, are hereby pledged to E*TRADE Futures for discharge of all of the Account Holder's Obligations hereunder, and E*TRADE Futures may, at its sole discretion, transfer to E*TRADE Futures any of such property from any of the Account Holder's Accounts, whether held by E*TRADE Futures, or any affiliate or otherwise, to offset and credit against any of the Account Holder's Obligations to E*TRADE Futures under this provision.

E*TRADE Securities may also invest and reinvest any funds deposited by the Account Holder, subject to applicable segregation requirements, and E*TRADE is under no obligation to pay the Account Holder any interest on cash balances or income or to provide any other benefit derived from the investment of Collateral.

## 6. REPRESENTATIONS AND WARRANTIES

i.   **Customer representations and warranties.** The Account Holder represents and warrants to E*TRADE:

   a.   that the Account Holder (1) is not a Commodity Pool Operator ("**CPO**") or a Commodity Trading Advisor ("**CTA**") and is acting solely as principal and that no one other than the Account Holder has an interest in the Account or (2) is a properly registered CPO or CTA or (3) is otherwise exempt from registration under CFTC rules and if exempt, Account Holder has properly registered their exemption; and

   b.   if the Account has been designated a "hedge account," and unless the Account Holder notifies E*TRADE to the contrary at the time they place an order with E*TRADE, the Account Holder represents that each such order is a bona fide hedging transaction as defined by Applicable Law.

## 7. DISPUTE RESOLUTION

i.   **Jurisdiction, venue, and waiver of jury trial.** The Account Holder agrees that as of the time of their acknowledgment of this Customer Agreement, the Account Holder is making any affirmative election or hereby submitting, prior to the time a claim or grievance has arisen, to have any and all controversies or claims arising out of or relating to the Account established pursuant to this Commodities Futures Supplement settled by arbitration. The Account Holder nevertheless reserves the right to express their preference to resolve any such dispute or controversy by arbitration at such time as it may arise.

   In the event the Account Holder and E*TRADE elect not to pursue resolution of any such dispute or controversy by arbitration, ANY CONTROVERSY BETWEEN THE ACCOUNT HOLDER AND E*TRADE ARISING OUT OF OR RELATING TO THE ACCOUNT ESTABLISHED PURSUANT TO THIS COMMODITIES FUTURES SUPPLEMENT, REGARDLESS OF THE MANNER OF RESOLUTION, SHALL BE ARBITRATED, LITIGATED (TRIED IN A COURT OF LAW), OR OTHERWISE RESOLVED BY A TRIBUNAL LOCATED IN THE SOUTHERN DISTRICT OF NEW YORK, NEW YORK. IN ADDITION, THE ACCOUNT HOLDER HEREBY WAIVES TRIAL BY JURY IN ANY SUCH ACTION OR PROCEEDING.

The Account Holder agrees to pay all expenses, including attorney fees, incurred by E*TRADE: (1) to defend against any unsuccessful claim the Account Holder brings against E*TRADE or any E*TRADE Affiliates or (2) to collect any debit balances in the Account Holder's Account(s) held for the Account Holder (individually or jointly) by E*TRADE or any E*TRADE Entity. No legal or administrative action arising out of this Customer Agreement with respect to any controversy or claim arising out of an Account opened subject to the terms of this Commodities Futures Supplement may be commenced by anyone more than one year after any claim arises. The Account Holder hereby expressly reacknowledges that this Customer Agreement is made in the State of New York and, further, hereby submits and consents to jurisdiction in the courts of the State of New York (federal and state) and shall be amenable to service of summons and other legal process of, and emanating from, the State of New York.

ii. **Agreement to shorten statutes of limitations.** In the event any claim or controversy arising out of or relating to the Account is agreed by the Account Holder and E*TRADE not to be settled by arbitration, the Account Holder and E*TRADE thereby agree that no action in law, equity, arbitration, or administrative proceeding arising out of this Commodities Futures Supplement, any transactions effected pursuant to this Commodities Futures Supplement, or the relationship between the Account Holder and E*TRADE may be commenced more than one year after the aggrieved party knew or should have known that a cause of action existed. The Account Holder acknowledges that they are expressly agreeing to waive the two-year statute of limitations provided by the Commodity Exchange Act, including the two-year time period for commencing a Commodity Futures Trading Exchange reparation proceeding, and any and all other applicable statutes of limitations exceeding one year, including but not limited to any statutory or common-law state or federal statutes of limitation, the statute of limitation provided by the National Futures Association for commencing an arbitration action, and the statute of limitations for initiating arbitration actions before contract markets. The Account Holder understands that their agreement with this paragraph is not necessary to open an Account with E*TRADE pursuant to this Commodities Futures Supplement.

iii. **Arbitration**

a. **THE FOLLOWING ARBITRATION PROVISION IS OPTIONAL, AND ANY ELECTION FOR DISPUTE RESOLUTION IN CONNECTION WITH THIS SECTION 7(iii) OF THE COMMODITIES FUTURES SUPPLEMENT IS NEITHER A CONDITION OF THE ACCOUNT HOLDER'S ACCOUNT APPLICATION NOR DO ITS TERMS REQUIRE AGREEMENT AT THE TIME OF THE ACCOUNT HOLDER'S CONSENT TO THE CUSTOMER AGREEMENT. THE PROVISIONS AND TERMS SET FORTH HEREIN ARE PROVIDED FOR THE ACCOUNT HOLDER'S CAREFUL REVIEW AND CONSIDERATION PRIOR TO MAKING ANY ELECTION WITH RESPECT TO THEIR DISPUTE RESOLUTION FORUM IF AND WHEN ANY SUCH DISPUTE MAY ARISE IN CONNECTION WITH OR ARISING OUT OF THE ACCOUNT OR ANY TRANSACTION EFFECTED PURSUANT TO THE ACCOUNT ESTABLISHED UNDER THIS COMMODITIES FUTURES SUPPLEMENT.**

If the Account Holder elects to have the dispute resolved by an arbitrator or otherwise pursuant to the terms of this Section 7(iii), the following terms shall apply:

b. Any controversy or claim arising out of or relating to the Account Holder's futures Account against E*TRADE or any other E*TRADE Entities, including any dispute regarding the scope and applicability of this Section 7, shall be settled by arbitration either (1) on the contract market on which the disputed transaction was executed or could have been executed or (2) by the National Futures Association. Any award rendered

thereon by the arbitrators shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered in any court of competent jurisdiction. Notification of the Account Holder's intent to arbitrate must be sent by certified mail to:

E*TRADE Financial Corporation
Attention: General Counsel
671 North Glebe Road
Arlington, VA 22203

Send an email copy to *vendor.notice@etrade.com.*

At such time as the Account Holder may notify E*TRADE that they intend to submit a claim to arbitration, or at such time as E*TRADE notifies the Account Holder of its intent to submit a claim to arbitration, the Account Holder will have the opportunity to elect a qualified forum for conducting the proceeding from a list that E*TRADE will provide to the Account Holder within 10 Business Days of receipt of such notice. If the Account Holder fails to make a selection within 45 calendar days of receipt of such list, E*TRADE has the right to make a selection from the list. E*TRADE acknowledges that it will be required to pay any incremental fees that may be assessed by a qualified forum for the provision of a mixed panel, unless the arbitrators determine that the Account Holder has acted in bad faith in initiating or conducting that proceeding.

THREE FORUMS EXIST FOR THE RESOLUTION OF COMMODITY DISPUTES: CIVIL COURT LITIGATION, REPARATIONS AT THE CFTC, AND ARBITRATION CONDUCTED BY A SELF-REGULATORY OR OTHER PRIVATE ORGANIZATION. THE CFTC RECOGNIZES THAT THE OPPORTUNITY TO SETTLE DISPUTES BY ARBITRATION MAY IN SOME CASES PROVIDE MANY BENEFITS TO CUSTOMERS, INCLUDING THE ABILITY TO OBTAIN AN EXPEDITIOUS AND FINAL RESOLUTION OF DISPUTES WITHOUT INCURRING SUBSTANTIAL COSTS. THE CFTC REQUIRES, HOWEVER, THAT EACH CUSTOMER INDIVIDUALLY EXAMINE THE RELATIVE MERITS OF ARBITRATION AND THAT AN ACCOUNT HOLDER'S CONSENT TO THIS ARBITRATION PROVISION BE VOLUNTARY.

THE ACCOUNT HOLDER AGREES AND UNDERSTANDS THAT THEY: (1) MAY BE WAIVING THEIR RIGHT TO SUE IN A COURT OF LAW AND (2) ARE AGREEING TO BE BOUND BY ARBITRATION OF ANY CLAIMS OR COUNTERCLAIMS THAT THEY OR E*TRADE MAY SUBMIT TO ARBITRATION UNDER THIS AGREEMENT. THE ACCOUNT HOLDER IS NOT, HOWEVER, WAIVING THEIR RIGHT TO ELECT INSTEAD TO PETITION THE CFTC TO INSTITUTE REPARATIONS PROCEEDINGS UNDER SECTION 14 OF THE COMMODITY EXCHANGE ACT WITH RESPECT TO ANY DISPUTE THAT MAY BE ARBITRATED PURSUANT TO THIS AGREEMENT. IN THE EVENT THAT A DISPUTE ARISES, THE ACCOUNT HOLDER WILL BE NOTIFIED IF E*TRADE INTENDS TO SUBMIT THE DISPUTE TO ARBITRATION. IF THE ACCOUNT HOLDER BELIEVES THAT A VIOLATION OF THE COMMODITY EXCHANGE ACT IS INVOLVED AND THEY PREFER TO REQUEST A SECTION 14 "REPARATIONS" PROCEEDING BEFORE THE CFTC, THEY WILL HAVE 45 DAYS FROM THE DATE OF SUCH NOTICE IN WHICH TO MAKE THAT ELECTION.

THE ACCOUNT HOLDER AGREES AND UNDERSTANDS THAT THEY NEED NOT CONSENT TO THIS

ARBITRATION PROVISION TO OPEN OR MAINTAIN AN ACCOUNT WITH E*TRADE.

0420-PCUSTAGR-B66501

<< Back

Connect with us

| About Us + | Service + | Quick Links + |

📞 800-387-2331

📍 Find a Branch

Check the background of E*TRADE Securities LLC on FINRA's BrokerCheck.

| Investment Products: • Not FDIC Insured • No Bank Guarantee • May Lose Value |

## PLEASE READ THE IMPORTANT DISCLOSURES BELOW.

Securities products and services offered by E*TRADE Securities LLC. Member **FINRA/SIPC**. Investment advisory services offered by E*TRADE Capital Management, LLC, a Registered Investment Adviser. Commodity futures and options on futures products and services offered by E*TRADE Futures LLC, Member **NFA**. Bank products and services offered by E*TRADE Bank and E*TRADE Savings Bank, both federal savings banks and **Members FDIC**. Stock plan administration solutions and services offered by E*TRADE Financial Corporate Services, Inc. All separate but affiliated subsidiaries of E*TRADE Financial Corporation.

**Securities, investment advisory, commodity futures, options on futures and other non-deposit investment products and services are not insured by the FDIC, are not deposits or obligations of, or guaranteed by, E\*TRADE Bank or E\*TRADE Savings Bank, and are subject to investment risk, including possible loss of the principal amount invested.**

**System response and account access times may vary due to a variety of factors, including trading volumes, market conditions, system performance, and other factors.**

Statement of Financial Condition | About Asset Protection | Customer Account Agreements | Quarterly 606 Report | Business Continuity Plan

©2020 E\*TRADE Financial Corporation. All rights reserved. **E\*TRADE Copyright Policy**





40w301m5.3

↖ **Screen Share** ⊘



# Updates to the E*TRADE Customer Agreement

Pursuant to the terms of the E*TRADE Customer Agreement (the "Agreement"), E*TRADE Securities LLC ("E*TRADE") reserves the right to amend or modify the Agreement at any time or from time to time in accordance with the terms of the Agreement and applicable law. This letter is intended to inform you of recent changes to this Agreement. Any amendment of the Agreement will be effective as of the designated effective date. By continuing to maintain an E*TRADE account, you are accepting the terms of the Agreement as amended and will be legally bound by such amended terms and conditions.

**E*TRADE is making changes to the Agreement, effective as of June 30, 2020, some of which are summarized below. Please note that the defined terms below shall have the same meaning as in the Agreement.**

Introduction: Addresses the account termination process.

Definitions: Defines new terms and clarifies existing terms.

General Account Terms – Fees and Commissions: Addresses the fee schedule.

Custodial Accounts: Addresses accounts opened under the Uniform Gifts to Minors Act (UGMA) or the Uniform Transfers to Minors Act (UTMA).

E*TRADE Brokerage Services: Defines Recommendation and states that the Account Holder is ultimately responsible for making investment decisions for the Account, and E*TRADE also does not provide account monitoring as part of the Service.

Sweep Programs: Addresses Sweep Products.

"Clearly Erroneous" provision: Updates terminology to "Obvious Error" and addresses E*TRADE's role and obligations with respect to requests to busting and adjusting trades.

Notice and Other Communications: Includes information on the E*TRADE Financial Corporation's Privacy Statement, which is posted on *etrade.com*.

Fraud-related Alerts: Adds language regarding the fraud alerts program.

Mutual Funds: Addresses the mutual fund offering.

Order Types: Addresses limit orders and the use of "firm" price quotes.

Transactions in Over-the-Counter ("OTC") Securities: Addresses current displays of interest and last sale, and addresses the different trading rules and systems applicable to OTC equity trading.

Order Routing Practices: Adds language regarding the Retail Order Priority Programs of certain exchanges.

Reorganizations and Corporate Actions: Adds language stating that some corporate actions may be subject to court review.

Market Data: Adds language stating that E*TRADE does not endorse or adopt third-party content provided to the Account Holder as part of the Service.

Third-Party Websites and Content Providers: Removes references that were duplicative.

Investment Professional Designations: Describes Investment Professional Designations and notes that compliance responsibilities for certain designations reside with the individual and not E*TRADE.

Options: Addresses treatment of short positions resulting from options assignments and exercises.

Margin: Addresses interest fees associated with short sales.

Commodity Futures: Addresses the Risk Disclosure and trading in Commodity Interests.

The E*TRADE Financial family of companies provides financial services including trading, investing, and banking products and services to retail customers.

E*TRADE Securities, Member FINRA/SIPC.

© 2020 E*TRADE Financial Corporation. All rights reserved.